UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

APRIL KRUEGER

Plaintiff,

v.

WYETH, INC., *et al,*

Defendants.

Civil No. 03CV2496 JAH (AJB)

**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

**INTRODUCTION**

The underlying complaint was filed in this district on December 12, 2003. On March 20, 2004, the Judicial Panel on Multidistrict Litigation transferred this case to the Eastern District of Arkansas for coordinated pretrial proceedings. After that court declined to certify a multi-state class of consumers alleging consumer fraud and seeking medical monitoring for any future injuries that arise from their use of Prempro, it remanded plaintiff's case to this district.

Plaintiff previously filed a motion for class certification in this district on May 14, 2007. In that motion, plaintiff sought to certify a class defined as :

> All California consumers who purchased Wyeth's Hormone Replacement Therapy products, Premarin, Prempro, and/or Premphase, between January 1995 and January 2003.

The Honorable Janis L. Sammartino found the class definition included consumers who suffered personal injuries. Because plaintiff has not suffered personal injuries and does not seek to pursue

personal injuries damages claims, the Court found plaintiff could not satisfy the adequacy requirement of F.R.C.P. 23(a)(4). Doc. 44 at 5-6. However, the Court stated in a footnote that "plaintiff may be able to satisfy the adequacy requirement by redefining the class." Id. at 6, fn3.

Plaintiff filed the instant motion for class certification on January 7, 2010. In the current motion, plaintiff requests certification of a damages class under F.R.C.P. 23(b)(3) defined as:

> All California consumers who purchased Wyeth's Hormone Replacement Therapy products, Premarin, Prempro, and/or Premphase, for personal consumption between January 1995 and January 2003, and who do not seek personal injury damages resulting therefrom.

Plaintiff seeks class certification for two separate claims under California law, one arising under the Consumer Legal Remedies Act ["CLRA"] and the other under the Unfair Competition Law ["UCL"]. Defendants filed an opposition and plaintiff filed a reply.[1]

For the reasons that follow, plaintiff's Motion for Class Certification is GRANTED IN PART with respect to both claims.

## FACTUAL BACKGROUND

The following contentions are taken from plaintiff's complaint, plaintiff's motion for class certification, and defendant's opposition.

Defendant, Wyeth, Inc. ("Wyeth"), currently manufactures hormone replacement therapy drugs. In 1994, Wyeth received FDA approval for Prempro for "limited use as a continuous, short-term regimen by post-menopausal women for the treatment of moderate to sever vasomotor symptoms associated with menopause (hot flashes, night sweats), vulvar and vaginal atrophy, and the prevention of osteoporosis." SSCF ¶1. At that time, the FDA refused Wyeth's request to market Prempro for cardiovascular benefits. Id. ¶2. Premarin is a FDA approved conjugated estrogen prescription drug for the treatment of moderate to severe vasomotor symptoms associated with menopause, prevention of postmenopausal osteoporosis, and treatment of vulvar and vaginal atrophy. Doc. 85 at 10. Premphase is "an alternative form of [hormone therapy] that consists of two separate tablets given on

[1] After oral argument on this motion, the parties submitted supplemental briefing to address the impact of the Ninth Circuit's decision in Dukes v. Walmart, 603 F.3d 571, 590 (9th Cir. 2010), on the instant motion.

a 28-day cycle." Id. at 11.

Wyeth used branded and unbranded campaigns to market its hormone therapy drugs to all women over forty five years old, and physicians, for on and off-label uses, including the prevention of cardiovascular disease, dementia and Alzheimer's disease. Id. ¶22,24. Branded campaigns marketed the drug for FDA approved uses and unbranded campaigns marketed the drug for non-approved, off-label uses. Wyeth used the unbranded campaign to educate women that estrogen loss increased cardiovascular, dementia and Alzheimers risk and that hormone replacement therapy reduced the risk of contracting those ailments. Id. ¶47. Wyeth then used its branded campaign ads to inform consumers about which hormone therapy drug provided the benefits touted during the unbranded campaign ads. Id. ¶53. During this campaign, defendant also informed consumers and physicians that HRT did not cause breast cancer. Id. ¶28-29.

In 2002, the Women's Health Initiative ("WHI"), sponsored by the National Institutes of Health, released a report indicating Prempro increased risk for strokes, heart attacks, cardiovascular disease, breast cancer, Alzheimers disease, and dementia. Id.¶9. After the study, Wyeth warned that its HRT drugs should not be used to prevent coronary heart disease. Id. ¶15. Wyeth also warned its hormone therapy drugs should be "prescribed selectively, appropriately, with clearly defined treatment goals, and for the shortest duration possible." Id.¶18. The FDA placed a warning label on Wyeth's HRT drugs listing its risks in 2003.

In this litigation, plaintiff alleges Wyeth advertising campaign misrepresented the benefits and failed to disclose the risks of its HRT drugs during the class period.

## DISCUSSION

### 1. STANDARD

Plaintiff seeks two forms of relief for the putative class members: 1) "damages, statutory damages, punitive damages, and/or refund of purchase monies paid by class members due to Wyeth's conduct in violation of the CLRA; and 2) "a refund of all monies spent by Class Members, as well as

a disgorgement of profits Wyeth earned from its HRT sales to Class Members, as a result of its unlawful, unfair, and fraudulent business practices under the UCL." Doc. 61 at 2. Plaintiff asserts her claims under the CLRA and UCL meet the requirements under F.R.C.P. Rule 23(a) and Rule 23(b)(3) for class certification.

F.R.C.P. 23(a) states:

One or more members of a class may sue or be sued as representative parties on behalf of all members only if:

> (1) the class is so numerous that joinder of all members is impracticable;
> (2) there are questions of law or fact common to the class;
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
> (4) the representative parties will fairly and adequately protect the interests of the class.

