Andy D. Birchfield, ASB-3625-C48A
P. Leigh O'Dell, ASB-5435-L70P
David B. Byrne, III ASB-2198-N77D
**BEASLEY, ALLEN, CROW, METHVIN,
PORTIS & MILES, P.C.**
218 Commerce Street
Montgomery, AL 36103
(334) 269-2343

Eileen L. McGeever, SBN 62076
Luci M. Montgomery, SBN 204986
**RUSHALL & McGEEVER**
6100 Innovation Way
Carlsbad, CA 92009
(760) 438-6855

W. Gary Holt, ARBN 81090
**GARY HOLT & ASSOCIATES, P.A.**
708 West Second Street
Little Rock, AK 72201
(501) 372-0266

**Attorneys for Plaintiff, APRIL KRUEGER,
Individually and on Behalf of All Others
Similarly Situated**

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| APRIL KRUEGER, Individually and on Behalf of All Others Similarly Situated,<br><br>         Plaintiffs,<br><br>      v.<br><br>WYETH, INC. f/k/a AMERICAN HOME PRODUCTS, a Pennsylvania Corporation, et al.,<br><br>        Defendants. | Case No. 3cv2496-JAH (MDD)<br><br>**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Date Filed:  October 8, 2012<br><br>Judge John A. Houston<br>Courtroom 11<br><br>Mag. Judge Mitchell D. Dembin<br>Courtroom B |

# **TABLE OF CONTENTS**

**Page**

INTRODUCTION & STANDARD OF REVIEW ...........................................................................1

FACTUAL STATEMENT……………………………………………………………………...2

   A.  Wyeth's HRT Product Labels Included Misrepresentations and Omissions
      About Breast Cancer Risks That Misled <u>Every</u> California Consumer During
      The Class Period.............................................................................................………...3

   B.  Wyeth Distorted The True Risk/Benefit Profile of HRT by Touting Unapproved
      And Unproven Cardiovascular, Alzheimer's, Dementia, and Cognitive Benefits…………..6

   C.  Wyeth Defied the FDA by Promoting HRT Drugs for Unapproved And
      Unproven Benefits………………………………………………………………9

   D.  Wyeth Used Branded and Unbranded Ads and Marketing Materials
      To Disseminate Deceptive HRT Marketing Messages……………………………….......9

   E.  Wyeth Used Other Marketing Techniques to Ensure that Every California
      Consumer and Doctor was Exposed to Its Misleading Messages About the
      Risks/Benefits of HRT………………………………………………………….............11

      1.  Sales Calls to California Doctors……………………………….……………….11

      2.  Physician Education Programs (CMEs) and VSB Lectures………………….......11

      3.  Ghost-Written Medical Articles & Publications…………………………….…...12

ARGUMENT…………………………………………………………………………………...13

   I.  <u>The Class Restitution and Damage Calculations Performed by Plaintiff's Expert</u>
      <u>Economist (Prof. Rosenthal) Do Not Conflict with the Court's Class Definition</u>....................13

   II.  <u>Dr. Rosenthal Properly Calculated Class Restitution Under the UCL and Class</u>
      <u>Refund Damages Under the CLRA – California Law Does Not Require</u>
      <u>Consideration of Individual Class Members' Views on HRTs "Value" When</u>
      <u>Making These Calculation</u>………………………………………………………….16

      A.  <u>The Calculation of Class Restitution Relief Under the UCL</u>…………………………17

      B.  <u>Calculating Class Damages Under the CLRA</u>………………………….............21

   III.  <u>California's Collateral-Source Rule Permits Recovery of the Full Retail Price</u>
       <u>of All Class Member Prescriptions</u>………………………………………………………24

CONCLUSION…………………………………………………………………..…………...25

Plaintiff's Memo. Of Points And Authorities In Opposition To Defendants' Motion For Summary Judgment
CASE NO. 03-cv2496-JAH (MDD)

i

**TABLE OF AUTHORITIES**

**FEDERAL CASES**

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242, 248 (1986)……………………………………………………..…………..…1

*Boca Raton Community Hospital v. Tenet Healthcare Corp.*,
    582 F.3d 1227 (11th Cir. 2009)……………………………………………….…14

*Celotex Corp. v. Catrett*,
    477 U.S. 317, 323 (1986)…………………………………………………………..1

*DSU Medical Corp. v. JMS Co., Ltd.*,
    296 F.Supp.2d 1140 (N.D. Cal. 2003)…………………………………………20

*Ewert v. eBay, Inc.*,
    No. C-07-02198 (N.D. Cal. Sept. 30, 2010)…………………………………...21

*In re Google Adwords Litig.*,
    No. 08-3369, 2012 U.S. Dist. LEXIS 1216 (N.D. Cal. Jan. 5, 2012)…………..……...20

*Hernandez v. Spacelabs Med. Inc.*,
    343 F.3d 1107, 1112 (9th Cir. 2003)……………………………………………1

*Kennedy v. Beaumont Investment, Ltd.*,
    111 Cal.App.4[th] 102, 135 (Cal. App. 2003)……………………………………18

*Mazza v. American Honda Motor Co.*,
    666 F.3d 581 (9th Cir. 2011)………………………………………………….15

*Paz v. Playtex Prods., Inc.*,
    No. 07-cv-2133, 2008 U.S. Dist. LEXIS 1829 (S.D. Cal. Jan. 10, 2008)…………………..22

*In re Pom Wonderful LLC Marketing and Sales Practices Litigation*,
    No. ML 10-02199, 2012 U.S. Dist. LEXIS (C.D. Cal. September 28, 2012)…………..20, 21

*Taylor v. List*,
    880 F.2d 1040, 1044 (9th Cir. 1989)……………………………………………1

*Yokoyama v. Midland Nat'l Life Ins. Co.*,
    594 F.3d 1087, 1089 (9th Cir. 2010)…………………………………………21

Plaintiff's Memo. Of Points And Authorities In Opposition To Defendants' Motion For Summary Judgment
CASE NO. 03-cv2496-JAH (MDD)

ii

# CALIFORNIA STATE CASES

*Colgan v. Leatherman Tool Grp., Inc.,*
  135 Cal. App. 4th 663 (2006)..................................................................18, 19, 20

*Feitelberg v. Credit Suisse First Boston, LLC,*
  134 Cal. App. 4th 997 (2005)……………………………………………..…17

*Fletcher v. Security Pacific National Bank,*
  23 Cal.3d 442, 453 (1979))…………………………………………….……18, 19

*Helfend v. Southern California Rapid Transit Dist.,*
  2 Cal. 3d 1 (1970)………………………………………………..………24

*Howell v. Hamilton Meats & Provisions,*
  52 Cal. 4th 541 (Cal. 2011)…………………………………………….24

*Kwikset Corp. v. Superior Ct.*
  51 Cal. 4th 310 (2011). . . . . . . . . . . . . . . . . . . . . . .….....…. . . . . .….21

*McAdams v. Monier,*
  182 Cal. App. 4th 174; 105 Cal. Rptr. 3d 704 (Cal. App. 2010). . . . . . . . . . . . 17, 18, 19, 21

*Massachusetts Mutual Life Ins. Co. v. Superior Court,*
  97 Cal. App .4th 1282; 119 Cal. Rptr. 2d 190 (Cal. 2002). . . . . …..... . . . . . .19

*Meyer v. Sprint Spectrum L.P.*
  45 Cal.4th 634, 640 (2009)…………………………….....…………………24

*Steroid Hormone Product Cases,*
  181 Cal. App. 4th 145; 104 Cal. Rptr. 3d 329 (Cal. App. 2010)……………………22, 23, 24

*In Re Tobacco II Cases,*
  46 Cal. 4th 298, 93 Cal. Rptr. 3d 559 (Cal. 2009) . . . . . . . . . . . . . .….......... . . . . . . . . 18

*In re Vioxx Class Cases,*
  180 Cal. App. 4th 116, 103 Cal. Rptr. 3d 83 (2009) . . . . . . . . . . . . . .…..... . . . . . . . . . . . 22

*Wang v. Massey Chevrolet,*
  97 Cal.App.4th 856, 869 (2002)……………………………………………...21

# FEDERAL RULES

Federal Rule of Civil Procedure 56 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .…... . . . . . . . . . . . 1

Plaintiff's Memo. Of Points And Authorities In Opposition To Defendants' Motion For Summary Judgment
CASE NO. 03-cv2496-JAH (MDD)

iii

# CALIFORNIA STATUTES

California Civil Code § 1760…………………………………………………….…………22

California Civil Code § 1770…………………………………………………….…………21

California Civil Code § 1780(a)…………………………………………………...…22, 23

California Civil Code § 3343………………………………………………………22, 23

California Civil Code § 17200…………………………………………………...…17

California Civil Code § 17203………………………………………….…...…17, 18

California Civil Code § 17500…………………………………………………...……17

Plaintiff's Memo. Of Points And Authorities In Opposition To Defendants' Motion For Summary Judgment
CASE NO. 03-cv2496-JAH (MDD)

iv

## INTRODUCTION & STANDARD OF REVIEW

A party seeking summary judgment or partial summary judgment has a heavy burden of proof. This is especially true in a case such as this one where the moving party (Wyeth) is asking the Court to completely dismiss the claims of women throughout the State of California who purchased its HRT drugs -- women that Wyeth deceived for years with material misrepresentations and misleading omissions concerning disease-prevention <u>benefits</u> of HRT (that didn't exist) and disease-causing <u>risks</u> of HRT (that did).

