UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| APRIL KRUEGER, | ) | Civil No. 03cv2496 JAH (MDD) |
| Plaintiff, | ) ) | |
| v. | ) ) | **ORDER ON SUPPLEMENTAL BRIEFS** **[Doc. # 278; Doc. # 279]** |
| WYETH, INC., *et al.*, | ) ) | |
| Defendants. | ) ) ) | |

# INTRODUCTION

Before the Court are the parties' supplemental briefs on modification of the class definition. After a careful consideration of the briefs and relevant exhibits submitted by the parties, the Court sets forth its decision below.

# BACKGROUND

**1.  Factual Background**

Defendants manufacture the hormone replacement therapy ("HRT") drugs Premarin, Prempro, and Premphase. See Doc. # 61-6 at 2. **Premarin**, an estrogen, is a prescription drug first approved by the Food and Drug Administration ("FDA") in 1942 and used to prevent postmenopausal osteoporosis, treat moderate to severe vasomotor symptoms associated with menopause (e.g., hot flashes, night sweats), and treat vulvar and vaginal atrophy. See Doc. # 85 at 10-11; Doc. # 20-10 at 4. **Prempro**, a combination of estrogen and progestin, is a prescription drug approved by the FDA in 1994 "for limited use as a continuous, short-term regimen" to treat and prevent the same symptoms

1  addressed by Premarin. See Doc. # 61-6 at 2; Doc. # 85 at 10. **Premphase**, a one tablet cyclic
2  regimen of estrogen and progestin, is an alternative form of hormone therapy also used to treat and
3  prevent the same symptoms addressed by the other two drugs. See Doc. # 61-5 at 5; Doc. # 85 at 11.
4       Plaintiff alleges that since the 1990s, defendants used "branded" and "unbranded" campaigns
5  to market their HRT drugs to women over 45 years old and to physicians for on- and off-label drug
6  uses. See Doc. # 61-6 at 4-5, 9-11; Doc. # 22. Branded campaigns marketed the drugs for FDA-
7  approved, on-label uses, while unbranded campaigns marketed the drugs for non-approved, off-label
8  uses, including the prevention of cardiovascular disease, dementia, and Alzheimer's disease. See Doc.
9  # 61-6 at 4-5, 9-11. Specifically, defendants used the unbranded campaign to inform women that
10 estrogen loss increased their risk of serious ailments, especially cardiovascular disease, dementia, and
11 Alzheimer's disease, with HRT effectively reducing these risks. Id. at 6-7, 9. Defendants then used
12 the branded campaign to introduce women to the HRT drugs and the purported benefits provided by
13 these drugs, while also emphasizing that HRT did not cause breast cancer. Id.
14      In 2002, however, the Women's Health Initiative ("WHI"), sponsored by the National
15 Institutes of Health ("NIH"), released a study reporting that Prempro increased a woman's risk of
16 stroke, heart attack, cardiovascular disease, breast cancer, dementia, and Alzheimers disease. See
17 Doc. # 61-6 at 2-3; Doc. # 20-1. Following the study, the FDA revised the labeling of defendants'
18 HRT drugs to reflect these health risks. See Doc. # 20-5 at 2. Thereafter, defendants began to warn
19 consumers that Premarin, Prempro, and Premphase "should not be used to prevent coronary heart
20 disease," and in light of the "potential increased risks of cardiovascular events, breast cancer, and
21 venous thromboembolic events," their use "should be limited to the shortest duration consistent with
22 treatment goals and risks for the individual woman, and should be periodically reevaluated." Id.; see
23 also Doc. # 61-6 at 3.
24      Plaintiff brings the instant action against defendants for falsely advertising and deceptively
25 marketing the HRT drugs in violation of California's Consumer Legal Remedies Act ("CLRA"), Cal.
26 Civ. Code §§ 1750 et. seq., and California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof.
27 Code §§ 17200 et. seq. See Doc. # 16.
28 //

**2.     Procedural History**

On December 12, 2003, plaintiff initiated a products liability action against defendants and Does 1-100, inclusive, in the U.S. District Court, Southern District of California. See Doc. # 1. The Judicial Panel on Multidistrict Litigation transferred the case to the Eastern District of Arkansas for coordinated pretrial proceedings pursuant to 28 U.S.C. § 1407, which merged plaintiff's complaint with those of other class action complaints as part of In re Prempro Prods. Liab. Litig., 230 F.R.D. 555 (E.D. Ark. 2005) (MDL-1507). See Doc. # 6; Doc. # 7. Thereafter, plaintiff's case was remanded back to this district after the Arkansas court declined to certify a multi-state class of consumers alleging consumer fraud and seeking medical monitoring for any future injuries that arise from their use of Prempro. See Doc. # 8; Doc. # 9.

On May 14, 2007, plaintiff filed a motion to certify a consumer fraud class of California women who purchased defendants' HRT drugs, which the Honorable Janis L. Sammartino ("Judge Sammartino") denied without prejudice upon a finding that plaintiff could not satisfy the "adequacy" requirement of Rule 23(a)(4) of the Federal Rules of Civil Procedure ("FRCP"). See Doc. # 15; Doc. # 16; Doc. # 44. Judge Sammartino noted, however, that plaintiff "may be able to satisfy the adequacy requirement by redefining the class," with plaintiff subsequently filing a motion before this Court for certification of a damages class pursuant to Rule 23(b)(3). Doc. # 44 at 6, n. 3; Doc. # 61 at 2. This Court granted in part and denied in part plaintiff's motion on March 30, 2011. See Doc. # 108. Defendants then filed a motion for reconsideration, which this Court denied on July 13, 2011. See Doc. # 110; Doc. # 122. Defendants subsequently filed a petition with the Ninth Circuit requesting permission to appeal this Court's class certification order. See Doc. # 123. The Ninth Circuit denied defendants' petition on October 18, 2011. See Doc. # 124. As it stands, therefore, the certified class in this case includes:

> All California consumers who purchased Wyeth's Hormone Replacement Therapy products, Premarin, Prempro, and/or Premphase, for personal consumption between January 1995 and January 2003, and were exposed to a representation from Wyeth, or health care providers, or read in literature in which Wyeth advertised or provided to third parties to be disseminated under its brand or the third parties' brand, that Premarin, Prempro, and/or Premphase lowered cardiovascular, Alzheimers and/or dementia risk, or did not increase breast cancer risk, and do not seek personal injury damages resulting therefrom.

1      On September 10, 2012, defendants filed a motion for summary judgment, a motion to exclude testimony, and a motion for decertification, which the parties fully briefed. See Docs. # 206, 208, 209, 220, 223, 224, 232-234, 266, 267, 270-73. Following a hearing on the motions, the Court denied defendants' motions as moot, without prejudice, because completion of discovery raised various disputed issues, thus prompting the Court to invite the parties to submit supplemental briefs addressing modification of the class definition. See Doc. # 274. The parties filed briefs in response to the Court's invitation. See Docs. # 278, 279, 280, 281. The Court now addresses the parties' arguments in their supplemental briefs.

## DISCUSSION

**1.    Legal Standard**

Whether to grant class certification is within the discretion of a court. Montgomery v. Rumsfeld, 572 F.2d 250, 255 (9th Cir. 1978). A cause of action may proceed as a class action if a plaintiff satisfies the threshold requirements of Rule 23(a) of the FRCP: numerosity, commonality, typicality, and adequacy of representation. See Fed.R.Civ.P. 23(a); Mazza v. Am. Honda Motor Co., 666 F.3d 581, 588 (9th Cir. 2012).

Courts have also implied an additional requirement under Rule 23(a): ascertainability. See Herskowitz v. Apple, Inc., No. 12-CV-02131-LHK, 2014 WL 3919900, at *4 (N.D. Cal. Aug. 7, 2014). A class is ascertainable if it is administratively feasible to determine whether a particular individual is a class member with a potential right to recover. See Parkinson v. Hyundai Motor Am., 258 F.R.D. 580, 593-94 (C.D. Cal. 2008); Wolph v. Acer Am. Cor., No. C 09-01314 JSW, 2012 WL 993531, at *1 (N.D. Cal. Mar. 23, 2012). However, ascertainability does not require "every potential class member... [to] be identified at the commencement of the action." O'Connor v. Boeing N. Am., Inc., 184 F.R.D. 311, 319 (C.D. Cal. 1998); see also Knutson v. Schwan's Home Serv., Inc., No. 3:12-CV-0964-GPC-DHB, 2013 WL 3746118, at *5 (S.D. Cal. Jul. 15, 2013) ("Class certification hinges on whether the identity of the putative class members can be objectively ascertained; the ascertaining of their actual identities is not required.").

Moreover, a plaintiff seeking class certification must meet one of the three criteria listed in Rule 23(b). See Fed.R.Civ.P. 23(b)(1)-(3); Wal-Mart Stores, Inc. v. Dukes, 131 S.Ct. 2541, 2548-48

(2011). Courts certify a Rule 23(b)(1) class when a party shows there would be a risk of substantial prejudice or inconsistent adjudications if separate adjudications were held. Fed.R.Civ.P. 23(b)(1). Courts certify a Rule 23(b)(2) class if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed.R.Civ.P. 23(b)(2). Lastly, courts certify a Rule 23(b)(3) class if "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed.R.Civ.P. 23(b)(3).

Courts should certify a class only if they are "satisfied, after a rigorous analysis," that Rule 23 prerequisites have been met. Marlo v. U.P.S., 639 F.3d 942, 947 (9th Cir. 2011) (citation omitted). "Rigorous analysis" frequently entails "some overlap with the merits of... plaintiff's underlying claim," which "cannot be helped." Wal-Mart, 131 S.Ct. at 2551. However, Rule 23 "does not authorize a preliminary inquiry into the merits of the suit for purposes other than determining whether certification [is] proper." Ellis v. Costco Wholesale Corp., 657 F.3d 970, 983 n.8 (9th Cir. 2011) (citation omitted). In the event courts find that Rule 23's prerequisites have been satisfied, then certification should be granted. See Gen. Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 161 (1982). However, courts retain discretion to revisit class certification throughout the legal proceedings, and may rescind, modify, or amend the class definition in light of subsequent developments in the litigation. See Fed. R. Civ. Proc. 23(c)(1)(C); Falcon, 457 U.S. at 160; Dukes v. Wal-Mart, Inc., 509 F.3d 1168, 1176 (9th Cir. 2007).

**2.  Analysis[1]**

Defendants contend the class is not ascertainable and no common issues of fact or law predominate, thereby requiring decertification of the class. See Doc. # 278; Doc. # 281. Plaintiff opposes defendants' assertions, and asks the Court to modify the current class definition to account for recent developments in this action. See Doc. # 279; Doc. # 280.

**a.  Ascertainability**

Defendants contend the class should be decertified because it is not ascertainable under Carrera

---

[1] The Court will not restate all of its previous findings and limits its discussion to only those issues and arguments presented by the parties in their supplemental briefs.