In addition to meeting the aforementioned requirements, a party seeking class certification must also satisfy one of the requirements in Rule 23(b). Plaintiff seeks certification under Rule 23(b)(3) which requires a court finding:

> that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. F.R.C.P. 23(b)(3).

The requirements of Rule 23(a) are commonly referred to as: numerosity, commonality, typicality, and adequacy. The only Rule 23(a) issues in dispute here are typicality and adequacy[2].

The Ninth Circuit recently clarified the standard for granting class certification. In Dukes v. Walmart, the court states:

> A district court must sometimes resolve factual issues related to the merits to properly satisfy itself that Rule 23's requirements are met, but the purpose of the district court's inquiry at this stage remains focused on, for example, common questions of law or fact under Rule 23(a)(2), or predominance under Rule 23(b)(3), not the proof of answers to those questions or the likelihood of success on the merits. 603 F.3d 571, 590 (9th Cir. 2010).

---

[2] According to plaintiff, Wyeth sold more than 53 million prescriptions of its hormone therapy drugs to California consumers between 1997 and 2002, which more than satisfies the numerosity requirement. Doc. 61 at 7. The commonality requirement has been construed permissively, such that the "existence of shared legal issues" and "a common core of salient facts are sufficient." Hanlon v. Chrylser Corp, 150 F.3d 1011, 1019 (9th Cir. 1998). Here, the claims asserted by the class members are all premised upon the same two legal theories: whether Wyeth's conduct violated the CLRA and UCL. Additionally, the claims are based upon the same set of facts, specifically the nature of Wyeth's marketing of its HRT drugs between 1995 and 2003. This satisfies the commonality requirement.

The Dukes court further iterates that:

> district courts . . . must perform a rigorous analysis to ensure that the prerequisites of Rule 23 have been satisfied, and this analysis will often, though not always, require looking behind the pleadings to issues overlapping with the merits of the underlying claims. It is important to note that the district court is not bound by these determinations as the litigation progresses . . .[but] district courts may not analyze any portion of the merits of a claim that do not overlap with the Rule 23 requirements. Id. at 595.

Using the above standard, this Court examines the pertinent Rule 23 requirements.

A. **Rule 23(b)(3)**

**1. Predominance**

The critical inquiry for courts assessing predominance is whether common issues will predominate throughout the entire litigation. Predominance "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." Amchem Products, Inc. V. Windsor, 521 U.S. 591, 623 (1997). This standard is "far more demanding" than the commonality requirement of Rule 23(a). Id. at 623-24. Predominance "focuses on the relationship between the common and individual issues. 'When common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than on an individual basis." Hanlon v. Chrysler Corp, 150 F.3d 1011, 1022 (9th Cir. 1998)(citing 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure, §1776 (2d ed. 1986)). Although there are multiple issues in this case, predominance does not depend on whether there are numerically more issues subject to common proof rather than individualized proof. Predominance can be found even where there is only one issue subject to common proof, if that is the primary issue in the action. On the other hand, it is possible that the predominance requirement is not met where only one issue is subject to individualized proof. Wyeth contends individualized issues of reliance predominate over any common issues for plaintiff's CLRA claim. Wyeth further contends individualized issues concerning whether a putative class member was actually exposed to Wyeth's alleged misrepresentations, and the proper amount of

restitution for each putative class member, predominate over common issues for plaintiff's UCL claim. The Court will discuss each of these arguments in turn.

**a. CLRA**

The CLRA prohibits "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale . . . of goods or services to any consumer." Cal Civ. Code § 1770. The CLRA only allows recovery when a consumer is damaged as a result of the unlawful practice. Thus, to prevail on a CLRA claim, a plaintiff must show defendant's conduct was deceptive and the deception caused them harm. In re Vioxx Class Cases, 180 Cal. App. 4th116, 128 (2009); see also Steroid Hormone Product Cases, 181 Cal. App .4th 145, 156 (2010)("to obtain relief under the CLRA, both the named plaintiff and unnamed class members must have suffered some damage caused by a practice deemed unlawful under Civil Code section 1770."). "The 'damage' that a plaintiff in a CLRA action must show 'may encompass harms other than pecuniary damages.'"Steroid Hormone Product Cases, 181 Cal. App.4th at 156.

Plaintiff's CLRA claim is based upon the premise that Wyeth's misrepresentation of the benefits of the HRT drugs, while failing to disclose the known risks, caused the class members to purchase the HRT drugs. Doc. 88 at 15, fn2. Plaintiff claims this conduct violated three provisions of the CLRA:

1. Misrepresenting the source, sponsorship, approval, or certification of goods or services.
2. Misrepresenting the affiliation, connection, or association with, or certification by, another.
3, Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have . . . .

Cal Civ. Code §1770(a)(2)(3)(5).

Additionally, Plaintiff claims reliance does not require an individualized inquiry and can be proven on a classwide basis. Under California law, a classwide inference of reliance is permitted when the deceptive conduct alleged is a material misrepresentation. Steroid Hormone Product Cases, 181 Cal.App.4th at 157. This is true notwithstanding a showing by defendant that some class members

would have bought the product with knowledge of the representation's falsity. Id. "[A] misrepresentation is deemed material if a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question . . . materiality is generally a question of fact unless the fact misrepresented is so obviously unimportant that the jury could not reasonably find that a reasonable man would have been influenced by it." Id. (internal citations omitted). Under the facts of this case the question is: would a reasonable person contemplating purchase of Wyeth's hormone therapy drugs attach importance to the nondisclosed fact that the drug increases the risk for breast cancer, heart disease, Alzheimers disease, and dementia in light of Wyeth's representations that the drug reduces menopausal symptoms while simultaneously lowering the risk for heart disease, Alzheimers disease and dementia, without increasing breast cancer risk.