Pursuant to Federal Rule of Civil Procedure 56(a), "summary judgment is only appropriate if, viewing the evidence in the light most favorable to the party opposing the motion, the court finds that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." *Taylor v. List,* 880 F.2d 1040, 1044 (9th Cir. 1989). A material issue of fact is a question that a trier of fact must answer to determine the rights of the parties under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The moving party bears "the initial responsibility of informing the district court of the basis for its motion." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). To satisfy this burden, the movant must demonstrate that no genuine issue of material fact exists for trial. *Id.* at 322. In considering a motion for summary judgment the court must review the record as a whole and draw all reasonable inferences in favor of the non-moving party. *Hernandez v. Spacelabs Med. Inc.,* 343 F.3d 1107, 1112 (9th Cir. 2003).

When measured by these standards, Wyeth's motion for summary judgment clearly falls short. Wyeth's motion raises issues that are largely fact-dependent, yet it offers no evidence or analysis of disputed (much less undisputed) material facts that have a bearing on whether it is (or is not) entitled to judgment as a matter of law.[1]

Thus, while the stated objective of Wyeth's motion is the dismissal (or partial dismissal) of the UCL and CLRA claims of the Plaintiff-Class, a closer examination of Wyeth's arguments regarding "alleged" defects in the Class restitution and damage calculations of Plaintiff's economic expert reveals the true objective of the motion – Wyeth simply wants to re-introduce its earlier class certification arguments that individual members of the Class are not "ascertainable" and that any post-trial proceedings the Court may order (following the Class trial) to establish their membership; verify their individual HRT purchases; and, determine their individual share of any Class relief,

---

[1] Indeed, Wyeth did not even file a Statement of Undisputed Facts with its motion for summary judgment.

Plaintiff's Memo. Of Points And Authorities In Opposition To Defendants' Motion For Summary Judgment
CASE NO. 03-cv2496-JAH (MDD)

1

would require thousands of mini-trials or would otherwise make this case "administratively infeasible."  The Court has previously rejected these arguments in its Class Certification Orders and Wyeth's current effort to disguise them as summary judgment arguments should be rejected as well.

For these reasons, and for the reasons set forth below, Plaintiff respectfully submits that there are numerous genuine issues of material fact in this case that preclude summary judgment. Accordingly, Wyeth's motion should be denied.

## FACTUAL STATEMENT[2,3]

The instant case involves false advertising and consumer fraud in California on a massive scale, deliberately carried out by Wyeth to create new and ever-expanding markets for its HRT drugs. From 1995 through 2002, Wyeth employed a systematic, standardized, and pervasive marketing campaign in California and throughout the U.S. aimed at skewing and "rebalancing" consumer and prescriber perceptions about the risks and benefits of Wyeth's HRT drugs. Specifically, Wyeth represented to consumers and physicians that its HRT drugs protected women from cardiovascular disease, dementia and Alzheimer's disease.  It also claimed that its HRT drugs did not increase breast cancer risks.  To make matters worse, Wyeth failed to disclose to consumers and physicians that its HRT drugs actually increased, rather than reduced, the risk of cardiovascular disease, dementia, Alzheimer's and breast cancer.

Wyeth's deceptive, false and misleading marketing campaign produced the results in California that Wyeth was hoping for.[4]  Between January 1995 and January 2003, a total of

---

[2] Because Wyeth did not file a Separate Statement of Undisputed Facts with its motion for summary judgment, the Factual Statement included herein is offered by Plaintiff in lieu of a Counter-Statement of Disputed Facts. However, since the page limit for Plaintiff's response brief is 25-pages, this Factual Statement only references a portion of the evidence that the Plaintiff-Class is prepared to offer in opposition to Wyeth's motion.  Thus, to the extent the Court believes that additional facts and evidence are needed to address and/or dispose of Wyeth's motion for summary judgment, the Plaintiff-Class respectfully requests leave of the Court to supplement their Response in Opposition.

[3] All exhibits are attached to the Decl. of David B. Byrne in Opposition to Defendants' Motion for Summary Judgment; filed contemporaneously herewith.

[4] Wyeth's California HRT marketing campaign was consistent with (and did not deviate from) its national campaign. *See* Ex. 1, Marquard Dep. 34:2-34:18, 59:1-59:9, July 20, 2012 (Michael Marquard was first VP the Western Business Unit with responsibility for California and later Executive VP for Sales nationally); Ex. 2, Lahman Dep. 52:3-11, July 6, 2012 (Robert Lahman was an area business director over southern California during the Class period); Ex. 3, Connolly Dep. 54:1-54:16, July 17, 2012 (James Connolly was an area business director in northern California during the Class Period.); Ex. 4, Kidd Dep. 44:5-23, July 5, 2012 (Jana Kidd was an area business director over southern California during the Class period.); Ex. 5, Woglom Dep. 76:17-21, June 13, 2012 (During the Class period, Peggy Woglom was an area business director in southern California and area business director in southern California.); Ex. 6, Coleman Dep. 46:17-48:2, June 14, 2012 (Michelle Coleman was a sales representative in southern California during the Class period).

Plaintiff's Memo. Of Points And Authorities In Opposition To Defendants' Motion For Summary Judgment
CASE NO. 03-cv2496-JAH (MDD)

**46,915,632** Wyeth HRT drug prescriptions were written for California women --- at a cost of nearly **$1.3 billion dollars**.[5] By the end of the 1990's, **almost half of postmenopausal women in the U.S. were taking long-term hormone therapy.**[6] By 1997, Wyeth's HRT drugs were **the most prescribed drugs in the U.S.** and from 1999 until June 2002; over **90 million HRT prescriptions** were dispensed annually to U.S. women.[7]   However, Wyeth's campaign was dealt a serious blow in July 2002 when the Women's Health Initiative ("WHI"), a nationwide HRT clinical trial sponsored by the National Institutes of Health abruptly terminated the Prempro arm of the trial because study participants exceeded the statistical safety boundary for overall disease rates, including breast cancer and cardiovascular events. Subsequent reports issued by the principal WHI study investigators showed that HRT increased risks for breast cancer, strokes, heart attacks, cardiovascular disease, Alzheimer's disease, and dementia.[8],[9],[10] Following the publication of the 2002 WHI study reports, sales of Wyeth's HRT drugs plummeted.[11]   As HRT drug prescriptions declined dramatically in 2003 and 2004, so did the rate of invasive breast cancers – in California[12] and throughout the U.S.[13]

A. **Wyeth's HRT Product Labels Included Misrepresentations and Omissions About Breast Cancer Risks That Misled <u>Every</u> California Consumer During the Class Period**

From 1995 until the WHI results were published in 2002, the breast cancer warnings in Wyeth's HRT product labels remained virtually the same.   More importantly, **every woman in**

---

[5] *See* Meredith Rosenthal, Ph.D., Report and CV; Ex. 7, at Table D.3.

[6] Ex. 8 (PX M1690)

[7] Ex. 9 (PX M0077)

[8]  Ex. 10 (PX M0030,

[9] Ex. 11 (PX M0032), Shumaker S.A., et al.; *Estrogen plus Progestin and the Incidence of Dementia and Mild Cognitive Impairment in Postmenopausal Women: the WHI Memory Study*; JAMA 2003; 289(2):2651-2662 (Finding that Prempro <u>doubled</u> the risk of dementia and substantially increased Alzheimer's risks).

[10] In 2004, the Premarin arm of the WHI trial was also stopped prematurely when it was discovered that study participants receiving the medication had a 39 percent increased risk of strokes and a 47 percent increased risk of venous thrombosis (blood clots). Ex. 12 (PX M0485), Anderson, G.L., et al.; *Effects of Conjugated Equine Estrogen in Postmenopausal Women with Hysterectomy: WHI Randomized Controlled Trial*; JAMA 2004; 291(14):1701-1712.

[11] Ex. 8 (PX M1690), p. 1987.

[12] Ex. 13 (PX M4770), Robbins AS, Clarke, CA, *Regional Changes in Hormone Therapy Use and Breast Cancer Incidence in California from 2001 to 2004.* J. Clin. Oncol. 2007 June 25.

[13] Ex. 14 (PX M4743), Ravdin P.M., et al.; *The Decrease in Breast Cancer Incidence in the United States*; N Engl J Med 2007; 356(16):1670-1674.   *See also*, Ex. 15 (PX 4771), Clarke, *Declines in breast cancer after the WHI: apparent impact of hormone therapy*, Cancer Causes Control (2007) at p. 4 ("the number of breast cancers related to E+P use could be on the order of hundreds of thousands").

**California** who purchased Wyeth's HRT drugs during the class-period was exposed to these false and misleading breast cancer "warnings" – **because they came with each purchase**.