1  v. Bayer Corp., 727 F.3d 300, 307-08 (3d Cir. 2013). See Doc. # 278 at 5, 7, 14. Defendants explain
2  that, in Carrera, the Third Circuit reversed a certification for consumer fraud claims because the court
3  found there was insufficient evidence to show that retailer records could be used to identify class
4  members. Id. According to defendants, the Third Circuit found that: (1) the need for individualized
5  fact finding made it impossible for class members to accurately identify whether they were part of the
6  class for purposes of opting out; (2) it was unfair to class action defendants, who possess a "due
7  process right" to challenge class membership, to ensure all class members were similarly situated and
8  could prove their claims through class-wide evidence; and (3) the need for individualized
9  determinations regarding class membership undermined the class action's basic function of "litigating
10 claims in an economical fashion." Id. at 7-8.

11         Like Carrera, defendants contend that these "three... problems plague" the class definition in
12 this case. See Doc. # 278 at 8. In support, defendants first contend that identifying the HRT users
13 who were exposed to defendants' representations regarding the drugs in relation to risks of breast
14 cancer, heart disease, or Alzheimer's disease would "require" an examination of "what" each HRT
15 user "saw or heard" about the drugs, and a determination of whether "those statements constitute
16 claims about the drugs' effect on the relevant conditions." Id. at 8. Defendants next contend that,
17 contrary to plaintiff's earlier submissions on the issue, discovery has revealed that existing documents,
18 such as pharmacy/medical records, sales call notes, and advertising records, cannot establish which
19 HRT users were actually exposed to defendants' representations. Id. at 9-10. Given such, potential
20 class members would be unable to establish class membership, thereby forcing the Court to conduct
21 "countless individualized mini-trials" to examine statements and documents, and to appropriately
22 identify class members, which undermines any efficiency afforded by a class action. Id. at 8-10.
23 Defendants further submit that if the Court "simply assum[es]" all HRT users were exposed to
24 misrepresentations about the drugs or relies on "self-serving affidavits" to establish class membership,
25 without "further indicia of reliability," the Court would violate defendants' due process right to "test
26 the reliability of the evidence submitted to prove class membership." Id. at 6, 8-9 (citing Carrera, 727
27 F.3d at 307; Marcus v. BMW of N. Am., LLC, 687 F.3d 583, 592-93 (3d Cir. 2012)).
28 //

Plaintiff, in response, argues the class is objectively ascertainable and defendants' reliance on Carrera is misplaced. See Doc. # 280 at 7-8. Plaintiff explains that, in Carrera, the Third Circuit faced the ascertainability issue of whether each class member purchased defendant's product in Florida, with the court finding no reliable or administratively feasible way to make this determination due to the absence of records identifying persons who purchased defendant's product during the class period. Id. at 8-10. In other words, per plaintiff, the Third Circuit's holding in Carrera was based on the lack of objective evidence establishing which individuals did (or did not) "purchase" defendant's product and not, as defendants argue, the lack of objective evidence establishing who was (or was not) "exposed" to defendant's representations. Id. at 10. Plaintiff also points out that the Third Circuit did not foreclose reliance on retail records as an acceptable method of proving class membership. Id. at 9. Plaintiff further points out that defendants erroneously rely on Marcus, which purportedly "had nothing to do with individualized proof of exposure" to defendant's representations, but involved the "lack of proof-of-purchase (and proof-of-replacement) records" for defendant's products. Id. at 11. Plaintiff then points out that defendants "completely ignore[..]" this Court's prior holding on the ascertainability issue requiring each individual to produce documentation establishing class membership and to demonstrate exposure to defendants' representations, with a view to allowing defendants the opportunity to challenge an individual's membership. Id. at 4-5, 10-11 (citing Doc. # 122). Plaintiff adds that defendants mistakenly assert the individual class members are required to produce additional evidence, such as advertising records or sales call notes, to establish class membership when this Court only referred to such materials in the context of defendants "having the ability to verify... individual answers using [defendants'] own records." Id. at 5 (citing Doc. # 122). Relatedly, per plaintiff, defendants err in asserting that each class member must individually verify membership "now" rather than "during post-trial proceedings," especially since this is not required by existing California law. Id. at 6. Plaintiff therefore submits that this Court was correct in finding the class ascertainable and identifiable "without the need for extensive, individualized fact-finding or mini-trials." Id. at 10-11.

This Court declines to apply Carrera and notes that while Carrera may be the law in the Third Circuit, it is not the law of this circuit. See In re ConAgra Foods, Inc., 302 F.R.D. 537, 566 (C.D. Cal.

2014) ("It appears that pursuant to Carrera in any case where the consumer does not have a verifiable record of its purchase, such as a receipt, and the manufacturer or seller does not keep a record of buyers, Carrera prohibits certification of a class. While this may now be the law in the Third Circuit, it is not currently the law in the Ninth Circuit.") (citing McCrary v. Elations Co., LLC, No. EDCV 13-00242 JGB OP, 2014 WL 1779243, at *8 (C.D. Cal. Jan. 13, 2014)). Under the law of this circuit, it is enough that the class definition describes "a set of common characteristics sufficient to allow" an individual to determine whether she is a class member with a potential right to recover. Id. A class definition describing the allegedly offending product and eligible dates of purchase, as here, is "sufficient." See id. To the extent defendants may have individualized defenses, defendants are free to employ those defenses against each claimant. See Johns v. Bayer Corp., 280 F.R.D. 551, 560 (S.D. Cal. 2012).