In its opposition brief, Wyeth's contention against predominance for the CLRA claim is that reliance must be proved on an individualized basis and that individualized inquiry predominates over any common issues. Wyeth presents three assertions on this point: 1) "an inference of reliance is improper because Plaintiff cannot show that all the proposed class members and their doctors were exposed to the same representations" [Doc. 85 at 21]; 2) "a presumption of reliance would [] be inappropriate because the physicians and proposed class members who were allegedly exposed to representations by Wyeth reacted differently to the information they received" [Doc. 85 at 23]; and 3) "any inference of classwide reliance is [] inappropriate because many HT users - including Ms. Krueger- continued taking HT drugs after they became aware of the alleged risks." Doc. 85 at 24.

Wyeth's second and third assertions stem from the same supposition- because the physician's decision about whether to prescribe, and the patient's decision to use, HRT is based on factors unique to each patient, and some patients currently take HRT with knowledge of the risks involved, the materiality of Wyeth's misrepresentations is not an issue subject to common proof. In support, Wyeth repeatedly cites <u>In re Vioxx Class Cases</u> ,180 Cal.App.4th 116 (2009). In <u>Vioxx</u>, the drug at issue, Vioxx, was marketed as a pain relief drug with no gastrointestinal side effects. Because the other generic drugs available in its class all had gastrointestinal side effects, the manufacturers of Vioxx charged a higher price for its product. However, the defendant manufacturers concealed the fact that

taking Vioxx, unlike taking the generic pain reliever, increased cardiovascular risks. Importantly, Vioxx had the benefit claimed but with an undisclosed side effect. The plaintiff in that action claimed the risks involved with taking Vioxx made it no more effective and less safe than the generic pain reliever. On that basis, the plaintiff sought to recover the difference in purchase price between Vioxx and the generic drug. To support their motion for class certification, the plaintiff alleged the defendant had a "common campaign of hiding the cardiovascular risks of Vioxx" and the "common representations support a common inference of reliance." Id. at 133. According to the plaintiff in that case "there can be nothing more material than an increased risk of death." Id.

However, the evidence in Vioxx demonstrated that certain members of the putative class suffered from gastrointestinal issues and thus would not have been able to take the generic drug. For those class members restitution could not be calculated as the difference between the Vioxx purchase price and the generic purchase price since those class members could not take the generic drug. The Court also surmised that certain class members may have deemed pain relief worth the increased cardiovascular risk. In addition, the Court found the drug only had an increased risk of death for certain class members while for other class members the risk was lower than for similar drugs. Finally, the Court concluded that because doctors prescribe drugs for many patient-specific reasons the "materiality of any statements made by Merck to any particular prescribing decision cannot be presumed." Based on the above reasoning the trial court determined, and the Court of Appeals agreed, plaintiff's overall theory of the case, to wit, Vioxx was no more effective and less safe than the generic pain reliever, could not be determined on a classwide basis. Id. at 126. However, the trial court acknowledged that the "issue of Merck's alleged misrepresentations and omissions was subject to common proof." Id.

Although Vioxx also involved a prescription drug, the facts of the instant case are readily distinguishable. First, plaintiff does not claim the risks of Wyeth's HRT drugs made it less effective than another hormone therapy drug. Nor does plaintiff contend that absent Wyeth's deceptions she would have purchased another, less riskier product. Because there was no similar hormone therapy drug on the market during the class period, the choice offered to plaintiff and the putative class members was to purchase Wyeth's HRT drugs or buy nothing. Second, plaintiff does not seek the

difference in price between Wyeth's drugs and a drug issued by another manufacturer. Rather, plaintiff seeks a refund of the entire purchase price. As a result, there will be no need for an individualized assessment of the drug's value to each class member nor an individualized assessment of the proper comparator drug for each class member.

Notwithstanding the aforementioned differences between this case and Vioxx, Wyeth argues that a physician's consideration of multiple patient-specific factors before prescribing a drug may negate the materiality of any particular misrepresentation it made. It is important to note that at this stage in the litigation, the issue is not whether the alleged misrepresentations were in fact material. The proper inquiry for class certification purposes is whether plaintiff can use common proof to prove whether a misrepresentation or nondisclosure is material. The seminal California case on this issue is Massachusetts Mutual Life Ins. Co. v. Superior Court. 97 Cal.App.4th 1282.

In Massachusetts Mutual the plaintiffs claimed they, and the rest of the proposed class, purchased a specific type of life insurance that had a guaranteed return on an accumulated premium and permitted plaintiffs to share in dividends the company declared on a discretionary basis. Massachusetts Mutual represented that over time, the dividend would pay for the accumulated premium. Plaintiffs claimed at the time they purchased the policies, Massachusetts Mutual paid a discretionary dividend rate that it planned to lower. Plaintiffs argued the failure of Massachusetts Mutual to disclose its plans to lower the dividend would have been material to any reasonable person contemplating a purchase of that type of policy. Although the thousands of putative class members obtained their policies from various agents who utilized various sales tactics, the Court stated:

> "We recognize that in determining whether the inference of reliance arises, the trial court will have to consider whether other information which Mass Mutual disclosed about its dividend rate provided buyers with the material information they needed in making a decision to purchase Mass Mutual's product. However, the information Mass Mutual provided to prospective purchasers appears to have been broadly disseminated. Given that dissemination, the trial court could have reasonably concluded that the ultimate question of whether the undisclosed information was material was a common question of fact suitable for treatment in a class action. 97 Cal.App.4th at 1294.

///

///

In the footnote appended to the above statement, the Court also stated:

> Plainly, should it develop that class members were provided such a variety of information that a single determination as to materiality is not possible, the trial court has the flexibility to order creation of subclasses or to decertify the class altogether. At this point, however, the record fully supports the trial court's determination [sic] Mass Mutual's failure to disclose its own conclusion presents an issue common to class members. Id. at 129, fn5.