What's more, even though Wyeth learned of studies conducted by independent researchers during the class-period (and in earlier years)[14] that showed a real breast cancer risk with HRT, Wyeth never bothered to update or change any of the misleading statements (or material omissions) concerning breast cancer risks in its HRT labels. The first two (2) sentences in the breast cancer section of Wyeth's pre-WHI labels are good examples of the deceptive statements that **every California purchaser** was exposed to. Consider each sentence in turn.

     1.   *"Some studies have reported a moderately increased risk of breast cancer (relative risk of 1.3 to 2.0) in those women on estrogen replacement therapy taking <u>higher doses</u>, or in those taking lower doses for prolonged periods of time, especially <u>in excess of 10 years</u>."*(Emphasis supplied).

Despite this representation, Wyeth actually knew that the risk of breast cancer existed for ALL doses of HRT, not just higher doses. In an October 17, 1994, memorandum provided to Wyeth by Dr. Trudy Bush, a long-time Wyeth consultant, Dr. Bush informed Wyeth that the National Cancer Institute had generated data showing an increased risk of breast cancer in women on **any** dose of HRT.[15] Further, Wyeth knew the risk of breast cancer existed for a duration of use significantly less than ten years. In August of 1989, a published study in the prestigious New England Journal of Medicine reported a 4.4 relative risk of breast cancer following six-years use of HRT. The article also showed an increase in risk after just two years of use.[16] Although these findings were clearly important, Wyeth never modified the warnings in its label to account for the findings and actually instructed its sales representatives that "under no circumstances should you initiate discussions concerning this study."[17]

     2.   *"The <u>majority of studies</u> however, <u>have not shown an association</u> in women who have ever used estrogen replacement therapy."* (emphasis supplied).

---

[14] As early as 1976, Wyeth's own medical director, Dr. Mike Stern, acknowledged in an internal company memo that "in view of the widespread use of estrogens with or without progestin, there is a valid concern as to whether or not the use of exogenous estrogen leads to an increase in the incidence of breast cancer" and that "[a]lthough estrogens may not bring about breast cancer, they are capable of accelerating growth of previously established breast tumors." *See* Ex. 16 (PX 28).

[15] Ex. 17 (PX 8638).

[16] Ex. 18 (PX M0600).

[17] Ex. 19 (PX 114).

Wyeth knew this statement was false from the moment it first appeared in the company's HRT product labels and it became substantially more inaccurate as the years went on.  In reality, the majority of studies conducted on HRT showed an increased risk of breast cancer.  In fact, three times as many pre-WHI studies reported an increased risk with HRT versus no risk.  And among review articles or meta-analysis studies, four of the five reported an increased HRT risk of breast cancer.[18]   The only article that did not report an increased risk was one published by Wyeth's consultant, Dr. Trudy Bush -- which Wyeth actually "ghost-wrote" for her.[19]

Plus, as the years went on, information became available to Wyeth that there was actually a causal connection between HRT and breast cancer. In 1995, for example, a highly regarded breast cancer researcher, Dr. Graham Colditz (who Wyeth actually hired as a consultant at one point), published data from the Nurse's Health Study.  In this article, Dr. Colditz, reported a "significant increase in the risks of breast cancer and of death due to breast cancer among women over 55 who are currently taking hormones."[20] Rather than disseminate this finding to California doctors and patients, Wyeth's medical director, Dr. Deitch, instead called Dr. Colditz to reprimand him for publishing his data – since Wyeth's stock had taken a hit as result.[21]  Wyeth also met with its Public Relations consultant, Burson Marstellar, to devise a way to blunt the negative news.  Wyeth and its consultant created a strategy to "shift media focus" away from the study data and to "undermine/cast doubt on validity of data."[22] The plan was to have Burson Marstellar draft "Letters to the editors and/or Op-Ed pieces" to off-set this data and Wyeth would find "appropriate authors" to put their names on the PR piece.  The journals would publish the piece without realizing that Wyeth and Burson Marstellar actually wrote them.[23] The plan also called for Wyeth to have one of its consultants, either Dr. Speroff or Dr. Bush, provide a dissenting opinion by stating that there was "no definitive answer" regarding hormone therapy and breast cancer "even after 40 observational studies."[24]

---

[19] Ex. 20 (PX ML1933); Ex.21 (PX 8155B).

[20] Ex. 22 (PX M0003).

[21] Ex. 23 (PX 21007).

[22] Ex. 24 (PX 8744A).

[23] *Id.* at p. 5.

[24] *Id.* at p. 2.

Plaintiff's Memo. Of Points And Authorities In Opposition To Defendants' Motion For Summary Judgment
CASE NO. 03-cv2496-JAH (MDD)

5

A week later, Wyeth sent a "Dear Doctor" letter to prescribing physicians across the country. In this letter, Wyeth reassured physicians that there was no breast cancer risk (but most definitely a cardiovascular benefit):

> "*Leon Speroff, M.D., a leading research expert from Oregon Health Sciences University, commented on the data at the March 1995 meeting of the Society of Gynecologic Investigation, saying that despite some 40 observational studies, **no consistent data linking estrogen use and breast cancer exist,** and none of these studies have ever shown causality between ERT and mortality due to breast cancer. He further added that the data from the studies have been inconsistent and ultimately inconclusive, **which is unlike the relationship between ERT and cardiovascular benefits where there is uniform and consistent data**.*"[25] (emphasis supplied).

Of course, Wyeth's Dear Doctor letter completely failed to mention the fact that Dr. Speroff was a paid Wyeth consultant and that the quote attributed to Dr. Speroff in the letter was actually written – verbatim – by Burson Marstellar, Wyeth's PR group a week earlier. Even more damning, Wyeth then started a patient survey study where the goal of the study was to determine whether patients were aware of Dr. Colditz's study and would that knowledge affect their decision to keep taking Wyeth's drugs.[26] Wyeth spent money, not to publicize the news of this finding, but rather to "estimate the impact on business."[27] Wyeth even congratulated its senior executives for helping to "manage" the Colditz crisis stating that it "was a great example of how the organization can pull together for the good of the business."[28]   One thing is clear:  these decisions were not made with the good of California patients in mind.

**B.   Wyeth Distorted The True Risk/Benefit Profile of HRT by Touting Unapproved and Unproven Cardiovascular, Alzheimer's, Dementia, and Cognitive Benefits**

From the very start, Wyeth's HRT drugs were only approved by the FDA for the treatment of moderate to severe menopausal vasomotor symptoms[29] ("hot flashes," etc.), vaginal atrophy, and

---

[25] Ex. 25 (PX 1579); Ex. 24 (PX 8744A), p. 1, 2 & 4. *See also,* Ex. 26 (PX 5775) (2/22/00 Dear Doctor letter referencing a treatise authored by Dr.   Speroff "ERT and HRT protect against osteoporosis and are associated with a reduced risk of developing heart disease.")

[26] Ex. 27 (PX 1583).

[27] Ex. 28 (PX 1587).

[28] Ex. 29 (PX 0133).

[29] Ex. 30 (PX 1206) (According to Wyeth's own internal data, only 17.5% of women between the ages of 50 and 59 become so lacking in natural hormones after menopause that they experience the type of significant menopausal symptoms that HRT was approved to treat).

short-term osteoporosis prevention.[30]   Yet throughout the class-period Wyeth waged an insidious campaign of deception to convince the medical community and the public that its HRT drugs had a variety of unproven "benefits" and minimal to non-existent breast cancer risks.   What motivated Wyeth to do this? The answer is <u>profits</u>.

Wyeth knew that the biggest obstacle to its plan to create a market in which ALL menopausal and postmenopausal women would take its HRT drugs and continue taking them for the rest of their lives was fear of breast cancer.[31]   Therefore, Wyeth instituted a marketing campaign to "change the HRT paradigm" by shifting the risk-benefit scale in its favor.  Wyeth's Group Product Director for the Premarin Family of products, Jamie Durocher, described the plan in stark detail in a 1998 report and presentation entitled "The U.S. Market, a Case Study in the Success of Changing the HRT Paradigm."[32] The presentation includes a series of graphics that depict the history and evolution of Wyeth's HRT marketing efforts via a set of scales weighing public perceptions about the risks and benefits of the drugs at different points in time.[33]



The scale corresponding to the 1980's time-period shows that public perceptions about the risks of HRT use (primarily breast cancer risks) outweigh the vasomotor treatment benefits that the drugs were approved for.[34] The next set of scales in the presentation, representing risk/benefit perceptions in the 1990's, depicts the same public perceptions about breast cancer risks and HRT

---

[30] Ex. 26 (PX 5775), p. 3-4;

[31]  Ex. 31 (PX 5756)

[32] Ex. 32 (PX 7182).

[33] *Id*. at 15-16.

[34] *Id*. at 15.

Plaintiff's Memo. Of Points And Authorities In Opposition To Defendants' Motion For Summary Judgment
CASE NO. 03-cv-2496-JAH (MDD)

7

use on one side of the scale.[35]   However, the other side of the 1990's scale includes perceived "prevention" benefits for cardiovascular disease, Alzheimer's disease, and macular degeneration – in addition to the benefits of vasomotor "treatment" and short-term osteoporosis prevention.