Notwithstanding, defendants contend that identifying HRT users who were exposed to defendants' representations would require "countless individualized mini-trials," thereby undermining any efficiency afforded by a class action. However, there is no such concern in this case where plaintiff has asserted, and this Court has found, that defendants' widespread advertising campaign promoted the alleged representations. Plaintiff has further asserted that there are only three products at issue in this case, all purporting to treat the same symptoms and to offer the same health benefits, with the product's packaging containing defendants' representations. Moreover, defendants' senior executives acknowledged that all information contained in breast cancer risk warnings, disseminated prior to 2002, applied to all estrogen products, i.e., Premarin, and all estrogen and progestin combination products, i.e., Prempro.[2] See Doc. # 224-10 at 13 (¶ 29). Consequently, this Court need not "simply assum[e]" that class members were exposed to defendants' representations regarding the drugs.

Defendants also contend that discovery has revealed the existing documents–such as pharmacy/medical records, sales call notes, and advertising records–cannot fully establish which HRT users were actually exposed to defendants' representations. However, as plaintiff rightly points out,

---

[2] The Court notes that defendants have acknowledged the Premphase labels and product inserts were consistent with the Prempro labels and product inserts throughout the class period. See Doc. # 281 at 7, n. 2.

this Court referred to such materials in the context of defendants, not individual class members, using such records to the extent possible to verify individual's claims of class membership.

Defendants then contend that if the Court relies on affidavits to establish class members' exposure to the representations, this Court would violate defendants' due process right to "test the reliability of the evidence submitted to prove class membership." However, defendants have no due process interest in the question of class membership because: (1) any liability is determined in the aggregate, with total sales measuring damages regardless of class size, and defendants have no claim to residual damages; (2) even assuming fraudulent or inaccurate claims result in a pro rata reduction of **class members'** (not defendants') relief, no case law suggests such dilution would undermine this Court's ability to issue a final judgment binding all class members; and (3) should manageability problems arise during the damages phase, this Court retains the flexibility to address such problems as they arise, including the ability to decertify. See Forcellati v. Hyland's, Inc., No. CV 12-1983-GHK MRWX, 2014 WL 1410264, at *6-7 (C.D. Cal. Apr. 9, 2014).

Further, courts in this circuit have found proposed classes ascertainable even when the **only way** to determine class membership is with self-identification through affidavits. See e.g., Ries v. AriZona Beverages LLC, 287 F.R.D. 523, 535 (N.D. Cal. 2012). Defendants have the option to respond to such affidavits by, among others, testing an individual's claim that she is a class member through a comparison of information regarding that individual's purchase with defendants' retail information during the class period, along with other similar information. See Galvan v. KDI Distribution, Inc., SACV 08-0999-JVS (ANx), 2011 WL 5116585, *4 (C.D. Cal. Oct. 25, 2011).

Consequently defendants fail to present any law or arguments establishing that an inability to absolutely confirm class members' identities would independently bar class certification in this circuit. See O'Connor, 184 F.R.D. at 319 (ascertainability does not require "every potential class member... [to] be identified at the commencement of the action."). Indeed, "[i]f class actions could be defeated because membership was difficult to ascertain at the class certification stage, there would be no such thing as a consumer class action." Thurston v. Bear Naked, Inc., No. 3:11-CV-02890-H BGS, 2013 WL 5664985, at *3 (S.D. Cal. Jul. 30, 2013) (citing Ries, 287 F.R.D. at 536). Accordingly, the Court finds that the current class is sufficiently ascertainable.

**b.     Predominance**

Plaintiff seeks to remove the "exposure criteria" for class membership from the existing class definition,[3] and proposes the following modified definition:

> All California consumers who purchased Wyeth's Hormone Replacement Therapy products, Premarin, Prempro, and/or Premphase, for personal consumption between January 1995 and January 2003, and who do not seek personal injury damages resulting therefrom.

See Doc. # 279 at 3.

Plaintiff asserts that this Court included the exposure criteria "out of an abundance of caution," pursuant to McAdams v. Monier, Inc., 182 Cal. App. 4th 174 (2010),[4] to ensure: (1) the class was sufficiently cohesive to warrant adjudication by representation, and (2) all class members were exposed to defendants' unfair practices. See Doc. # 279 at 6-7 (citing Doc. # 108). According to plaintiff, however, the Court can still achieve these goals without adding an exposure criteria to the class definition. Id. at 7. In support, plaintiff argues that unlike McAdams, in which the class definition properly contained exposure criteria to account for the different sources from which customers purchased defendant's roof tiles, "every" California woman in this case who purchased HRT drugs received a product label that "came solely" from defendants, with each label containing "misstatements... and omissions... about breast cancer risks."[5] See Doc. # 279 at 8 (citing, among others, Kwikset Corp. v. Superior Court, 51 Cal. 4th 310 (2011) (label misrepresentations satisfy the standing requirement for class representatives)). Plaintiff also argues that defendants were the "sole source" of "Dear Doctor letters" sent to "every" prescribing physician in California, with the letters initially denying breast cancer risks from HRT use and, later, downplaying these risks once articles

---

[3] The existing class definition is as follows, with the exposure criteria in bold: All California consumers who purchased Wyeth's Hormone Replacement Therapy products, Premarin, Prempro, and/or Premphase, for personal consumption between January 1995 and January 2003, **and were exposed to a representation from Wyeth, or health care providers, or read in literature in which Wyeth advertised or provided to third parties to be disseminated under its brand or the third parties' brand, that Premarin, Prempro, and/or Premphase lowered cardiovascular, Alzheimers and/or dementia risk, or did not increase breast cancer risk**, and do not seek personal injury damages resulting therefrom.