The California Court of Appeals relied upon the reasoning of Massachusetts Mutual to certify a class of consumers who purchased roof tiles that were represented to (1) last for 50 years, (2) permanently retain their color, and (3) be maintenance free. McAdams v. Monier, 182 Cal.App.4th 174 (2010). In McAdams, the plaintiff alleged those representations were misleading because the manufacturer failed to disclose the tiles were inherently defective and would lose their color well before the end of their represented 50 year life span. The trial court denied certification in part due to its finding that each class member would have to prove the representation they relied on and the resulting damage. On appeal, the court found that the misrepresentations alleged by plaintiff actually constituted one material nondisclosure. Based on that finding the Court stated:

> The record here permits an inference of common reliance among the CLRA class. Plaintiff alleges that Monier made a single, material misrepresentation to class members that consisted of a failure to disclose a particular fact regarding its roof tiles. Plaintiff has tendered evidence that Monier knew but failed to disclose to class members that the color composition of its roof tiles would erode to bare concrete well before the end of the tiles' represented 50-year life; and that this failure to disclose would have been material to any reasonable person who purchased tiles in light of the 50-year/lifetime representation, or the permanent color representation, or the maintenance-free representation. If plaintiff is successful in proving these facts, the purchases common to each class member- that is, purchases pursuant to this alleged failure to disclose in light of the 50-year life, permanent color, or maintenance-free representations- would be sufficient to permit an inference of common reliance among the class on the material misrepresentation comprising the alleged failure to disclose. Id. at 184.

Because of this reasoning, the Court in McAdams limited the class to individuals who "prior to purchasing or obtaining their Monier roof tile product . . .[were] exposed to a statement along the lines that the roof tile would last 50 years, **or** would have permanent color, **or** would be maintenance free." Id. at 179 (emphasis added). Of importance is the fact that members of the class did not have to hear the representation from Monier. The court included consumers as class members who heard one of the aforementioned representations from Monier, or an independent distributor who had Monier literature, home builders, or individuals selling their homes. Id. at 186. Additionally, a class

representative who purchased the roof tile product after exposure to the representations from any of these sources would have a claim typical of other class members who purchased from any other source because the claim is based on a "single, specific failure to disclose." Id.

The allegations here are analogous to those in Massachusetts Mutual and McAdams. Through its extensive advertising campaign, Wyeth broadly disseminated representations about the benefits of its HRT drugs. Plaintiff has tendered evidence to show Wyeth failed to disclose to both physicians and consumers the material fact that its HRT drugs posed an increased risk for heart disease, Alzheimers, dementia, and breast cancer. As a result, neither physicians nor consumers had the necessary information upon which to accurately determine whether HRT was an appropriate drug to prescribe or use.

The tendered evidence also indicates that prior to Wyeth's campaign many physicians and consumers did not consider HRT a viable therapy for menopause because the increased risk of breast cancer caused by HRT outweighed the benefit of reduced menopausal symptoms. According to plaintiff, against this backdrop of fear that HRT increased breast cancer while only providing the benefit of menopausal relief, Wyeth began a massive advertising campaign to convince consumers and physicians that HRT had more benefits, including reducing the risk of heart disease, Alzheimers and dementia. Wyeth further claimed HRT did not increase breast cancer. Wyeth's campaign was so broad so as to include providing literature to health care plans for distribution to patients regarding HRT's benefits and affixing the health care plan's brand, mark or name on the literature to suggest the health care provider, not Wyeth, was the source of the information. Doc. 95 at 8.

According to the proffered evidence, Wyeth conducted a systematic, standardized, and broadly disseminated advertising campaign misrepresenting the benefits of HRT drugs for the class period to induce California consumers to purchase HRT while failing to disclose the known fact that the drug actually increased, rather than reduced, the risks. This campaign altered physician and consumer perception of HRT. Thus, instead of evaluating HRT to determine whether relief of menopausal symptoms was worth the increased breast cancer risk, physicians and consumers were evaluating HRT to determine whether the drug would be a benefit because it decreased menopausal symptoms along with a reduction in risk of heart disease, dementia, and Alzheimers. While informing

physicians and consumers of the multiple additional benefits of HRT, Wyeth allegedly failed to disclose that those additional benefits were false. That in and of itself would be an egregious omission. However, Wyeth also allegedly failed to disclose that HRT had the opposite effects of those advertised and actually increased the risk of heart disease, dementia and Alzheimers. This allegation is another key distinguishing factor between the instant case and Vioxx. In Vioxx the drug at issue was advertised as a pain reliever **without** gastrointestinal side effects. As such, the drug in Vioxx ultimately performed as advertised, but with an undisclosed side effect. In this case, HRT did not perform as advertised. Thus, for the facts of Vioxx to be analagous to those here, the Vioxx drug would have to perform as a pain reliever **with** gastrointestinal side effects, in addition to the undisclosed risk factor. In addition, Wyeth's campaign also encouraged long term use of HRT to prevent the onset of identified diseases and to reduce menopausal symptoms despite the fact that HRT was approved by the FDA for short term alleviation of menopausal symptoms only. It is within this context that materiality must be assessed.