Together, this new collection of "perceived" benefits (both the FDA-approved benefits and the cardiovascular and Alzheimer's/dementia benefits fabricated by Wyeth) is shown to shift or tip the 1990's risk/benefit scale so that the benefits outweigh any public perceptions or concerns about breast cancer risks. To further emphasize the point of the scale diagrams, Ms. Durocher's presentation also outlines three related goals of Wyeth's HRT marketing plan:[36] First, expand the market for hormone therapy from treatment to prevention and enhancement of overall health. Second, increase acceptance of hormone therapy by managing the breast and endometrial cancer issues. Third, promote intervention of doctors' prescribing habits and making sure they prescribe hormone therapy for long-term use.

Wyeth's marketing scheme was clearly intended to give women (and their doctors) inaccurate and misleading information about the risks and benefits of HRT.  The scheme was deceptive and it violated FDA regulations. It has long been a violation of FDA regulations for a pharmaceutical company to promote its drugs for unapproved ("off-label") uses. Also, FDA regulations define the "labeling" of a drug to include not just the printed package insert, but also all information the manufacturer provides about the safety, efficacy and uses of the drug – irrespective of whether that information is physically attached to the product itself.  21 U.S.C. § 321, *et seq.*

Despite these restrictions, Wyeth consistently promoted its HRT drugs for ***off-label*** benefits like cardiovascular disease and Alzheimer's protection to defuse women's concerns about breast cancer -- the biggest obstacle to HRT sales.  With the help of outside marketing consultants, Wyeth began "Repositioning the Breast Cancer Issue" during the class-period through a variety of marketing "pipelines", including Op-Ed pieces in newspapers and magazines; radio programs; on-line forums; the use of influential spokespeople; direct-to-patient promotional/educational pamphlets; and, desk-side briefings with television network reporters and talk show hosts.[37] Wyeth also sought to influence women's doctors by sponsoring continuing medical education ("CME") seminars and polluting both the scientific and lay literature with ghost-written articles. The goal of these powerful communication

---

[35] *Id.* at 16.

[36] Id. at 13-14

[37] Ex. 33 (PX 5677).

weapons was to reassure women and their doctors that the breast cancer risk was a hoax, convince them that hormone therapy prevented many serious diseases, and motivate them to feel outraged at critics of hormone therapy for frightening them about breast cancer.[38]

### C. Wyeth Defied the FDA by Promoting HRT Drugs for Unapproved & Unproven Benefits

In 1989, Wyeth asked the FDA to approve cardiovascular protection as a new indication for HRT.[39] In 1992, the FDA rejected Wyeth's application because the company had not submitted any adequate controlled clinical trials to prove that hormone therapy protected women against heart attacks and strokes. Furthermore, as Wyeth knew, evidence suggested that MPA (progestin) counteracted any putative benefits of estrogen alone.[40] Wyeth promoted hormone therapy for cardiovascular benefits anyway. Wyeth reasoned that it was lawful to do so because the "precautions" section of its HRT label contained a discussion of data showing a lipid lowering effect. The FDA explicitly rejected Wyeth's position and placed the lipid data in the "precautions" section "to prevent Wyeth from promoting [HRT] for what FDA considers to be a 'yet to be proven' benefit."[41] But that didn't stop Wyeth from continuing to tout HRT as an effective treatment for the prevention of cardiovascular disease and high cholesterol during the class-period.[42]

### D. Wyeth Used Branded and Unbranded Ads and Marketing Materials to Disseminate Deceptive HRT Marketing Messages

Beginning in 1997, Wyeth inundated women's magazines and television with a barrage of direct-to-consumer ("DTC" advertisements). Wyeth's market research taught it that consumer knowledge of HRT's benefits "can prove to be powerful motivators – turning candidates into users."[43] Wyeth's DTC campaign consisted of a mix of two different types of advertising: "unbranded" ads and "branded" ads. "Unbranded" drug ads are used to "educate" consumers about medical conditions – without mentioning the drug by name – and to encourage consumers to ask

---

[38] *Id.* at 000095.

[39] Ex. 34 (PX 5988).

[40] Ex. 35 (PX 0093); Ex. 36 (PX 1567); and, Ex. 37 (PX 0239).

[41] Ex. 38 (PX 3422).

[42] *See* Ex. 39 (PX 0349); Ex. 40 (PX 0345).

[43] Ex. 41 (PX 0461).

Plaintiff's Memo. Of Points And Authorities In Opposition To Defendants' Motion For Summary Judgment
CASE NO. 03-cv-2496-JAH (MDD)

9

their doctors about treatment options. The FDA has no authority to regulate "unbranded" ads because technically, drug companies are not promoting their specific drugs by name. By not mentioning the HRT drugs by name, Wyeth's unbranded ads allowed it to avoid the FDA's product-promotion regulations.[44]

The purpose of Wyeth's "unbranded" ad campaign was "to grow prescription volume by educating physicians to the benefits of HRT and overcoming resistance to initiating therapy."[45] Wyeth used the "unbranded" ads as a smooth transition to its HRT "branded" ad campaign. Wyeth's "unbranded" ads were a powerful marketing tool because they "drove" women into their doctors' offices to ask about HRT.[46] And because Wyeth's HRT drugs made up 92% of the hormone therapy market, almost every woman who sought hormone therapy got a prescription for HRT.[47]

In 2000, Wyeth launched an unbranded campaign featuring the celebrity Lauren Hutton.[48] She promoted hormone therapy as a cure for diseases caused by estrogen loss, including cognitive dysfunction, heart disease, colon cancer, bone fractures, macular degeneration, and tooth loss.[49] Over half a million women responded to the Lauren Hutton ad campaign in the U.S.[50]

Wyeth also ran "branded" ads.[51] These ads mentioned Wyeth's HRT drugs by name. The FDA regulates the content of branded ads for prescription drugs. That is, branded ads must not promote the drug for unapproved uses. But Wyeth did not need to promote its HRT drugs illegally in its branded ads, because it had already gotten the message across in its unbranded ads. In fact, branded and unbranded ads were deceptively identical in appearance. Wyeth cleverly used the same color schemes, phrases, and even fonts, in the branded ads[52] as it did in the "unbranded" ads.[53]

The branded/unbranded campaign during the class-period was a coup for Wyeth's HRT sales. Wyeth's marketing research revealed that 75 percent of all women had become familiar with

---

[44] Ex. 42 (PX 0992), p.3.

[45] Ex. 43 (PX 0361).

[46] Ex. 41 (PX 0461), p.8.

[47] *Id.*

[48] Ex. 42, (PX 0992), p.8.

[49] Ex. 44 (PX 0586), p.8.

[50] Ex. 45 (PX 0720), p.9.

[51] Ex. 42 (PX 0992), p.4.

[52] Ex. 46 (PX 8424); Ex. 47 (PX 8423).

[53] Ex. 48 (PX 8425)

its HRT drugs during the company's DTC efforts.[54] Wyeth's DTC blitz made hormone therapy ubiquitous. In short, Wyeth made it impossible for women living in California during the class-period to avoid being exposed to the message that its HRT drugs provided a host of benefits and little if any risk of breast cancer.

### E. Wyeth Used Other Marketing Techniques to Ensure that Every California Consumer and Doctor was Exposed to Its Misleading Messages About the Risks/Benefits of HRT

Wyeth used a number of other marketing techniques to ensure that its deceptive messages concerning the risks and benefits of its HRT drugs reached every California consumer and doctor. These techniques included:

#### 1. Sales Calls to California Doctors

Between 1995 and 2003, Wyeth sales representatives made more than a million HRT-related sales calls to doctor's offices and hospitals throughout California.  During a substantial portion of this time-period, sales representatives documented and described their sales meetings and discussions with doctors in Wyeth's Leapfrog and SalesWorks databases.  The "Call Note" databases document countless instances where Wyeth representatives misled California physicians with representations – both oral and in written marketing pieces, patient education brochures (e.g., breast cancer "tear sheets", "Body of Evidence", etc.) – that Wyeth's HRT drugs would lower their patients' risk of cardiovascular disease, lower their risk of Alzheimer's disease, lower their risk of dementia, and would not increase their risk of breast cancer. Examples of these call notes are attached to this Response.[55] Even a cursory review of the call note examples provided in Exhibits 50 and 51 demonstrate that Wyeth sales representatives were an integral part of  the company's  "Off-Label" marketing campaign in California and that the sales force managed to convey Wyeth's deceptive HRT marketing messages to virtually every doctor's office and hospital in the state (repeatedly).

#### 2. Physician Education Programs (CMEs) and VSB Lectures

Wyeth also recruited high-prescribing doctors and HRT medical advocates throughout California for its Visitor Speaker Bureau ("VSB") program. Sales reps. were trained to be "selective"

---

[54] Ex. 49 (PX 5733), p.2.