[4] In McAdams, the California Court of Appeal, Third District, added exposure criteria to the class definition and held that common issues of nondisclosure of material facts by defendant predominated over issues regarding what defendant and its sales agents may have affirmatively represented to purchasers of defendant's product. 182 Cal. App. 4th at 174.

[5] Plaintiff points out that defendants concede every user who purchased their HRT products received a product label. See Doc. # 279 at 8 (citing Doc. # 233 at 4).

were published on the subject. Id. at 10. Plaintiff then points out that although the labels and letters were "only" two components of defendants' "systematic, standardized, and broadly disseminated advertising campaign," both components show that HRT purchasers and prescribing physicians were "uniformly" exposed to defendants' "misrepresentations and omissions" during the class period, thereby distinguishing the facts of this case from McAdams. Id. at 11.

In further support, plaintiff points to decisions by the Ninth Circuit and California district courts holding that when defendants' representations are "material" and disseminated through "a massive Tobacco II-style advertising campaign,"[6] it is not necessary for the class definition to include exposure criteria. See Doc. # 280 at 14; Doc. # 279 at 12-14 (citing Mazza;[7] Stearns v. Ticketmaster, 655 F.3d 1013, 1022 (9th Cir. 2011);[8] Johnson v. General Mills, Inc., 276 F.R.D. 519, 522 (C.D. Cal. 2011);[9] In re Brazilian Blowout Litig., No. CV 10-8452-JFW MANX, 2011 U.S. Dist. Lexis 40158 (C.D. Cal. Apr. 12, 2011)[10]). Because this Court already found that defendants launched a massive Tobacco II-style advertising campaign to inform users and prescribing physicians about the purported benefits of HRT drugs, plaintiff argues that, pursuant to Mazza, this Court should remove the existing class definition's exposure criteria. See Doc. # 280 at 14; Doc. # 279 at 12-14. Plaintiff additionally submits that modifying the class definition would not trigger new expert discovery or delay trial in this case. See Doc. # 279 at 15. Finally, plaintiff submits that the cases cited by defendants do not involve Tobacco II-style advertising campaigns and, thus, are inapplicable to the instant case. See Doc. # 280 at 14-16.

//

---

[6] The complaint, in In re Tobacco II Cases, 46 Cal. 4th 298 (2009), alleged that the tobacco industry defendants violated the UCL by conducting a decades-long campaign of deceptive advertising and misleading statements regarding the addictive nature of nicotine and the relationship between tobacco use and disease.

[7] In Mazza, 666 F.3d 581, the Ninth Circuit vacated the district court's certification order because many class members were likely never exposed to defendant's representations, especially in the absence of a massive Tobacco II-style advertising campaign.

[8] The Ninth Circuit, in Stearns, held that causation can be established on a class-wide basis by showing that a defendant made "material" representations to the entire class. 655 F.3d at 1022.

[9] The district court, in Johnson, noted that "California law permits a court to try, and a class to establish causation/reliance as a common issue by inference." 276 F.R.D. at 522 (citing Stearns, 655 F.3d at 1022).

[10] In Brazilian Blowout, the district court found that although plaintiffs must prove actual reliance for their misrepresentation claims, reliance may be presumed class-wide if defendant's misrepresentations are "material." 2011 U.S. Dist. Lexis 40158, at *20, 24-26.

Defendants, in opposition, contend that plaintiff's proposed class definition is "not viable" because the Court "already considered and correctly rejected" that definition, and required plaintiff to demonstrate class-wide exposure to defendants' representations in order to satisfy Rule 23(b)(3)'s "predominance" requirement. See Doc. # 278 at 6, 11. Defendants add that plaintiff's reliance on cases like Mazza to resurrect plaintiff's old argument–i.e., that class-wide exposure exists because class members were purportedly exposed to defendants' massive advertising campaign–is "unhelpful" to plaintiff's cause because this argument was already rejected by the Court. See Doc. # 281 at 17. Defendants next turn to case law in which class certification of CLRA and UCL claims were denied because plaintiff, like those plaintiffs in the cases cited, fails to provide evidence demonstrating class-wide exposure to defendants' representations, and fails to show that class members relied on defendants' representations to make purchasing decisions. Id. at 12-13 (citing Minkler v. Kramer Laboratories, Inc., 2013 U.S. Dist. LEXIS 90651 (C.D. Cal. Mar. 1, 2013); Davis-Miller v. Auto. Club of S. Cal., 201 Cal. App. 4th 106 (2011); Faulk v. Sears Roebuck & Co., No. 11-CV-02159 YGR, 2013 U.S. Dist. LEXIS 57430 (N.D. Cal. Apr. 19, 2013)).

To illustrate, defendants contend that plaintiff's reliance on drug labels fails to establish class-wide exposure because the labels "varied" by product and "changed throughout the class period." See Doc. # 281 at 7-9. Defendants also contend that plaintiff's reliance on two "Dear Doctor letters" fails to demonstrate class-wide exposure because the class period spans eight years (1995-2003), making it "inevitable" that a "significant number" of doctors prescribing drugs later in the class period would not have received the letters and would not have been in practice in 1995. Id. at 9-10. Defendants add that one of the letters was not even sent until February 2000, "five full years after the class period began." Id. at 9. Defendants then contend that even if the same labels and letters were sent to every HRT user's doctor, that doctor's "mere receipt" does not equal "exposure." Id. at 10 (citing, among others, Campion v. Old Republic Home Prot. Co., 272 F.R.D. 517 (S.D. Cal. 2011)).[11] According to defendants, moreover, plaintiff improperly relies on advertisements that contain different information, risks, and benefits, and improperly relies on sales call notes that indicate, among others, "different