Wyeth contends, nonetheless, that because physicians still prescribe, and consumers continue to use, HRT with the same dosage as the drug advertised during the class period, physicians and consumers perceived the importance of Wyeth's misrepresentations differently. The Court recognizes that the drug in its original dosage remains approved by the FDA to treat certain symptoms associated with menopause. However, the evidence in the record demonstrates that usage of HRT greatly increased during Wyeth's advertising campaign and decreased dramatically when that campaign ended and the risk factors about HRT became public.[3] The massive decrease in HRT usage in the aftermath of the WHI study gives credence to plaintiff's theory that many physicians would not have prescribed, and many consumers would not have used, HRT with knowledge of the risks involved.[4]

---

[3]See Def. Ex. D [Doc. 85-2 at 50] Physicians' and Women's Views on Hormone Therapy and Breast Cancer Risk After the WHI: A Qualitative Study (" The use of menopausal hormone therapy (HT) has significantly declined since the release of the Women's Health Initiative findings . . . .")

[4]Def. Ex. D at 59 ("Our qualitative study conducted more than three years after the release of the WHI findings suggested that, for both physicians and women, concern about breast cancer risk was a key factor in the **decision making process** to initiate and continue HT.") (emphasis added). But see id. at 51 ("For women, control of menopausal symptoms was important and possibly outweighed their concerns about the potential risks of breast cancer.")

The Court further recognizes that some physicians and consumers currently believe that the benefits of HRT outweigh the risks in certain circumstances. This recognition is somewhat aligned with Wyeth's argument that physicians consider multiple patient-specific factors when deciding which drug to prescribe. Yet, regardless of those patient-specific factors, it cannot be seriously contended that the drug manufacturer's knowledge that a drug has the opposite effect of its advertised benefits would not play an important role in the physician's decision to prescribe.

Additionally, a material misrepresentation or omission is one that a "reasonable [person] would attach importance to its existence or nonexistence in determining [her] **choice of action**." Steroid Hormone Product Cases, 181 Cal. App.4th at 157. Thus, materiality is not decided by determining whether the misrepresentation or omission was the sole reason behind a particular action.[5] Rather, materiality is found where the omitted or misrepresented information would have been important to the decision-making process. This principle is espoused in Steroid Hormone Product Cases. In that litigation, the plaintiff sought to certify a class of consumers who purchased supplements that contained androstenediol from GNC. Although those supplements were purported to be legal, over the counter products, it was illegal under California law to possess and use androstenediol products without a prescription. Plaintiff claimed he was damaged by purchasing a product he would not have purchased had he known it was illegal. Plaintiff further claimed class certification was appropriate because GNC's representation that the products were legal over the counter supplements was material. Despite defendant's argument that the illegality of the supplements would not have been important to the bodybuilders who purchased those products, the California Court of Appeals agreed with plaintiff and stated "we assume that a reasonable person would not knowingly commit a criminal act." Id. at 157. In addition, that Court found "even if there may be some people who bought androstenediol products from GNC with the knowledge that the products were unlawful to sell or possess in California without a prescription . . . their existence would not defeat class certification." Id. at 157. Similarly, here, the fact that some class members may have purchased HRT despite Wyeth's misrepresentations does not defeat class certification. "[P]laintiff[] satisf[ies] [her] burden of showing causation as to each class member by showing materiality as to all." Steroid Hormone

[5] See footnote 4, supra.

Product Cases, 181 Cal. App.4th at 157 (citing Massachusetts Mutual, 97 Cal. App.4th at 1292).

In sum, to meet the requirements for class certification plaintiff is not required to prove the information Wyeth failed to disclose was material. Plaintiff must only demonstrate at this stage of the litigation that common proof can be used to show that failure to disclose was material to the putative class members. The final determination of materiality is a question of fact for the jury, not this court. However, for the purpose of this motion the Court finds that a reasonable consumer contemplating purchase of a prescription drug would attach importance to the fact that the drug does not provide most of its advertised benefits but rather has the opposite effect of its advertised benefits and increases the risk of contracting several life threatening diseases. In this case the advertised benefits of HRT were the same for all class members. Additionally, Wyeth's failure to disclose both the nonexistence of those benefits and the drug's risk factors were the same for all class members. Thus, the question of materiality is subject to common proof.[6]

If the plaintiff is successful in proving these facts, the purchases common to each class member - to wit, those who were exposed to a representation from Wyeth, or health care providers, or read in literature in which Wyeth advertised or provided to third parties to be disseminated under its brand or the third parties' brand, that Wyeth's HRT lowered cardiovascular, Alzheimers and/or dementia risk, or did not increase breast cancer risk - would be sufficient to permit an inference of common reliance among the class on the material misrepresentation comprising the failure to disclose. McAdams, 182 Cal.App.4th at 174.[7] This Court finds that limiting the class as defined in this paragraph is consistent with and based upon the rationale in McAdams and makes this class sufficiently cohesive to warrant adjudication by representation. Amchem Products, Inc., 521 U.S. at 623. Based upon the tendered evidence, the Court finds that common issues predominate for this

---

[6]This Court is mindful of the court's monition in the MDL opinion, In re Prempro, that "[p]laintiffs' causes of action 'raise a host of individual issues. For example, the consumer fraud claim 'require[s] individualized proof concerning reliance and causation.' Whether a plaintiff saw an advertisement; whether the particular advertisement was fraudulent; whether that plaintiff relied on the advertisements; and whether the plaintiff was damaged as a result of the advertisement are all individual questions of fact." 230 F.R.D. 555, 567 (E.D. Ark. 2005). However, that action involved varying consumer fraud laws from more than 20 states. Additionally, that court was not bound by California law which, unlike most states, allows an inference of reliance where the alleged misrepresentations are material.

[7] This limitation also resolves the issue raised in Wyeth's first argument, supra p.7, and ensures all class members were exposed to the same representation.

claim.[8]

b. **UCL**

California's UCL defines unfair competition as "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by [the false advertising law {§ 17500 et seq.)]." McAdams v. Monier, Inc., 182 Cal.App.4th 174, 187 (Cal. Ct. App. 2010). In 2004, California enacted Proposition 64 which limited standing under the UCL "to a 'person who has suffered injury in fact and has lost money or property as a result of the unfair competition.'" Id. at 188. However, in the class action context the injury in fact requirement is limited to the named representative, not the putative class as a whole. Id. at 189 (citing In re Tobacco II Cases, 46 Cal.4th 298, 315-16 (2009)).