[55] Ex. 50; Ex. 51.

and to "evaluate physicians carefully" to ensure that the speakers were true product advocates. Not surprisingly, the four Ob/Gyn doctors that Wyeth has disclosed as testifying experts in this case were long-time Wyeth VSB speakers and gave countless HRT-related lectures at VSB lunches/dinners and Continuing Medical Education Programs ("CMEs") throughout California.[56]  In fact, two of Wyeth's Ob/Gyn experts have admitted that their VSB physician-lectures were essentially "product promotion" talks.[57] Of course, the aim of all these "educational" programs (which were not monitored by the FDA) was to communicate Wyeth's message that its HRT drugs did not cause breast cancer and provided cardiovascular, Alzheimer's, and cognitive benefits.[58]

### 3.  Ghost-Written Medical Articles & Publications:

During the Class Period, Wyeth "ghost-wrote" and published numerous HRT-related medical articles with the help of consulting companies like Design-Write, Inc. The purpose of Wyeth's ghost-writing campaign was to flood the medical community with articles that both minimized the breast cancer risks associated with its HRT drugs and promoted their cardiovascular, Alzheimer's, and general cognitive benefits.[59]  Naturally, Wyeth was fully aware that prescribing doctors relied heavily on medical journal articles for credible information on drug risks and benefits.

By March 2001, Wyeth was tracking its involvement in more than 50 ghost-written articles that it categorized under topics like "Breast Cancer Message", "Cardiovascular Message" and "CNS [Alzheimer's] Message".[60] Wyeth even ordered its Publications Planning Committee to publish at least "one positive piece" each month. [61] Yet throughout the class-period, Wyeth never informed doctors or the FDA that it was the driving force behind all of these HRT publications.  Instead, Wyeth allowed doctors to believe that all of these articles were authored by legitimate scientists.

---

[56] *See*, Ex. 52, Depo. of Michael Policar, M.D. (8/10/2012),  p. 128:21 – 130:20.  Ex. 53, Depo. of Anita Nelson, M.D. (7/27/2012),  p. 92:3-7;  97:14-23; &, 105:10 - 106:25. Ex. 54, Depo. of Mindy Goldman, M.D. (1/19/2012),  p. 81:4 -12; and, Ex. 55, Depo. of Raquel Arias, M.D. (4/17/2008), p.287:9 - 290:6.

[57] Ex. 52, Depo. of M. Policar, M.D., p. 131:16 – 136:24.  Ex. 53, Depo. of A. Nelson, M.D., p. 99:3-14.

[58] Ex.56 (PX 7422A); Ex. 57 (PX 427); Ex. 58 (PX 423).

[59] Ex. 59 (PX 0937) at p.3 & 8; Ex. 21 (8155B); and, Ex. 60 (PX 0390).

[59] Ex. 61 (PX 8155G).

[60] Ex. 62 (PX 1654); and, Ex. 63 (PX 0956).

# ARGUMENT

## I.   The Class Restitution and Damage Calculations Performed by Plaintiff's Expert Economist (Professor Rosenthal) Do Not Conflict with the Court's Class Definition

As demonstrated in Plaintiff's Factual Statement, Wyeth's systematic, standardized, and broadly disseminated fraudulent advertising campaign and active attempts to "skew the medical standard of care" poisoned the well of information in the HRT market for all consumers. Moreover, the evidence accompanying Plaintiff's Response clearly shows that every California woman who purchased Wyeth's HRT drugs during the class-period was exposed to: Wyeth's representations that HRT did not increase the risk of breast cancer; its omission that HRT did in fact increase the risk of breast cancer; its representations that HRT decreased the risk of cardiovascular disease, Alzheimer's disease, and dementia; and, its omission that HRT actually increased the risk of developing those three diseases.   In view of this evidence, it was completely appropriate for Professor Rosenthal to consider all of the HRT prescriptions purchased in California during the class-period (excluding personal injury claimant purchases) for purposes of calculating Class damages under the Consumer Legal Remedies Act ("CLRA") and Class restitution under the Unfair Competition Law ("UCL").

In challenging these calculations however, Wyeth's motion for summary judgment makes no effort to justify or explain its business misconduct in California during the class-period – much less its scope and reach.  Nor does the motion provide any evidence to suggest that California women were able to purchase Wyeth's HRT products during the class-period without being exposed to Wyeth's misleading statements about breast cancer risks in its HRT product labels and/or its "systematic, standardized, and broadly disseminated advertising campaign misrepresenting the benefits of HRT drugs". [ECF No. 108, p. 11].

Yet despite Wyeth's failure to present any facts (much less undisputed facts) pertaining to this issue, it's motion seeks the complete dismissal of the Class' UCL and CLRA claims because Dr. Rosenthal's damage and restitution calculations considered all HRT prescriptions purchased in California during the class-period and thus, only provide "a damages estimate for the class definition *rejected* by the Court".  [ECF No. 206-1, p. 1].

Contrary to Wyeth's suggestion, the restitution and damage claims of the Plaintiff-Class and Professor Rosenthal's calculations are fully consistent with (and do not deviate from) the Class definition approved by the Court.  As Wyeth knows full well, Plaintiff's position has been clear

Plaintiff's Memo. Of Points And Authorities In Opposition To Defendants' Motion For Summary Judgment
CASE NO. 03-cv2496-JAH (MDD)

13

from the beginning of this case that every woman in California who purchased its HRT drugs during the Class period was exposed to a misrepresentation or omission about breast cancer risks in Wyeth's product labels (which accompanied every prescription) and/or, a misrepresentation or omission about the "alleged" cardiovascular, Alzheimer's or dementia benefits of HRT that Wyeth's "systematic, standardized, and broadly disseminated advertising campaign" touted (to doctors and consumers) for 8-years. Moreover, Plaintiff's position has consistently been that Wyeth "failed to disclose [to every California purchaser] that HRT had the opposite effects of those advertised and actually increased the risk of heart disease, dementia and Alzheimers." [ECF No. 108, p. 12]. Wyeth's motion offers no evidence to refute this – because it has none.

For this reason alone, Wyeth's motion should be denied. However, Plaintiff also urges the Court to deny Wyeth's motion for the following additional reasons as well.

**First**, Wyeth's argument chiefly relies on a case that is not applicable: *Boca Raton Community Hospital v. Tenet Healthcare Corp.*, 582 F.3d 1227 (11th Cir. 2009). *Boca Raton* is an Eleventh Circuit Court of Appeals case that does not interpret the CLRA, UCL, or any other California Act or Civil Code provision. Instead, *Boca Raton* dealt with a RICO claim that Boca Raton Community Hospital brought against Tenet Healthcare alleging that Tenet engaged in a practice called "turbocharging" in order to manipulate Medicare's "outlier" program and garner more reimbursements than its cases justified. *Boca Raton*, 582 F.3d at 1227. Boca sought to represent a class of acute-care hospitals that received at least one outlier payment between 2000 and 2004 and had an unaudited ratio above Medicare's National threshold. According to Boca, Tenet's practice of turbocharging forced Medicare to increase the loss threshold and that resulted in Boca and others receiving less outlier money for extraordinary-cost cases that they would have but for Tenet's conduct. Boca's damages expert purported to show that Tenet's overcharging had caused the loss threshold to increase, that Boca would have received additional outlier payments but for Tenet's overcharging, and the amount of those additional outlier payments. *Id.*at 1231. The Eleventh Circuit held that Boca's expert opinion on injury and damages was overbroad because it accounted for and incorporated not only Tenet's unlawful charges but also its lawful charges. As a result, the damages were overstated.

Clearly, the *Boca Raton* decision is not applicable in this case. Here, Plaintiff does not overstate the damages caused by Wyeth's misconduct. Plaintiff's theory is, and has always been, that each woman who was prescribed and purchased HRT in California during the class period was

exposed to Wyeth's omissions and misrepresentations. The Factual Statement provided by Plaintiff fully supports this theory – even though it only references a portion of the evidence that the Plaintiff-Class intends to offer at trial (due to page-limitations).

**Second**, the other case that Wyeth cites in support of its summary judgment argument, *Mazza v. American Honda Motor Co*., 666 F.3d 581 (9th Cir. 2012),  is also inapplicable. Unlike the facts in *Mazza*, the omissions and misrepresentations at issue in this case were not made for a limited time in a small geographic area.  Rather, Wyeth's orchestrated efforts to suppress safety information about breast cancer and to misrepresent the benefits of HRT were carried out over more than eight years in California and throughout the U.S. The Court acknowledged this in its Class certification order:   "According to the proffered evidence, Wyeth conducted a systematic, standardized, and broadly disseminated advertising campaign misrepresenting the benefits of HRT drugs for the class period to induce California consumers to purchase HRT while failing to disclose the known fact that the drug actually increased, rather than reduced, the risks." [ECF No. 108, p. 11.) .  Again, Wyeth's motion offers no evidence to refute the Court's assessment; much less demonstrate that Professor Rosenthal's damage and restitution calculations are inconsistent with the Court's class definition. At best, Wyeth's motion simply makes the point that the scope and reach of its marketing misconduct in California during the class-period is a genuine (and hotly-disputed) issue of material fact.