---

[11] In Campion, the district court denied certification due to the varying ways proposed class members acquired their home warranty plans, reasoning that members "may have seen some, all or none" of defendant's representations prior to purchase. 272 F.R.D. at 517.

discussions" between "different sales representatives... [and] doctors," with some notes even failing to document any discussions. See Doc. # 278 at 13-14; Doc. # 281 at 15. But even if it is proper for the Court to presume all class members were universally exposed to defendants' representations, defendants contend class certification would still be inappropriate because defendants are entitled to present "substantial individualized evidence" contained in the record to rebut that presumption. See Doc. # 281 at 18. Defendants further contend that plaintiff improperly uses one theory to obtain class certification and a different theory to prove her claims at trial. See Doc. # 281 at 11. Defendants explain that while plaintiff relies only on drug labels and Dear Doctor letters for class certification, plaintiff plans to introduce other types of evidence during trial,[12] which violates the U.S. Supreme Court's ruling that "the theory advanced to justify class certification defines and limits what will be relevant at trial." Id. at 12 (citing Comcast Corp. v. Behrend, 133 S. Ct. 1426 (2013)).[13] Defendants concede that while the materials cited by plaintiff go to liability rather than damages, plaintiff's reliance on such "individualized evidence" would narrow the scope of trial "considerably" and render irrelevant the discovery plaintiff has provided to defendants in this case. Id. at 13. Thus, defendants submit that no viable class definition exists that would satisfy Rule 23(b)(3)'s requirement of predominance, and ask the Court to decertify the class. See Doc. # 278 at 14; Doc. # 281 at 19.

The central inquiry under Rule 23(b)(3) is whether the proposed class is "sufficiently cohesive" to permit "adjudication by representation." Amchem Products, Inc. v. Windsor, 521 U.S. 591, 594 (1997). If common questions "present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication," then a "clear justification" exists for "handling the dispute on a representative rather than on an individual basis," and the predominance test is satisfied. Hanlon v. Chrysler Corp., 150 F.3d 1011, 1022 (9th Cir. 1998). However, "if the main issues in a case require the separate adjudication of each class member's individual claim or defense, a Rule 23(b)(3) action would be inappropriate." Zinser v. Accufix Research Institute, Inc.,

---

[12] Defendants point to plaintiff's opening brief in which plaintiff notes the "prodigious" evidence of brochures, tear sheets, advertising, magazines, articles, sales call notes, and programs establishing defendants' "systematic, standardized and broadly disseminated advertising campaign." See Doc. # 281 at 12 (citing Doc. # 279 at 11).

[13] In Comcast, the U.S. Supreme Court reversed a grant of class certification because questions of individual damage calculations overwhelmed questions common to the class. 133 S. Ct. at 1426. The Court's holding, uncontested by the parties, required damages to be measurable based on a common methodology applicable to the entire class in antitrust cases. Id.

253 F.3d 1180, 1190 (9th Cir. 2001) (citation omitted).

This Court disagrees with defendants' assertion that plaintiff fails to satisfy the "predominance" requirement. As a preliminary matter, the central issue raised in this action is the allegedly overriding, material misrepresentation that defendants' HRT products lower a woman's risk of cardiovascular disease, dementia, and Alzheimers disease, without increasing breast cancer risk. Plaintiff has alleged and submitted evidence showing that this misrepresentation was communicated by the drugs' packaging and by doctors under the influence of, among others, defendants' "Dear Doctor" letters and sales representatives. Plaintiff has also alleged and submitted evidence showing that this misrepresentation was further amplified by defendants' massive marketing campaign through, among others, television, radio, newspaper, and magazine advertisements. Plaintiff has additionally alleged and submitted evidence showing that, as part of defendants' massive marketing campaign, defendants hired, among others, physicians to author or sign off on articles generally dispelling negative perceptions about defendants' HRT drugs and specifically refuting medical studies finding increased health risks associated with HRT use. At this stage of the lawsuit, plaintiff has made a sufficient showing that the issues of whether defendants' representation was material, and whether defendants' representation would have deceived reasonable consumers, **can** be litigated on a class-wide basis.

The Court also disagrees with defendants' assertion that common issues do not predominate because: (1) HRT product labels "varied" and "changed"; (2) the content of advertisements and sales call notes "varied"; (3) the dispatch date of "Dear Doctor" letters varied; and (4) prescribing doctors' exposure to the "Dear Doctor" letters likely varied. The Court finds that the allegedly false and deceptive packaging and marketing of the HRT drugs need not be absolutely uniform or "consist of... specifically-worded false statement[s] repeated to each and every [member] of the plaintiff class." In re First Alliance Mortg. Co., 471 F.3d 977, 992 (9th Cir. 2013). Indeed, "[t]he class action mechanism would be impotent if a defendant could escape much of his potential liability for fraud by simply altering the wording or format of his misrepresentations across the class of victims." Id.

This Court also finds that plaintiff has presented substantial evidence showing that HRT users were exposed to defendants' overriding and material misrepresentations of the HRT drugs. For

example, plaintiff has presented evidence showing that the FDA, through correspondences and various meetings, admonished defendants for misrepresenting their products, with the FDA ultimately directing defendants to cease all off-label drug promotions. Id. at 10 (¶ 25-26). Defendants, in response, published an insert addressing the risks of breast cancer and benefits of HRT use in the annual Physician's Desk Reference ("PDR"). Id. at 12-13 (¶ 28). In its insert, defendants modified the FDA's requested language addressing breast cancer risk by including additional language nullifying these risks, with the insert remaining unchanged from 1995 to 2002. Id. Defendants' sales executives have also acknowledged that their sales representatives were trained in a standardized manner using a series of nationwide manuals and training programs to communicate the following messages: (1) that Prempro was safe for long term use; (2) that doctors should prescribe combination hormone therapy to all menopausal women even though only a minority of women suffered from significant menopausal symptoms to justify hormone treatment; (3) that Premarin and Prempro had equivalent risk/safety profiles; and (4) that Prempro did not have any significant breast cancer risks and could reduce the risk of contracting breast cancer. Id. at 11 (¶ 26).