Although a plaintiff is only required to prove a business act is either unlawful, unfair or fraudulent, plaintiff asserts Wyeth's conduct satisfies all three criteria. Plaintiff states Wyeth acted unlawfully by violating the CLRA and reasonable basis doctrine, fraudulently because "members of the public are likely to be deceived" by the defendant's conduct, and unfairly because defendant's conduct was unlawful and fraudulent. (Doc. 61 at 17-21). The injury claimed by plaintiff is the monetary loss incurred from purchasing defendant's product.

Initially, the Court finds that plaintiff's allegations meet the standing requirements to bring a cause of action under the UCL. Plaintiff's purchase of Wyeth's HRT drugs constitutes an injury in fact under the UCL. Morgan v. AT&T Wireless Servs., Inc., 177 Cal.App.4th 1235, 1249 (2009). To bring a claim under the UCL's fraud prong, plaintiff must show actual reliance, or, in other words, that "the defendant's misrepresentation or nondisclosure was 'an immediate cause' of the plaintiff's injury producing conduct." Tobacco II, 46 Cal.4th at 326 (internal citations omitted). As discussed in this

[8]See, e.g., McAdams, 182 Cal.App.4th 174 (finding class action of CLRA claim appropriate where the issues of liability and causation were subject to common proof). The Court also notes that while there have been multiple litigations nationwide with respect to Wyeth's conduct in the marketing of Prempro, discovery has not commenced in this litigation. Accordingly, if it subsequently becomes clear that the class members were inundated with such a variety of information about HRT that it is impossible to assess materiality on a classwide basis, the Court will entertain a motion to redefine or decertify the class.

Court's analysis of plaintiff's CLRA claim, an inference of reliance is allowed when the misrepresentation is material. Id. at 327. The evidence demonstrating Wyeth consistently made the same material misrepresentations during a strategically orchestrated widespread multi-year advertising campaign entitles plaintiff to an inference of reliance. See id. at 327-328; Morgan, 177 Cal.App.4th at 1258. Plaintiff's allegations also state a claim under either the unlawful or unfair prong of the UCL. Plaintiff alleges defendant's conduct violated the CLRA, which satisfies the unlawful prong of the UCL. Additionally, conduct alleged to be fraudulent is by definition unfair. See Blakemore v. Superior Court, 129 Cal.App.4th 36, 49 (2005)("Because the allegations are sufficient to state a UCL claim based upon deception, the same allegations necessarily suffice to state a claim under the unfairness prong of the UCL. A practice which is deceptive is necessarily unfair.").

Turning to the merits of this motion, Wyeth first asserts that certification is inappropriate in that "different [hormone thereapy] users (and their doctors) received different information about [hormone therapy] from Wyeth at different times- and some received no information from Wyeth at all." Doc. 85 at 29. According to defendant, "as in *Kaldenbach* and *Pfizer*, there is no way for Plaintiff to prove- in one trial, with common evidence - that each proposed class member was exposed to an unfair marketing practice by Wyeth." Id. A review of Kaldenbach v. Mutual of Omaha Life Ins. Co., 178 Cal.App.4th 830 (Cal. Ct. App. 2009) and Pfizer v. Superior Court, 182 Cal.App.4th 622 (Cal.Ct. App. 2010) reveals the error in Wyeth's contention.

In Kaldenbach, the plaintiff sought to represent a class of individuals who purchased vanishing premium policies issued by the defendant insurance company. 178 Cal.App.4th at 830. Plaintiff claimed the defendant's representations about the overall cost of the policy were misleading and violated the UCL. Although the putative class members bought their policies from various agents who worked as independent contractors, plaintiff claimed the alleged misrepresentations were part of marketing material sent by defendant to each of its agents. Plaintiff further claimed the agents underwent standard training programs conducted by defendant. Because defendant sent the same material to each agent and used the same information in its training programs, plaintiff asserted the claim could be resolved on a classwide basis. However, defendant submitted evidence showing that agent sales presentations varied from one another and agents were not required to utilize the marketing

materials from defendant. Furthermore, agents were not required to attend the training programs. Because of the various sales presentations each putative class member received, the appellate court found the trial court "could properly conclude there was no showing of uniform conduct likely to mislead the entire class, and the viability of a UCL claim would turn on an inquiry into the practices employed by any given independent agent." 178 Cal.App.4th at 850. Thus, the question of "whether there was in fact an unfair business practice by [the defendant]" would require an individualized inquiry. Id.

Wyeth also cites Pfizer for the proposition that individuals seeking restitution under the UCL must establish that the money lost was acquired by defendant because of the alleged unfair competition. 182 Cal.App.4th at 622. In that case, plaintiff alleged Pfizer ran a six month marketing campaign where it misrepresented that its Listerine mouthwash was "as effective as floss." Plaintiff sought to certify a class of consumers under the UCL who purchased Listerine during that six month period. However, because of the short-term nature of the campaign, the fact that not every bottle of Listerine sold during that period contained the misrepresentation, and the undisputed evidence showing many, if not most, class members had never seen the "as effective as floss" representation, the Court of Appeals reversed the trial court's certification and concluded the class was overbroad. The Pfizer court distinguished In re Tobacco II Cases, 46 Cal.4th 298 (Cal. 2009), on the grounds that "cigarettes were marketed as part of a massive, sustained, decades-long fraudulent advertising campaign" and consequently defendants "may have . . acquired" the purchase price as a result of such a pervasive campaign.[9]