**Third,** Professor Rosenthal's opinions relate to damages only. She was not asked – as Plaintiff's liability experts were -- to offer opinions about Wyeth's integrated marketing plan that systematically misrepresented the nature of HRT and omitted material facts that would have been important to both physicians and patients. Thus, it is perfectly appropriate for Professor Rosenthal to rely on the Plaintiff to prove her case in rendering her opinions.

**Lastly,** Wyeth has not challenged Professor Rosenthal's underlying methodology in calculating either the full refund or the out-of-pocket refund damages of the Class.  Nor has Wyeth challenged Professor Rosenthal's methodology in calculating the profits it earned on HRT sales to the Plaintiff-Class.  Indeed, Wyeth's <u>only</u> criticism of Professor Rosenthal is that she assumed in her analyses that all women who purchased HRT in California during the class-period were exposed (not relied, but exposed) to a Wyeth misrepresentation or omission.  Once again though, Wyeth's motion for summary judgment does not even include an explanation or theory for how a California woman could have purchased its HRT drugs during the class-period and <u>not been exposed</u> to a

Plaintiff's Memo. Of Points And Authorities In Opposition To Defendants' Motion For Summary Judgment
CASE NO. 03-cv2496-JAH (MDD)

15

misrepresentation or omission about breast cancer risks in Wyeth's product labels (which accompanied every prescription) and/or, a misrepresentation or omission about the "alleged" cardiovascular, Alzheimer's or dementia benefits of HRT that Wyeth's "systematic, standardized, and broadly disseminated advertising campaign" touted during the class-period.  Of course, Wyeth's motion offers no explanations or theories on that point because it doesn't have any that are plausible.

**II.** **Dr. Rosenthal Properly Calculated Class Restitution Under the UCL and Class Refund Damages Under the CLRA – California Law Does Not Require Consideration of Individual Class Members' Views on HRTs "Value" When Making These Calculations.**

Alternatively, Wyeth argues that it is entitled to partial summary judgment because Professor Rosenthal's calculation of Class restitution under the UCL and her calculation of Class refund damages under the CLRA did not account for individual Class members' subjective views on the "value" of HRT.  Specifically, Wyeth contends that Professor Rosenthal's calculations are fatally flawed because Plaintiff did not ask her "to put forth a damages model that either accounts for the benefits derived by plaintiff's class (to recover restitution or restitutionary disgorgement) or determines the loss of value to class members (to recover actual damages)." [Id. at ECF 206-1, pg. 14:17-20].

As demonstrated below, the Plaintiff-Class has remedies available to it under the UCL and CLRA and the calculation of these remedies do **not** require (as Wyeth suggests) consideration of each individual class members' subjective views concerning the value of HRT **or** an analysis of any positive experiences an individual class member may have had while taking HRT that could possibly off-set the negative value-impact of Wyeth's deceptive misrepresentations and omissions. Wyeth's arguments erroneously amalgamate the methods for calculating restitution under the UCL and damages under the CLRA.  As the Court is aware, the remedies available under each Act are distinct and cumulative and should be considered separately.

Moreover, Wyeth's motion is conspicuously silent on the question of how an assessment of each Class member's subjective views concerning HRT's "value" could have been made by Dr. Rosenthal at this stage of the litigation – even if California law required her to do so (which it does not).  This is hardly surprising since Wyeth knows full well that absent class members are just now receiving the Class Notice approved by the Court that informs them of the Court's class certification Order; the Class claims; and, their right to opt-out of the litigation within the deadline imposed by

Plaintiff's Memo. Of Points And Authorities In Opposition To Defendants' Motion For Summary Judgment
CASE NO. 03-cv2496-JAH (MDD)

16

the Court (i.e., December 19, 2012).  Wyeth also knows that the Court's prior Class Certification Orders contemplate that the process of verifying the class membership and HRT purchases of individual Class members will take place in post-trial proceedings following the Class trial. Lastly, Wyeth knows that the Court's prior Orders do not suggest that an individualized assessment of Class members' personal views on the "value" of HRT will be required at <u>any stage</u> of the proceedings.

Accordingly, the primary objective of Wyeth's motion for partial summary judgment seems clear – it simply wants to re-introduce its earlier class certification arguments that individual members of the Class are not "ascertainable" and that any post-trial proceedings the Court may order (following the Class trial) to establish their membership; verify their individual HRT purchases; and, determine their individual share of any Class relief, would be "administratively infeasible." The Court has previously considered and rejected both arguments in its prior Class Certification Orders and regardless of how Wyeth might try to "repackage" them now as summary judgment arguments -- they are still without merit.

### A.  The Calculation of Class Restitution Relief Under the UCL

The purpose of the UCL "is to protect both consumers and competitors by promoting fair competition in commercial markets for goods and services. Cal. Civ. Code § 17200.  It defines unfair competition as "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by the false advertising law." Cal. Civ. Code § 17500.  The UCL is limited to injunctive, restitutionary and related relief. *Id.* § 17203.  According to section 17203, "[t]he court may make such orders or judgments ... as may be necessary to prevent the use ... of any practice which constitutes unfair competition ... , or as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition." *Id.* § 17203; *see* McAdams v. Monier, 182 Cal. App. 4th 174, 187 (2010).

As the Court noted in its class certification order, restitutionary disgorgement is allowed under the UCL. *See* ECF No. 108, p. 19, n. 10; <u>see</u> *Feitelberg v. Credit Suisse First Boston, LLC*, 134 Cal. App. 4th 997, 1013 (2005)).  One possible measure of restitutionary disgorgement is the return to Plaintiff of monies earned by Wyeth on the sale of HRT to class members.  For this reason, Plaintiff plans to offer at trial Professor Rosenthal's analysis of the profits earned by Wyeth on sales to class members during the class period.

Plaintiff's Memo. Of Points And Authorities In Opposition To Defendants' Motion For Summary Judgment
CASE NO. 03-cv2496-JAH (MDD)

17

1   In its argument for partial summary judgment, Wyeth suggests that the proper method for

2   determining restitution in this case under the UCL is the difference between the price that an

3   individual Class member paid for an HRT prescription and the "value" that individual received when

4   she consumed the drug. Additionally, Wyeth suggests that despite any misrepresentations or

5   omissions about breast cancer risks or unproven (and unapproved) cardiovascular, Alzheimer's or

6   dementia benefits that it might have exposed individual Class members like Plaintiff April Krueger

7   to – they all received so much value from their HRT prescriptions that their restitution claims are

8   effectively zeroed-out.[62]   Of course, both suggestions are inaccurate and Wyeth's entire argument

9   badly mischaracterizes the law pertaining to the calculation of Class restitution under the UCL.

10   In arriving at an appropriate amount of restitution under the UCL, the Court's focus should

11   be on Wyeth's conduct since the purpose of the UCL is to protect the public against unscrupulous

12   business practices like the ones at issue in this case.  *In re Tobacco II Cases,* 46 Cal. 4th 298, 311

13   (2009) (citing *Fletcher v. Security Pacific National Bank,* 23 Cal.3d 442, 453 (1979)).  Restitution is

14   intended to penalize a defendant for unlawful conduct and thereby deter future violations. *Colgan v.*

15   *Leatherman Tool Group, Inc.,*[63] 135 Cal.App.4th 663, 694 (Cal. App. 2006) (citing *People ex rel.*

16   *Kennedy v. Beaumont Investment, Ltd.,* 111 Cal.App.4th 102, 135 (Cal. App. 2003)).  Furthermore,

17   the measure of restitution should be whatever it would take to restore to the Class any money that

18   Wyeth acquired through its deceptive conduct. The California Court of Appeals decision in

19   *McAdams v. Monier,* 182, Cal. App.4th 174, 189 (2010), underscores this point:

> . . . ."Similarly, the language of *Business and Professions Code section 17203* with respect to those entitled to [UCL] restitution--**'to restore to any person in interest any money or property, real or personal, which *may have been acquired*' ... by means of the unfair practice** . . . . This language, construed in light of the **'concern that wrongdoers not retain the benefits of**

---

[62] In regard, to Plaintiff April Krueger, Wyeth's motion repeatedly misstates and mischaracterizes her prior testimony regarding how and when she ceased taking Prempro. Mrs. Krueger has indicated that she suffered a serious skiing injury early in 2002, which necessitated surgery. While struggling to recover, her long time physician, Dr. Vyenielo, left Scripps Green Hospital. Mrs. Krueger was assigned a new internist, Dr. Kim, but did not meet her until November 2002, on an "urgent care" basis. Mrs. Krueger states they jointly agreed to defer a detailed discussion about Prempro until she came in for her annual checkup. When she did, at Dr. Kim's strong recommendation, Mrs. Krueger quit Prempro immediately. (Krueger Decl., Doc. No. 61-2). Also, contrary to Wyeth's disingenuous assertion, Dr. Vyenielo was under the impression (prior to WHI) that her patients might receive some form of cardiovascular benefit from Prempro – though she no longer has that impression and does not communicate that message to patients. Although Mrs. Krueger's personal history is not particularly germane to this Motion, the fact that Wyeth feels compelled to misrepresent her history and omit key details about it is just further evidence of Wyeth's pattern and practice of stretching the truth on ALL matters pertaining to HRT.