In addition, contrary to defendants' assertion that limiting information was provided to health care professionals, plaintiff has presented evidence showing that prescribing doctors, along with the obstetrics and gynecology community at-large, were bombarded with HRT information during the class period, and received "Dear Doctor" letters that promoted defendants' HRT products in 1989, 1995, 1998, 2000 and 2001.[14] See Doc. # 224-10 at 27-29. Indeed, from 1994 onwards, defendants strategically countered research and publications that found HRT use significantly increased breast cancer risk and related deaths. In response to one such publication in 1995, defendants circulated "Dear Doctor" letters containing language drafted by defendants' marketing group that downplayed the research, and initiated a strategy to create "Letters to the Editor" and "Op-ed" submissions that would be presented by paid "authors." Id. at 14. In 1996, the WHI's ten-year study, sponsored by the NIH, revealed that Prempro increased, among others, breast cancer risk, to which defendants responded by adopting a "Dismiss/Distract" policy to divert attention away from this finding by

---

[14] The Court notes that the 2001 letter was sent to all members of the American Congress of Obstetricians and Gynecologists. See Doc. # 224-10 at 29.

forming a "Breast Cancer Working Group" that would counter the study, and instructing defendants' public relations group to keep research results confidential and to refrain from discussing these results outside the group. Id. at 15. In 1997, after an international research group published a review showing an increased risk of breast cancer with Prempro use, defendants responded by launching a $12 million "Myths and Misperceptions" campaign to counteract the negative publicity, and by directing their sales force to refrain from raising the issue and to focus sales presentations on HRT benefits. Id. at 16. In 1998, after another article found that "postmenopausal hormones cause breast cancer," defendants funded a newsletter intended for obstetricians and gynecologists entitled, "Ob Gyn Rounds," which served as an extension of the "Myths and Misperceptions" campaign. Id. Relatedly, defendants sponsored and influenced the content of reference materials and textbooks for obstetricians and gynecologists, and funded a textbook program whereby defendants purchased "reference texts" and circulated them to internal medicine and family practice residents. Id. at 34. In 1999, another article concluded that a review of existing literature revealed that almost all patients treated with Premarin had an increase in breast cancer. Id. at 16-17. Defendants decided not to respond to this article. Id. Then in early 2000, two articles were published that found increased breast cancer risk with use of combination hormone therapy. Id. at 17. Defendants questioned these findings in "Dear Doctor" letters sent to prescribing physicians. Id. These letters included breast cancer data charts that contained "misleading" information. Id. Following these publications, the FDA again asked defendants to update their breast cancer warnings, but defendants failed to do so. Id. at 24. Then in 2002, the NIH discontinued the WHI clinical trial involving trial participants due to an increased risk of invasive breast cancer, increased cognitive decline, and no heart benefits. Id. at 25. WHI's lead investigator concluded that Prempro use generated an additional 200,000 breast cancers in the United States. Id.

Based on the evidence provided, the Court finds that HRT users and prescribing physicians were systematically exposed to defendants' material misrepresentations during the class period through defendants' massive advertising campaign, which included, among others: (1) sales calls designed to mislead and/or omit crucial health risk information; (2) funding of various media advertisements and press releases; (3) funding and publication of newsletters, brochures, medical

studies, and other written media that downplayed, among others, breast cancer risks and promoted fictitious health benefits; (4) funding and creation of physician and patient outreach and informational programs; and (5) funding, publication, and dissemination of "Dear Doctor" letters. The Court also agrees with plaintiff that every California woman who purchased HRT drugs during the class period was exposed to defendants' material misrepresentations through defendants' drug labels originating from defendants.[15]

Contrary to defendants' assertion, moreover, individualized proof of deception and reliance are not necessary under California law for plaintiff to prevail on class claims. See McAdams, 182 Cal. App. 4th at 174, 191-92; see also In re Steroid Hormone Prod. Cases, 181 Cal. App. 4th 145, 157 (2d Dist. 2010). In California, it is enough for a court to reasonably assume that no rational class member would have purchased the product had the individual known of the alleged misrepresentation. See Negrete v. Allianz Life Ins. Co. of N. Am., 238 F.R.D. 482, 491-92 (C.D. Cal. 2006). As already discussed, the common issue that predominates in this case is whether defendants' packaging and marketing communicated a persistent and material message that HRT drugs lower a woman's risk of cardiovascular disease, dementia, and Alzheimers disease, without increasing breast cancer risk. At minimum, everyone who purchased HRT drugs would have been exposed to defendants' representations that appeared on every package during the class period, rendering defendants' reliance on Campion[16] as misplaced for the proposition that class members may have seen, at worst, **none** of defendant's representations prior to purchase.

Importantly, this Court has already found that defendants launched a massive Tobacco II-style advertising campaign to inform users and prescribing physicians about the purported benefits of HRT drugs.[17] Given their exposure to defendants' advertising campaign, class members need not plead specific reliance on any individual misrepresentations. See Tobacco II, 46 Cal. 4th at 328 (Plaintiff

---

[15] The Court has considered and finds instructive a decision by the Supreme Court of Nevada, which also found the same product labels misleading. See Wyeth v. Rowatt, 244 P.3d 765, 780 (Nev. 2010). See also supra text accompanying note 5.