This Court's decision to restrict the class for the CLRA claim to those consumers who actually heard or read one of Wyeth's alleged misrepresentations applies to the UCL claim as well. This

[9]In Tobacco II, the California Supreme Court reversed the trial court's decertification of a UCL class defined as "those people who are residents of California and who, while residents of California, smoked one or more cigarettes during the applicable class period." 46 Cal. 4th at 308-09. The Court found this class consists of "members of the public who were exposed to defendants' allegedly deceptive advertisements and misrepresentations and who were also consumers of defendants' products during a specific period of time." Id. at 324. The Court surmised such a class could be appropriate for a UCL class action due to the tobacco industry defendants' "long-term campaign of deceptive advertising and misrepresentations to the consumers of its products regarding the health risks of those products. Id. at 325. In so doing, the Court rejected the defendants' arguments that class certification was inappropriate because each putative class member would have to individually show they read or heard a misrepresentation made by defendants and were misled or deceived about the health risks of smoking. Id. at 309.

limitation resolves the issue of ensuring all class members were actually exposed to an unfair practice by Wyeth. This limitation also distinguishes the instant case from Kaldenbach. This Court notes that in Kaldenbach, the claim was based on representations from various agents about the advantages of a particular type of life insurance. Because the representations did not follow a standard format, there was no way to determine on a classwide basis whether an agent's sales presentations consisted of misleading representations. As stated, plaintiff's claim is based on uniform material misrepresentations that were part of a pervasive, strategically orchestrated, widespread, multi-year advertising campaign. As a result, common evidence can be used to establish the elements of this claim.

This Court also finds the reasoning in Pfizer does not apply here. In Pfizer the allegedly deceptive advertising campaign ran for only six months. During that time multiple advertisements aired that did not contain the misrepresentation that formed the basis of plaintiff's lawsuit. However, in this case, the same alleged misrepresentations were featured in Wyeth's advertising campaign in a massive, well organized and sustained manner throughout the eight year class period. Additionally, the breadth and length of defendant's fraudulent advertising campaign is more analagous to Tobacco II than Pfizer.

Wyeth next claims certification is inappropriate for this claim because "of the need for individualized evidence that the defendant's allegedly wrongful conduct caused each proposed class member to pay more for [hormone therapy] than it was worth to her." Doc. 85 at 29. Wyeth refutes plaintiff's contention that hormone therapy drugs have "no health-related quality of life benefit"and thus the class should simply be refunded the full purchase price. According to Wyeth, class certification is only appropriate if plaintiff can prove at trial that "no doctor would have prescribed [hormone therapy] in the face of more risk information- and no woman would have taken it." Doc. 85 at 30. Wyeth claims plaintiff cannot make this showing because many doctors continue to prescribe hormone therapy medication, notwithstanding the risk, and plaintiff herself continued taking hormone therapy medication for more than six months after becoming aware of the risks. Id. at 31. This argument is unpersuasive as California law allows recovery, including restitution, under the UCL "without individualized proof of deception, reliance and injury." McAdams, 182 Cal.App.4th at 192

(internal citations omitted).[10] As a result, the fact that damages may require an individualized inquiry does not prevent this claim from proceeding as a class action by way of the UCL cause of action.[11] Id.

Because the primary issue of plaintiff's UCL claim is whether Wyeth's representations about the benefits of its HRT drugs and concomitant failure to disclose the risks were unlawful, fraudulent or unfair, is subject to common proof, the Court finds common issues predominate over individualized issues for this claim.[12]

**2. Superiority**

The factors pertinent to assess superiority include: "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;( C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." F.R.C.P. 23(b)(3)(A-D).

"The purpose of the superiority requirement is to assure that the class action is the most efficient and effective means of resolving the controversy" Wolin v. Jaguar Land Rover North America, LLC, 2010 WL 3222091, at *6 (9th Cir. 2010)(citing 7AA Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure, §1779 at 174 (3d ed. 2005). "Where

---

[10]Defendant's argument that nonrestitutionary disgorgement is not an available remedy under the UCL is correct. Tobacco II, 46 Cal.4th at 320 n.14. However, restitutionary disgorgement is allowed under the UCL and that is the remedy sought by plaintiff here. See Feitelberg v. Credit Suisse First Boston, LLC, 134 Cal.App.4th 997, 1013 (2005).

[11]See also McAdams, 182 Cal.App.4th at 186 ("A class action can be maintained even if each class member must at some point individually show his or her eligibility for recovery or the amount of his or damages, so long as each class member would not be required to litigate substantial and numerous factually unique questions to determine his or her individual right to recover."). Where the claims of all class members stem from the same source, and it does not involve substantial and numerous factually unique questions, a class action may be appropriate even though a class member will have to show the specific misrepresentation made and the amount of their damages. Id.

[12]Wyeth also contends that predominance should not be found because different statute of limitations apply to each class member. However, a statute of limitations defense can be separated out and determined on an individualized basis once the class trial is over. Cartwright v. Viking Industries, Inc., 2009 WL 2982887, at *7 (E.D. Cal. 2009)(citing Arthur Young & Co. v. U.S. Dist. Court, 549 F.2d 686, 696 (9th Cir. 1977).

recovery on an individual basis would be dwarfed by the cost of litigation on an individual basis, this factor weighs in favor of class certification. . . Rule 23(b)(3)'s superiority test requires the court to determine whether maintenance of this litigation as a class action is efficient and whether it is fair." Id.

Here, the minimal recovery that each class member might obtain pales in comparison to the substantial legal costs involved in litigating this type of action on an individual basis. Thus, if this case does not proceed as a class action thousands, if not millions, of potentially injured parties may not have the opportunity to obtain recovery. Additionally, in a case such as this where the majority of pertinent issues are subject to common proof, judicial economy weighs in favor of allowing this case to proceed as a class action rather than a host of individual ones. The Court thus finds the superiority requirement is met here.