> **their misconduct'** (*Fletcher v. Security Pacific National Bank [(1979)] 23 Cal.3d 442, 452 [153 Cal. Rptr. 28, 591 P.2d 51]*) [and in light of the limited nature of relief under the UCL--injunction and restitution, not damages--] has led courts repeatedly and consistently to hold that relief [including restitution] under the UCL is available without individualized proof of deception, reliance and injury. (E.g., *Bank of the West v. Superior Court (1992) 2 Cal.4th 1254, 1267 [10 Cal.Rptr. 2d 538, 833 P.2d 545]*; *Committee on Children's Television, Inc. v. General Foods Corp. [(1983)] 35 Cal.3d [197,] 211 [197 Cal. Rptr. 783, 673 P.2d 660].*) Accordingly, to hold that the absent class members on whose behalf a private UCL action is prosecuted must show on an individualized basis that they have 'lost money or property as a result of the unfair competition' would conflict with the language in *section 17203* authorizing broader relief--the 'may have been acquired' language--and implicitly overrule a fundamental holding in our previous decisions, including *Fletcher, Bank of the West* and *Committee on Children's Television*.

*McAdams*, 182 Cal.App.4th, at 189.  California courts have repeatedly held that restitution under the UCL is available without individual proof of deception, reliance and injury. *Tobacco II*, 46 Cal.App.4th at 319; see also *Massachusetts Mutual Life Ins. Co. v. Superior Court*, 97 Cal.App.4th 1282, 1288 (2002).   In light of California's clear rule that individual reliance and injury need not be proven in regard to restitution under the UCL, there is simply no basis for Wyeth to argue that an individual assessment and calculation of HRT's subjective "value" to each class member is required.

In its motion however, Wyeth cites *Colgan* for the proposition that it is inequitable to return to consumers the entire purchase price paid or profit received from the sale of a product because although purchasers did not receive entirely what they bargained for they likely drew some benefit or value from the consumed product. *See* Mot. for Summ. J., at 13-16.  In its attempt to use *Colgan* to support its argument, Wyeth cites to the trial court's reasoning as recited by the appellate court, <u>not</u> to the appellate court's holding.  The Court of Appeal reversed the trial court and held that the trial court's decision regarding restitution was in error and not supported by substantial evidence.  The *Colgan* court in outlining the principles to be followed in determining the amount of restitution emphasized that the remedy of restitution has two purposes – "returning to the plaintiff monies in which he or she has an interest and deterring the offender from future violation." *Colgan*, 135 Cal.App.4th at 695.  The discussion of value in *Colgan* is focused on the value of the property <u>taken</u> from the <u>consumer</u>, not some perceived "value" of a product to the consumer. *Id.* at 699.

Plaintiff's Memo. Of Points And Authorities In Opposition To Defendants' Motion For Summary Judgment
CASE NO. 03-cv2496-JAH (MDD)

19

Likewise, Wyeth mistakenly relies on *In re Google AdWords Litigation*, No. 5:08-CV-3369, 2012 U.S. Dist. LEXIS 1216 (N.D. Cal. Jan. 5, 2012),[64] to argue that the amount of restitution must account for the benefits received.  In *Google AdWords,* plaintiffs alleged that Google engaged in deceptive advertising and unfair, deceptive and unlawful business practices because AdWords had a policy of placing ads on parked domains and error pages, but failed to disclose the policy to customers.  The district court denied class certification finding that common issues did not predominate because restitution could not be proven with relative ease. *Google AdWords,* 2012 U.S. Dist. LEXIS 1216, at 13.  The court's reasoning centered on the fact that the amount customers paid for ads was determined by auction and varied per advertiser, per ad and per click.  Moreover, customers in some instances received significant revenues from the ads, thus making it necessary to consider the value of the advertisements to the customer's business. *Id.* at 12-13.   In that circumstance, the court found that because restitution could not be calculated with methods of common proof, certification was not appropriate.  The proposed plaintiff class in *Google AdWords* included members who advertised for to promote a business or product.  The intent of the advertisements was inarguably to achieve sales or some other pecuniary gain.  The class was not composed of consumers, i.e., one who obtains a product for personal use.  In the present case, the Class purchased prescriptions of HRT for personal consumption – not for any commercial reasons. There was no financial or organizational incentive for purchasing the drug.  For these reasons, the concept of value discussed in *Google AdWords* is not relevant to the present case.

Moreover, if "value" received was germane to the damages calculation for a CLRA claim or the restitution analysis for a UCL claim common questions of fact would never predominate and class certification in a consumer class would never be appropriate.   This is not the case. For example, in the recently decided *In re Pom Wonderful LLC Marketing and Sales Practices Litigation,* No. ML 10-02199, 2012 U.S. Dist. LEXIS (C.D. Cal. September 28, 2012), the court certified a class of consumers who purchased Pom's pomegranate juice products.  Plaintiffs alleged that Pom through various advertisements represented that medical research had shown that its juice products had health-related benefits (specifically related to aging *and* ***heart disease***) when this was false and misleading. *Pom*, 212 U.S. Dist. LEXIS, at 5.  The court found that common questions of

---

[64] Wyeth's reliance on *DSU Medical Corp. v. JMS Co., Ltd.*, 296 F.Supp.2d 1140 (N.D. Cal. 2003), is similarly erroneous.  The discussion of lost profits in *DSU* related to the infringement of a patent.  Restitutionary disgorgement of profits under the UCL was not at issue.

fact predominated even though individualized damage calculations might be necessary. *Id.* at 6 (citing *Yokoyama v. Midland Nat'l Life Ins. Co.,* 594 F.3d 1087, 1089 (9th Cir. 2010)). A determination regarding potential "benefit" received or individual perception of "value" was not a part of the court's calculus in *Pom -- and it should not be here.* The CLRA and UCL do not require this sort of individualized inquiry into subjective "value" judgments about pomegranate juice – and the same holds true for HRT.

Restitution under the UCL is confined to the restoration of any interest in money or property acquired by means of unfair, wrongful competition. *Kwikset Corp. v. Superior Ct. of Orange County,* 51 Cal.4[th] 310, 336 (Cal. 2011). Though restitution need not be determined with exact precision, the amount must be supported by substantial evidence. *Ewert v. eBay, Inc.,* No. C-07-02198 (N.D. Cal. Sept. 30, 2010).

Here, Professor Rosenthal's analyses offers substantial and reliable evidence of three measures of money taken from the Class – 1) the full prescription price paid for prescriptions of Premarin, Prempro, and/or Premphase filled during the class period; 2) the out-of-pocket monies paid by members of the Class for Premarin, Prempro, and/or Premphase during the class period; and 3) the profit earned by Wyeth on sales to members of the Class. The Court would be well within its discretion to award restitution based on either one or a combination of the three calculations.

**B. Calculating Class Damages Under the CLRA**

The CLRA prohibits "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale . . . of goods or services to any consumer." Cal. Civ. Code § 1770. The purposes of the Act are to "to protect consumers against unfair and deceptive business practices and to provide efficient and economical procedures to secure such protection." *McAdams v. Monier,* 182 Ca. App. 4th 174, 180 (2010) (quoting *Wang v. Massey Chevrolet,* 97 Cal.App.4[th] 856, 869 (2002)). As the Court noted in its Order certifying the class:

> The CLRA only allows recovery when a consumer is damaged as a result of the unlawful practice. Thus, to prevail on a CLRA claim, a plaintiff must show defendant's conduct was deceptive and the deception caused them harm. The "damage" that a plaintiff in a CLRA action must show "may encompass harms other than pecuniary damages."

*See* ECF No. 108, at 6 (citing *Steroids Hormone Products Cases,* 181 Cal.App.4[th] 145 (2010) and *In re Vioxx,* 180 Cal.App.4[th] 116 (2009)). The CLRA "shall be liberally construed." Cal. Civ. Code §

Plaintiff's Memo. Of Points And Authorities In Opposition To Defendants' Motion For Summary Judgment
CASE NO. 03-cv-2496-JAH (MDD)

21

1760. Under the CLRA, Plaintiff may recover actual damages, injunctive relief, restitution of property, punitive damages, and any other relief the court may deem proper. *See* Cal. Civ. Code § 1780(a).

In regards to the damages available to the Plaintiff-Class under the CLRA, Plaintiff seeks the return of the monies expended for the purchase of Premarin, Prempro, and/or Premphase during the class period. Plaintiff also contends that the proper measure of refund to the Class under the CLRA is the entire amount paid for the drugs or the full prescription price. See *Steroids Hormone Products Cases,* 181 Cal.App.4[th], at 155. Because a jury could also return a verdict for restitution and/or punitive damages under the CLRA, Plaintiff also offers Professor Rosenthal's calculation of the monies expended by the Class "out-of-pocket" without regard to any amounts paid by an insurer or third party payer. Wyeth does not challenge the correctness of Professor Rosenthal's calculations of either the amount of the full prescription price or the "out-of-pocket" payments made by the Class.[65]

However, in its motion, Wyeth seeks partial summary judgment on all CLRA damage claims of the Plaintiff-Class – save for the $1,000 statutory minimum allowed a Class under California Code §1780(a)(1) when it can make no showing of actual damages. More specifically, Wyeth argues that the Plaintiff-Class cannot properly demonstrate that it has sustained any actual damages because, in its view, Plaintiff has *"failed to put forth expert testimony necessary to enable a reasonable factfinder to determine the amount of damages purportedly sustained by plaintiff's class – **i.e., plausible evidence of both the value of the product as it was represented and the value of the product actually received."*** In other words, Wyeth contends (as it does with the Class UCL claims) that Professor Rosenthal should have considered each individual Class Member's subjective views concerning the "value" they received from their HRT prescriptions – Wyeth's misrepresentations and omissions notwithstanding.