[16] See supra text accompanying note 11.

[17] The Court adopts by reference its discussion of defendants' massive Tobacco II-style advertising campaign from its earlier decision. See Doc. # 108 at 18.

17                                                                                      03cv2496

is "not required to necessarily plead and prove individualized reliance on specific misrepresentations or false statements where, as here, those misrepresentations and false statements were part of an extensive and long-term advertising campaign."). Given defendants' advertising campaign, moreover, it is fair to assume that almost all, if not all, class members had been exposed to defendants' purportedly false and misleading statements and, by extension, were likely deceived by these representations.

The Court further agrees with plaintiff that cases cited by defendants are inapposite to this case. Unlike this case, in Davis-Miller the court found that different class members were exposed to different information by different contractors who made different representations, and plaintiff failed to present evidence showing that advertising and marketing of the subject battery service program was seen by the entire class. 201 Cal. App. 106. In Faulk, plaintiff failed to identify advertisements or to establish that class members were exposed to, and relied upon, such advertisements in purchasing the product at issue. 2013 U.S. Dist. LEXIS 57430. In Minkler, the UCL and CLRA claims were never certified because plaintiff failed to show class members' exposure to the alleged misrepresentation. 2013 U.S. Dist. LEXIS 90651. In this case, by contrast, plaintiff has identified drug labels, advertisements, and marketing materials that comprised defendants' massive marketing campaign. Plaintiff has also presented evidence establishing that HRT users were exposed to the same product misrepresentations through defendants' massive marketing campaign on a class-wide basis. Plaintiff has additionally presented evidence showing that product representations were generated and/or overseen solely by defendants.

Meanwhile, this Court disagrees with defendants' assertion that plaintiff, under Comcast, improperly uses one theory to obtain class certification and a different theory to prove damages at trial. Even assuming Comcast is applicable to mass tort actions in some way, it is merely dicta and does not bind this Court. See Comcast, 133 S.Ct. at 1436 (Ginsburg and Breyer, JJ., dissenting) ("[T]he decision should not be read to require, as a prerequisite to certification, that damages attributable to a class-wide injury be measurable on a class-wide basis."). Nevertheless, Comcast does not dictate a contrary result even if applied to the instant case. Unlike the situation in Comcast, there is no possibility in this case that damages could be attributed to defendants' acts that are **not**

1 challenged on a class-wide basis because all members of the current class attribute their damages to the HRT drugs. Defendants also wrongly assume it was the existence of multiple theories in Comcast that precluded class certification. Rather, it was plaintiffs' failure to base all of the damages sought on plaintiffs' **injury**, i.e., the antitrust impact. See Doyle v. Chrysler Grp. LLC, No. SACV 13-00620 JVS, 2014 WL 7690155, at *8 (C.D. Cal. (Oct. 9, 2014) ("The Seventh Circuit has explained... that a damages suit cannot be certified to proceed as a class action unless the damages sought are the result of the class-wide injury that the suit alleges."). In this case, by contrast, HRT users were injured by purchasing drugs that did not meet those qualities represented by defendants. To the extent damages would require an individual inquiry, the Ninth Circuit has held that "[t]he amount of damages is invariably an individual question and does not defeat class action treatment." Leyva v. Medline Indus. Inc., 716 F.3d 510, 514 (9th Cir. 2013) (citation omitted).

This Court further notes that the question of false advertising and deceptive marketing of defendants' HRT drugs and their purported health benefits is a common issue particularly well-suited to class-wide resolution because it will turn on complex evidence and expensive expert testimony. Litigating this issue in individual cases would not only be extraordinarily duplicative and wasteful, it would increase the likelihood that courts and juries reach inconsistent decisions. Thus, the Court concludes that the predominance requirement has been satisfied in this case.

Lastly, turning to the question of whether to modify the current class definition, the Court finds that a modification removing the exposure requirement is appropriate in light of the discussion above, which involves consideration of new evidence, pleadings, and arguments submitted by the parties after the Court entered its previous order (doc. # 108)[18] addressing defendants' massive marketing campaign. The Court finds that, unlike in McAdams,[19] in which class members received different product representations from four separate and independent sources, defendants here directed and exercised full control over the messages and representations made by all company personnel and third parties in promoting defendants' HRT drugs as part of defendants' massive advertising campaign.[20]

---

[18] The Court's order, doc. # 108, was entered on the record on March 30, 2011.

[19] See supra text accompanying note 4.

[20] The Court's previous discussion and conclusions relating to the class definition's exposure requirement (doc. # 108) are amended as expressed herein.

Thus, the Court adopts plaintiff's suggested class definition. The certified class in this case now includes:

> All California consumers who purchased Wyeth's Hormone Replacement Therapy products, Premarin, Prempro, and/or Premphase, for personal consumption between January 1995 and January 2003, and who do not seek personal injury damages resulting therefrom.

## CONCLUSION AND ORDER

Accordingly, IT IS HEREBY ORDERED that:

1. Plaintiff satisfies the ascertainability and predominance requirements, and has met all other requirements for class certification;
2. Defendants' request to decertify the class is **DENIED**;
3. Plaintiff's request to modify the class definition is **GRANTED**; and
4. The class definition is **MODIFIED** as described herein.

Dated: October 7, 2015

JOHN A. HOUSTON
United States District Judge