**B.     Rule 23(a)**

Having found the requirements of Rule 23(b)(3) satisfied, the Court will now examine the remaining issues under Rule 23(a).

**Typicality**

"The purpose of the typicality requirement is to assure that the interest of the named representative aligns with the interest of the class." Hanon v. Dataproducts Corp., 976 F.2d 497, 508 (9th Cir. 1992). "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." Id. (internal quotation marks omitted).

Wyeth claims plaintiff is not typical of the class she wishes to represent because she continued taking HRT for more than six months after becoming aware of the risk. According to Wyeth this renders plaintiff's claims "atypical of any proposed class members who stopped taking HT as soon

as they learned about its alleged risks." Doc. 85 at 34. Additionally, plaintiff's physician testified that for some women the benefits of HRT outweigh the risks. Wyeth argues plaintiff would not be typical of other class members whose physicians disagree and no longer prescribe HT at all. Id.

Plaintiff claims she is typical of the proposed class because her claim, like the other putative class members, arises from the same advertising scheme conducted by Wyeth and alleges the same injury as the other class members.

This Court agrees with plaintiff. Typicality does not require that the factual circumstances surrounding plaintiff's claim be completely identical to the other class members. The relevant inquiry is whether the claims asserted by plaintiff are based on the same conduct that gives rise to the claims of the other class members and whether plaintiff and the other class members have been injured in a similar manner. Plaintiff claims Wyeth uniformly failed to disclose the risks associated with its HRT drugs and that conduct was deceptive in light of the representations Wyeth made about the drugs' benefits. Plaintiff further claims that deception caused her to purchase the product. Finally, plaintiff seeks a refund of the entire purchase price for all HRT drugs bought from Wyeth during the class period. Because there was no competing product in the marketplace, plaintiff had the option to buy Wyeth's HRT drugs or buy no drug at all. That claim is typical of the proposed class. The Court thus finds that typicality has been satisfied here.

**Adequacy**

To ensure due process requirements are met, "absent class members must be afforded adequate representation before entry of a judgment which binds them." Hanlon v. Chrylser Corp., 150 F.3d 1011, 1020 (9th Cir. 1998). There are two criteria used to evaluate whether this requirement is met: 1) does the named class representative and their counsel have any conflicts of interest with other class members; and 2) will the named representative and her counsel prosecute the action vigorously on behalf of the class. Id. In this case, the named representative and class counsel have been actively pursuing this litigation since 2003, first in this court, then in the multi-district litigation, and back in this court again. This Court has no difficulty finding that both the named representative and class

counsel will continue their vigorous prosecution of this action.

With respect to the first requirement, however, Wyeth contends that named representative April Krueger's employment relationship with class counsel "gives her an incentive to advocate in the interests of counsel, rather than the interests of class members." Doc.85 at 36. According to Ms. Krueger's declaration, she has worked on a part-time basis for class counsel's law firm since 2004 as an independent contractor. Doc. 88-2 ¶2. During this time period, Ms. Krueger also had other employment and did "not rely on the law firm for [her] livelihood." Id. Ms Krueger also states she has "no personal financial stake in this litigation, nor any personal participation or interest in what the law firm might recover, if anything." Id. ¶3. Finally, there is no proffer or argument that Ms. Krueger began taking Wyeth's HRT drugs, or initiated litigation against Wyeth, at the request of class counsel.

Unlike the cases cited by Wyeth where the class representative's livelihood depended on her employment with class counsel, see Miller v. Mercedes-Benz USA LLC, 2009 WL 1393488 (C.D. Cal 2009), or class counsel was the primary employer of the named representative, see Shroder v. Suburban Coastal Corp, 729 F.2d 1371 (11th Cir. 1984), the named representative here is not dependent on class counsel for her economic well-being. Thus, the concern that the named representative will put counsel's interest above that of her fellow class members does not appear applicable at this time.

This Court does acknowledge its duty to "undertake a stringent and continuing examination of the adequacy of representation by the named class representative[] at all stages of the litigation where absent members will be bound by the court's judgment." Susman v. Lincoln American Corp., 561 F.2d 86 (7th Cir. 1977). If the court is later made aware of facts tending to show the named representative's interest conflicts with those of the other class members, the Court will revisit this issue. See, e.g., Barboza v. West Coast Digital GSM, Inc., 179 Cal.App.4th 540, 547 (Cal. Ct. App. 2009)("it is the duty of the trial court to ensure at every stage of the proceeding that counsel is adequately representing [absent class members'] interests").

///

///

///

**CONCLUSION AND ORDER**

Based on the foregoing, the Court finds plaintiff has satisfied all of the requirements for class certification under Rule 23(a) and Rule 23(b)(3). The Court further finds it appropriate to modify the class definition to incorporate the limitation on the class discussed supra in the Court's analysis of plaintiff's CLRA claim. Accordingly, this Court GRANTS plaintiff's motion IN PART and certifies a class of:

> All California consumers who purchased Wyeth's Hormone Replacement Therapy products, Premarin, Prempro, and/or Premphase, for personal consumption between January 1995 and January 2003, and were exposed to a representation from Wyeth, or health care providers, or read in literature in which Wyeth advertised or provided to third parties to be disseminated under its brand or the third parties' brand, that Premarin, Prempro, and/or Premphase lowered cardiovascular, Alzheimers and/or dementia risk, or did not increase breast cancer risk, and do not seek personal injury damages resulting therefrom.

Plaintiff's Motion for Class Certification is **DENIED** insofar as it is based on the class definition set forth in the motion.

**IT IS SO ORDERED**.

Dated: March 29, 2011

John A. Houston
United States District Judge