In support of this misguided argument, Wyeth cites *Paz v. Playetex Prods., Inc.,* No. 07-cv-2133, 2008 U.S. Dist. LEXIS 1829 (S.D. Cal. Jan. 10, 2008), for the proposition that the appropriate standard for determining damages under the CLRA is the same standard set forth in California Civil Code §3343(a) – the statute that "governs common-law claims of fraud." Thus, Wyeth contends that pursuant to §3343(a), the individual members of the Plaintiff-Class can only recover "the difference between the actual value of that with which the defrauded person parted and the actual value of that which he received, together with any additional damage arising from the particular transaction."

---

[65] Ex. 64, Wiggins 8/8/2012 Depo.,p. 180:20-181:20, 200:2-200:13 (Wyeth's damages expert).

Plaintiff's Memo. Of Points And Authorities In Opposition To Defendants' Motion For Summary Judgment
CASE NO. 03-cv2496-JAH (MDD)

22

However, contrary to Wyeth's assertion, damages under the CLRA **are not governed by California Civil Code 3343**.  In the case of *Steroid Hormone Products Cases*, 181 Cal. App. 4th 145 (Cal. App. 2010), the Court of Appeal in California addressed a very similar situation.  Plaintiffs in that case sought certification of a class against GNC stating claims under the CLRA and the UCL. GNC sold products containing androstenediol without requiring a prescription and without notifying customers that the product contained a controlled substance.  Like Wyeth, defendant GNC tried to argue that each class members' subjective belief regarding the "value" of the product was relevant to the question of materiality and damages.  The Court of Appeal rejected this argument; stating:

> In moving for certification of the class, Martinez argued that causation and injury could be established by showing that the alleged misrepresentation--that the androstenediol products were legal over-the-counter supplements--was material, and therefore was an issue common to the class. In opposing the motion, GNC argued that the issue was not common to the class because "the existence and manner of incurring damages" for each class member would depend upon each class member's subjective belief regarding the "actual value" of the androstenediol products he or she bought. In denying class certification, the trial court agreed that the causation/injury issue depended upon materiality, but found that materiality could not be decided on a classwide basis because "the illicit nature of a product impacts its value only to the extent the buyer knows about the illegality or cares," and the perceived value was an issue requiring an individualized inquiry.

> **In ruling that the materiality question depended upon each class member's subjective belief regarding value, the trial court was led astray by GNC's *erroneous legal assumption*. GNC's argument that the examination of each class member's subjective belief was necessary was based upon its assumption that the showing of "damage" required under the CLRA is governed by *Civil Code section 3343*, i.e., the measure of actual damages for persons defrauded in the purchase of property. That assumption is incorrect. The "damage" that a plaintiff in a CLRA action must show under *Civil Code section 1780, subdivision (a)* is "any damage," which "is not synonymous with 'actual damages'" and "may encompass harms other than pecuniary damages." (*Meyer v. Sprint Spectrum L.P. (2009) 45 Cal.4th 634, 640 [88 Cal. Rptr. 3d 859, 200 P.3d 295].)**

*Steroid Hormone Products Cases*, 181 Cal. App. 4th, at 155 (citing, *Meyer v. Sprint Spectrum L.P.* (2009) 45 Cal.4th 634, 640 (2009)).  Here, Wyeth seeks to lead this Court astray with the same

Plaintiff's Memo. Of Points And Authorities In Opposition To Defendants' Motion For Summary Judgment
CASE NO. 03-cv2496-JAH (MDD)

23

erroneous legal assumption that GNC put forth.  Just as the Court in *Steroid Hormone Products* rejected GNC's argument, Plaintiff respectfully suggests that this Court should reject Wyeth's argument that a class member's subjective view of "value" is relevant in calculating damages under the CLRA.  This sort of individualized analysis of subjective values is no more relevant to calculating damages under the CLRA than it is in the calculation of restitution under the UCL.

Accordingly, since the Class is entitled to recover the amount of their actual damages – i.e., the amount paid for the prescriptions purchased by members of the class – Wyeth's motion for partial summary judgment on the Class CLRA damage claims should be denied.

## III.    California's Collateral-Source Rule Permits Recovery of the Full Retail Price of All Class Member Prescriptions

Finally, Wyeth contends that it is separately entitled to partial summary judgment on plaintiff's claim that Class relief "should be calculated based on the full retail price" of HRT purchases by the Class "as opposed to what plaintiff and the class members themselves allegedly paid for the drugs."  As grounds for this motion, Wyeth argues that California's "collateral-source" rule has no application in this case because any payments by governmental or private insurers for HT prescriptions compensated insured Class members for underlying medical conditions – rather than any injuries that Wyeth's violations of the UCL and CLRA caused.

Plaintiff respectfully submits that Wyeth's interpretation of California's "long-standing" collateral-source rule is incorrect and that its motion for partial summary judgment should be denied.

In *Howell v. Hamilton Meats & Provisions*, 52 Cal. 4th 541 (Cal. 2011), the California Supreme Court stated that the collateral-source rule "precludes deduction of compensation the plaintiff has received from sources independent of the tortfeasor from damages the plaintiff "would otherwise collect from the tortfeasor" *Howell*, 52 Cal. 4th at 548; citing *Helfend v. Southern Cal. Rapid Transit Dist.*, 2 Cal.3d 1, 6 (1970) ("The collateral source rule as applied here embodies the venerable concept that a person who has invested years of insurance premiums to  assure his medical care should receive the benefits of his thrift. The tortfeasor should not garner the benefits of his victim's providence.").

In this case, payments by governmental or private insurers for Class member HRT prescriptions were a direct result of Wyeth's violations of the UCL and CLRA. The whole point of Wyeth's deceptive and misleading marketing campaign was to convince California women that they should start taking HRT (and continue taking HRT) to treat or prevent "underlying medical conditions" like cardiovascular disease, Alzheimer's disease and dementia and that doing so would not result in an increased risk of breast cancer. Therefore, Wyeth can hardly argue that the payments simply "covered treatment for underlying medical conditions" and were not for the same injury "allegedly caused by Wyeth."

Additionally, Wyeth's interpretation of the California collateral-source rule relies almost entirely on Iowa and Washington state cases.  Why?  Because it knows full well that there are no California decisions that preclude the application of the California long-standing collateral source rule in this case or prevent the Plaintiff-Class from recovering the full retail price of their HRT prescriptions. Accordingly, Wyeth's motion for partial summary judgment on this issue should be denied.

## CONCLUSION

For the reasons set forth above, Plaintiff respectfully submits that there are numerous genuine issues of material fact in this case that preclude summary judgment or partial summary judgment on the restitution and damage claims of the Plaintiff-Class under the UCL and CLRA. Accordingly, Wyeth's motion should be denied.

Plaintiff's Memo. Of Points And Authorities In Opposition To Defendants' Motion For Summary Judgment
CASE NO. 03-cv2496-JAH (MDD)

25

1

2   October 8, 2012                         Respectfully submitted,

3                                           BEASLEY, ALLEN, CROW,
4                                           METHVIN, PORTIS & MILES, P.C.

5                                           s/David B. Byrne, III
6                                           Andy D. Birchfield, Jr.
                                            P. Leigh O'Dell
7                                           David B. Byrne, III
                                            Post Office Box 4160
8                                           Montgomery, Alabama 36103-4160
                                            (334) 269-2343 Telephone
9                                           (334) 954-7555 Facsimile
10                                          Email:  andy.birchfield@beasleyallen.com
                                            Email:  leigh.odell@beasleyallen.com
11                                          Email:  david.byrne@beasleyallen.com

12                                          Eileen L. McGeever, SBN 62076
13                                          Luci M. Montgomery, SBN 204986
                                            **RUSHALL & McGEEVER**
14                                          6100 Innovation Way
                                            Carlsbad, California 92009
15                                          (760) 438-6855
16                                          Email:  rm@rushallmcgeever.com

17                                          W. Gary Holt, ARBN 81090
18                                          **GARY HOLT & ASSOCIATES, P.A.**
                                            708 West Second Street
19                                          Little Rock, Arkansas 72201
                                            (501) 372-0266
20                                          Email:  holtg@garyeubanks.com

21

22                                          Attorneys for Plaintiff, APRIL KRUEGER,
                                            Individually and on Behalf of All Others
23                                          Similarly Situated

24

25

26

27

28