UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| APRIL KRUEGER, individually and on behalf of all others similarly situated,<br><br>                    Plaintiff,<br><br>v.<br><br>WYETH, INC. f/k/a AMERICAN HOME PRODUCTS, a Pennsylvania corporation; WYETH PHARMACEUTICALS f/k/a WYETH-AYERST PHARMACEUTICALS, a Pennsylvania corporation; and DOES 1 through 100 Inclusive,<br><br>                  Defendants. | Case No.: 3:03-cv-2496-JAH (MDD)<br><br>**ORDER:**<br><br>**(1) DENYING DEFENDANTS' MOTION TO EXCLUDE EXPERT TESTIMONY [DOC. NO. 317];**<br><br>**(2) GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [DOC. NO. 341]** |

## INTRODUCTION

This matter comes before the Court on Defendants Wyeth, Inc. and Wyeth Pharmaceuticals, Inc.'s (collectively "Wyeth" or "Defendants") motion to exclude expert testimony and motion for summary judgment, or in the alternative, partial summary judgment pursuant to Rule 56(a) of the Federal Rules of Civil Procedure ("Fed. R. Civ. P.") *See Doc. Nos*. 317, 341. Both motions have been fully briefed by the parties. *See Doc. Nos*. 326, 340, 342, 350, 351, 353, 359, 360. After careful consideration of the record,

pleadings and exhibits submitted by the parties, oral argument from counsel, and for the reasons set forth below, the Court **DENIES** Wyeth's motion to exclude Professor Rosenthal's testimony (*doc. no*. 317), **DENIES** Wyeth's motion for summary judgment and **GRANTS** Wyeth's motion for partial summary judgment. *Doc. No*. 341.

<h2 style="text-align:center">F<small>ACTUAL</small> B<small>ACKGROUND</small></h2>

Defendants manufacture a variety of hormone replacement therapy ("HRT") products, including the drugs known as Prempro, Premarin and Premphase. Between 1995 and 2002, Wyeth employed a standardized pervasive marketing campaign in California, and throughout the United States, aimed at "rebalancing" consumer and prescriber perceptions about the risks and benefits of Wyeth's HRT drugs. Defendants positioned themselves as the authoritative source on HRT and developed strategies, campaigns, education materials, and presentations to neutralize the global fear of breast cancer. *Doc. Nos*. 351- 24, 32, 35, 36. Defendants created articles discussing the myths and mis-perceptions relating to breast cancer and HRT with suggestive readings authored by hired consultants to refute negative HRT information. *Doc. No*. 351-62. These materials and guides were created by Defendants' home office and the information was uniformly distributed to their sales force nationwide. *Doc. Nos*. 351-4, 6. It was also disseminated in advertisements using celebrities, publications targeting women, and in "Dear Doctor" letters aimed at reaching those physicians treating women with menopausal symptoms. *Doc. Nos*. 351-34, 351-35 at 28, 351-48,50-52; 351-28,29. Wyeth promoted that its HRT drugs protected women from cardiovascular disease, and had other cognitive benefits, despite the Food and Drug Administration ("FDA") prohibiting "off-label" promotion prior to standardized verification. *Doc. No*. 351-17 at 10 (Parisian, M.D. Decl., at 10). Although Wyeth warned of a moderate risk of breast cancer on its Prempro label, it qualified the risk as being associated with *higher doses* and prolonged use, *in excess of 10 years. Id.* at 13. These representations were made despite clinical data showing an increased risk of breast cancer at any dose and several studies reporting an increased risk of breast cancer following usage significantly less than ten years. *Id*. (citing to various studies published before and

2

during the relevant time frame indicating increased risk after only a short exposure) (*i.e.* Bergkvist, 1989: 2 years; Wyeth's Pivotal Trial, 1994: One year; Schairer, 1994: 2 years; Gapstur, 1999: Less than 5 years; Schairer, 2000: 4 years). Nonetheless, between 1995 and 2002, Defendants' label remained unchanged. *Id*. at 13.

California women were prescribed HRT by their physicians for the "treatment of moderate to severe vasomotor symptoms associated with menopause (hot flashes, night sweats), vulvar and vaginal atrophy, and the prevention of osteoporosis." *See Doc. No*. 317-3 at 5. Just under 47,000 HRT drug prescriptions were purchased by Californians during the class period at a cost of approximately $1.3 billion. *Doc. No*. 351-7 at 2 (Rosenthal, Ph.D. Decl. at 2). By 1997, Wyeth's HRT drugs were the most prescribed drugs in the United States, used by over 9 million women. *Doc. Nos*. 351-9, 351-35 at 3. However, in 2002, the National Health Institute removed Prempro from the Women's Health Initiative ("WHI") clinical trial due to the increased rate of disease present among participants, including breast cancer and cardiovascular complications. *Doc. Nos*. 351-11, 351-12, 351-15. In 2004, Premarin was also removed based on study participants experiencing a 39 % increased risk of stroke and a 47% increased risk of blood clots. *Doc. No*. 351-12. Subsequent reports issued by investigators showed that HRT increased risks of breast cancer, strokes, venous thromboembolic disease, heart attacks, cardiovascular disease, Alzheimer's disease, and dementia. *Id.*

At the time the study was terminated, 53.8% of women had already stopped taking the HRT. *Doc. No*. 351-12 at 6. Although some women began hormone therapy use outside of the study through their own health clinicians, many women stopped taking hormone therapy altogether. *Id.*; 351-15 at 2. Prescriptions of Prempro declined by 66% and Premarin 33% from the first half of 2002 to the first half of 2003. *Doc. No*. 351-15 at 2; *see also Doc. Nos*. 351-13 at 3, 351-14.

This representative action arises from Plaintiff April Krueger's ("Plaintiff" or "Krueger") allegation that, between January of 1995 and January of 2003 ("class period"), Defendants violated California consumer protection laws. The gravamen of Plaintiff's

claims is that Defendants misrepresented the health risks associated with their HRT drugs during a long term, nationwide, marketing campaign, conducted in violation of (1) California's Unfair Competition Laws, *Cal. Bus. & Prof. Code* §§ 17200-17210 ("UCL"); and (2) the California Consumer Legal Remedies Act, *Cal. Civ. Code* §§ 1750-1784 ("CLRA"). *See Doc. No*. 1. Plaintiff, on behalf of herself and others similarly situated ("Class" or "class members"), seek both damages and restitution. Pursuant to the CLRA, Plaintiff seeks actual damages as a result of purchasing Defendants' HRT products during the class period (d*oc. no*. 326 at 8). Plaintiff also seeks restitution of the full purchase price or restitutionary disgorgement of the net profits Defendants earned from class members as result of the allegedly unfair practices. *Id*. at 10.

Plaintiff retained the services of Professor Meredith Rosenthal, Ph.D. ("Dr. Rosenthal") to establish the damage of the alleged misconduct on the Class. *See Doc. No.* 326-2 at 2-9. Dr. Rosenthal was directed to utilize the class definition certified by this Court on March 29, 2011 (*doc. nos*. 108, 326-2 at 4-5) and "assume that all California consumers who purchased Premarin, Prempro, and/or Premphase" would constitute members of the Class unless they had a personal injury claim. *Id*. at 5. She "calculated damages incurred by [] end-payer purchasers of Wyeth's [HRT] products[.]" *Id*. at 2. As a result, she provided the following opinions: (1) total dollar amount spent on prescriptions ($1.3 billion); (2) total out-of-pocket cost paid by class members ($590.2 million); and (3) profit earned by Wyeth as a result of sales to members of the class ($771.6 million), all of which were limited to the class period. *Id*. at 6. The *Full Prescription Price* scenario calculates the retail cost of Defendants' HRTs, as to all California consumers (excluding personal injury claimants), by multiplying "the total number of prescriptions sold in California" by "the full retail prescription price." *Id.* at 7. The *Out-of-Pocket Payments* scenario was calculated by taking the total amount paid for non-Medi-Cal prescriptions

4

and excluding insurance payments from the total purchase price.[5] Both the full prescription price and the out-of-pocket costs are referred to in the report as "refund" damages. *Id*. Last, the *Wyeth Profit* (i.e. *Restitutionary Disgorgement*) scenario, based on profit and loss statements produced by Defendants, offers the "total net profits earned as a result of sales of Premarin, Premphase and Prempro to California consumers during the class period." *Id*. at 9.

On March 28, 2016, Defendants filed the instant motion to exclude the opinions of Dr. Rosenthal on the grounds that her calculations fail to account for the value or benefit class members received from use of Defendants' HRT products. *See Doc. No*. 317. Defendants later filed the instant motion for summary judgment, arguing no genuine dispute of material fact exists as to certain elements of the alleged violations: (1) damages and (2) injury and reliance of absent class members. See *Doc. No*. 341. Both motions have been fully briefed and argued by the parties. *See Doc. Nos.* 350, 353. Wyeth filed a notice of supplemental authority in support of its pending motions and Plaintiff filed a response. *Doc. Nos*. 359, 360. The motions are now before the Court.

<u>**LEGAL STANDARD**</u>

**A.      Summary Judgment**

Summary judgment is appropriate under Rule 56(c) of the Federal Rules of Civil Procedure where the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Fed. R. Civ. P.* 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is material when, under the governing substantive

---

[5] The total *out-of-pocket* cost was obtained by adding:(i) the number of prescriptions for uninsured California consumers multiplied by the total retail prescription price; plus (ii) the number of prescriptions for insured California consumers who paid a fixed copay amount multiplied by the average fixed copay amount; plus (iii) the number of prescriptions for insured California consumers who paid a percentage coinsurance amount multiplied by the average coinsurance amount. (Rosenthal Decl.; *Doc. No*. 342-32 at 9 ¶¶ 21-24.) Professor Rosenthal further states that she excluded California consumers who were covered by California Medicaid ("Medi-Cal") from this calculation because these individuals would not have been required to pay a copay. (*Id*. at ¶ 22.)

law, it could affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997). A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

A party seeking summary judgment always bears the initial burden of establishing the absence of a genuine issue of material fact. *See Celotex*, 477 U.S. at 323. The moving party may satisfy this burden in two ways: (1) by presenting evidence that negates an essential element of the nonmoving party's case or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *Id.* at 322-23. Where the party moving for summary judgment does not bear the burden of proof at trial, it may show that no genuine issue of material fact exists by demonstrating that "there is an absence of evidence to support the non-moving party's case." *Id.* at 325. The moving party is not required to produce evidence showing the absence of a genuine issue of material fact, nor is it required to offer evidence negating the nonmoving party's claim. *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 885 (1990). "Rather, the motion may, and should, be granted so long as whatever is before the District Court demonstrates that the standard for the entry of judgment, as set forth in Rule 56(c), is satisfied." *Id.* (quoting *Celotex*, 477 U.S. at 323). If the moving party fails to discharge this initial burden, summary judgment must be denied, and the court need not consider the nonmoving party's evidence. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159-60 (1970).

If the moving party meets the initial burden, the nonmoving party cannot defeat summary judgment merely by demonstrating "that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see also Anderson*, 477 U.S. at 252 ("[t]he mere existence of a scintilla of evidence in support of the nonmoving party's position is not sufficient."). Rather, the nonmoving party must "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts

6

showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (quoting Fed.R.Civ.P. 56(e) (internal quotations omitted)). The court may not make credibility determinations, and inferences to be drawn from the facts must be viewed in the light most favorable to the party opposing the motion. *See Masson v. New Yorker Magazine*, 501 U.S. 496, 520 (1991); *Anderson*, 477 U.S. at 255; *Matsushita*, 475 U.S. at 587.

## B.    Expert Witness Qualification

Federal Rule of Evidence 702 governs the admissibility of expert witnesses. Expert witnesses can testify to "scientific, technical, or other specialized knowledge" that will assist the "trier of the fact [in] understand[ing] the evidence or to determine a fact in issue." *Fed. R. Evid*. 702. Proponents of the expert witness have the burden of demonstrating the admissibility of the testimony. *See Lust ex rel. Lust v. Merrell Dow Pharms.*, 89 F.3d 594, 598 (9th Cir. 1996). The offering party must prove by preponderance of evidence that its expert witness' testimony is admissible. *See Stambolian v. Novartis Pharm. Corp.*, No. CV 12-0437, 2013 WL 6345566, at *3 (C.D. Cal. Dec. 6, 2013) (citing *Lust ex rel. Lust*, 89 F.3d at 598). Failure to show admissibility of an expert witness will result in the exclusion of the witness. *See Mesfun v. Hagos*, No. CV 03-02182, 2005 WL 5956612, at *2 (C.D. Cal. Feb. 16, 2005) (holding expert witness is excluded because offering party failed to show how opinion was more than "rank speculation").

Expert testimony is admissible pursuant to Rule 702 if it is both relevant and reliable. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993). Reliability requires that an expert's testimony "have a reliable basis in the knowledge and experience of his discipline." *Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 462 (9th Cir. 2014) (quoting *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999)). A trial court will not weigh the accuracy of the testimony of an expert witness, rather the court must determine if the expert's testimony is grounded in principals and methodology employed in a particular field of study. Advisory Committee Notes to Rule 702, 2000 Amendments (proponents are not required to show by a "preponderance of the evidence that the assessments of their experts are correct, they only have to demonstrate by a preponderance

7

of evidence that their opinions are reliable . . . the requirement of reliability is lower than the merits standard of correctness") (quoting *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 744 (3d Cir. 1994)).

Reliable expert testimony may still be inadmissible if it is irrelevant. Evidence is relevant when it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Fed. R. Evid.* 401. If expert opinion does not assist the trier of fact with deciding a pertinent factual issue, the testimony is irrelevant and therefore inadmissible. When considering the admissibility of an expert witness, the court acts as a "gatekeeper" rather than a fact finder. *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010) (citing *Daubert*, 509 U.S. at 594, 596). As the gatekeeper, the Court makes a "'preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology properly can be applied to the facts in issue.'" *Daubert*, 509 U.S. at 592-93 (citation omitted). Where the expert witness meets the criteria of Rule 702, the trial court has broad discretion whether to admit the evidence. *Id.* (finding juries should be given leave to act as a fact-finder on the conclusions of an expert witness).

## ANALYSIS

Wyeth moves for summary judgment challenging the sufficiency of Plaintiff's evidence: first as to damages after moving to exclude Plaintiff's expert opinion; and second as to injury and reliance on the alleged misrepresentations and omissions by absent class members. Because the latter raises an issue as to Article III standing and the jurisdiction of this Court over unnamed class members, the Court addresses these issues in reverse order.

### A. Evidence of Injury and Reliance

Wyeth contends it is entitled to summary judgment against absent class members because Plaintiff has not produced evidence of injury or reliance by class members on the alleged misrepresentations and omissions. Defendants emphasize that at the summary judgment phase, it is not enough to allege that class members were likely to be deceived

8

and injured by Defendants' actions. Instead, Defendants argue that Plaintiff must produce competent evidence that class members actually relied on the alleged misrepresentations and were injured as a result.

Quoting the March 30, 2011 order granting in part and denying in part class certification, Plaintiff relies on this Court's ruling that under the UCL, the injury in fact requirement is limited to the named representative, not the putative class as a whole. *Krueger v. Wyeth, Inc*., No. 03CV2496 JAH AJB, 2011 WL 8971449, at *10 (S.D. Cal. Mar. 30, 2011. Plaintiff highlights this Court's prior ruling, citing *McAdams v. Monier, Inc.,* 182 Cal.App.4th at 192, that "individualized proof of deception, reliance, and injury is not necessary under California law for class members to prevail on class claims." *Krueger*, WL 8971449, at *12. Under both the UCL and CLRA reliance may be inferred when the facts show that material misrepresentations were made to the entire class. *In re Vioxx*, 180 Cal.App.4th 116, 129(2009). [6]

Indeed, as the Ninth Circuit has explained:

Unlike common-law fraud claims that focus on the victim's reliance or damages, the UCL focuses on the perpetrator's behavior: "to state a claim under either the UCL or the false advertising law ... it is necessary only to show that members of the public are likely to be deceived." *In re Tobacco II Cases*, 46 Cal.4th 298, 312, 569–70 (2009). Actual falsehood, the perpetrator's knowledge of falsity, and perhaps most importantly, the victim's reliance on the false statements—each of which are elements of common-law fraud claims—are not required to show a violation of California's UCL. (citations omitted).

*Berger v. Home Depot USA, Inc*., 741 F.3d 1061, 1068 (9th Cir. 2014), *abrogated by Microsoft Corp. v. Baker*, 137 S. Ct. 1702 (2017); *see also Waller v. Hewlett-Packard Co*., 295 F.R.D. 472, 476 (S.D. Cal. 2013) (elements of common law fraud aren't incorporated into a UCL claim).

---

[6] As this Court has noted in prior orders, Plaintiff presents overwhelming evidence of Wyeth's extensive campaign to neutralize the fear of breast cancer by distributing information and articles to health care providers by way of medical publications, *doc. no.* 351-62, through promotional materials in magazines, and other publications read primarily by the target population of consumers. *Doc. No.* 351- 50-52. The Ninth Circuit noted that the California Supreme Court holding in *Tobacco II* was made under similar circumstances where there "was little doubt that almost every class member had been exposed to defendants' misleading statements." *Mazza v. Am. Honda Motor Co*., 666 F.3d 581,596 (9th Cir.2012).

Nonetheless, Article III standing requires the injury-in-fact to be "fairly traceable" to defendant's misconduct. *In re Deepwater Horizon*, 739 F.3d 790, 799 (5th Cir. 2014) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) (listing the elements of Article III standing: injury in fact, the injury's traceability to the defendant's conduct, and the potential for the injury to be redressed by the relief requested).

### 1. Article III Standing

Since the issuance of this Court's 2011 order certifying the class, various courts have discussed how to evaluate Article III standing for the purposes of class certification. In *In re Deepwater Horizon*, the Fifth Circuit discusses in moderate detail the two different approaches courts have followed: (1) focusing exclusively on individual standing of the "named plaintiffs" or "class representatives" and ignoring absent class members entirely, and (2) examining the class definition to ensure absent class members possess Article III standing. 739 F.3d 790, 800-01 (5th Cir. 2014).

Prior to the Ninth Circuit decision in *Mazza,* district courts were heavily split on this issue. *See Webb v. Carter's Inc.,* 272 F.R.D. 489 (C.D.Cal.2011)(analyzing standing of proposed class members); *O'Shea v. Epson America, Inc.*, 2011 WL 4352458 (C.D.Cal. Sept. 19, 2011) (examining the class definition to ensure standing); *Gonzales v. Comcast Corp.*, 2012 WL 10621 (E.D.Cal. Jan. 3, 2012)(same); *Cf. Bruno v. Quten Research Inst., LLC*, 280 F.R.D. 524 (C.D.Cal.2011) (focusing only on named plaintiff); *In re Google AdWords Litig.*, 2012 WL 28068 at *10 (N.D.Cal. Jan. 5, 2012) (same); *Agne v. Papa John's Int'l, Inc.*, 286 F.R.D. 559, 565 (W.D.Wash.2012) (acknowledging the split, but taking no position). However, neither approach requires Plaintiff to submit evidence of each class member's standing as Defendants suggest. "The core function of class actions, wherein named plaintiffs represent a passive group of class members, would be significantly compromised" if class members were required to submit evidence of their standing. *Newberg on Class Actions* § 2:3 (5th ed.).

Notably, the Ninth Circuit has employed both approaches. In *Stearns v. Ticketmaster Corp.*, the court held that "our law keys on the representative party, not

all of the class members." 655 F.3d 1013, 1021 (9th Cir. 2011). However, this conclusion followed recognition that "each alleged class member was relieved of money in the transactions" and that the loss, presumably of each class member, was "fairly traceable to the action of the Appellees." *Id.* In *Mazza*, the Ninth Circuit followed the test set forth in *Denney v. Deutsche Bank AG*:

> We do not require that each member of a class submit evidence of personal standing. At the same time, no class may be certified that contains members lacking Article III standing. The class must therefore be defined in such a way that anyone within it would have standing.

443 F.3d 253, 263–64 (2d Cir.2006)(citations omitted); *see Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 596 (9th Cir. 2012)(examining the class definition).

In *Mazza*, the court found the named plaintiff's *allegations* sufficient to withstand the standing challenge at the class certification stage, but that the district court erred in finding that a class-wide inference of reliance on the misrepresentations was appropriate. In *Mazz*a, the Ninth Circuit vacated the class certification order, holding that the class definition certified by the district court was overboard because it was not defined in such a way as to include only members who were exposed to advertising that is alleged to be materially misleading. Although this Court has already explained that the exposure issue is not present here due to the massive advertising campaign employed by Defendants (*see Krueger v. Wyeth, Inc.,* 310 F.R.D. 468, 479-82 (S.D. Cal. 2015); *see also Torres v. Mercer Canyons Inc*., 835 F.3d 1125, 1137 (9th Cir. 2016)), the Court must assure itself that there is "a causal connection between the injury and the conduct complained of…" *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

This Court joins the multiple others in our circuit that have followed *Mazza*. *See, e.g., Walker v. Life Ins. Co. of the Sw*., 2012 WL 7170602 (C.D.Cal. Nov. 9, 2012); *Guido v. L'Oreal, USA, Inc.*, 284 F.R.D. 468, 474–75 (C.D.Cal.2012); *Tietsworth v. Sears, Roebuck and Co*., 2012 WL 1595112 at *14 (N.D.Cal. May 4, 2012); *Baxter v. Rodale*, 2012 WL 1267880 at *2 (Apr. 12, 2012); *In re TFT–LCD* (Flat Panel Antitrust Litig.), 2012 WL 253298 at *1 n. 2 (N.D.Cal. Jan. 26, 2012). Defining the class in such a way as

11

to ensure the standing of the class is necessary to avoid inconsistencies and inequities that would inevitably occur if plaintiffs were allowed to sue as class members, but not as individuals. From an evidentiary standpoint at summary judgment, only the named plaintiff or class representative must produce evidence to support Article III standing. *Id.* (plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing these elements). However, that does not alleviate the Court's obligation to confirm standing as to the Class. See *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 831 (1999)(finding that Article III standing of class members may be resolved after class certification issues, which themselves pertain to statutory standing). The traditional doctrine of standing "ensures that federal courts do not exceed their authority and imposes limitations on the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547. Such litigants include passive class members. Thus, the Court must engage in a two-step analysis: (1) ensuring that individual standing of the named plaintiff is supported by competent evidence and (2) examining the class definition to ensure that anyone within it would have standing.

### a. Evidence of Named Plaintiff's Individual Standing

Plaintiff contends that she would not have purchased Defendants' HRT products "but for" Defendants' minimization and omission of information regarding serious health risks and misrepresentation of health benefits. Plaintiff must therefore produce evidence that she was relieved of each dollar she spent because of Wyeth's deceptive conduct. *See Mazza*, 666 F.3d 581, 595. Plaintiff provided the following testimony:

Q. And what prompted you to decide to stop?

A. That, um, I discussed it with my doctor at the time, and she wanted -- she really wanted me off of it.

Q. And at the time of that annual visit, did you -- did you raise the issue of discontinuing Prempro or did she?

A. I don't recall which one of us did, whether it was her -- I -- I -- maybe the discussion came up about all the information that was out there.

12

Q. So at this point in time you had seen the articles --

A. Yes.

Q. -- regarding Prempro in or about the fall of 2002?

A. Yes.

Q. And what did Dr. Kim tell you about why she thought you should discontinue Prempro?

A. With all the -- the information that was out there, …  it would be a good time for me to stop all hormone therapy.

Q. Do you remember anything specific, though, that she told you about the, quote, unquote, new information?

A. Um, well, the heart was one of them and, um, you know, with my family history and the heart, and of course breast cancer was always in there, so she thought it was better that we get off of it completely.

Q:…about August of '03 you went to Scripps Clinic and under "Reason for today's visit," it says, "Follow-up discontinued Prempro."

A. Correct.

Q. Am I correct that -- so in or about July of '03  you were just phasing off of the Prempro; right?

A. Right, she had me phase out.

The evidence indicates that Plaintiff stopped purchasing Defendants' HRT and "all hormone therapy" products as a result of learning of the "new information" regarding increased risk of disease.  There is sufficient evidence by which a fact-finder could conclude that Plaintiff would not have purchased Defendants' HRT products in the first instance had all the information been available to her (or her physician) at the time of purchase.  Therefore, the Court finds,  for standing purposes, Plaintiff has offered evidence of an "injury-in fact"  that is "fairly  traceable  to the challenged  conduct."   Despite

13

Defendants' evidence to the contrary[7], the Court need only find evidence exists on which the fact-finder could reasonably find for the plaintiff. Plaintiff has met that burden.

### b.    Reexamination of the Class Definition

The certified class is defined as follows:

> All California consumers who purchased Wyeth's Hormone Replacement Therapy products, Premarin, Prempro, and/or Premphase, for personal consumption between January 1995 and January 2003, and who do not seek personal injury damages resulting therefrom.

"Pursuant to Rule 23, the court's task at certification is to ensure that the class is not 'defined so broadly as to include a great number of members who for some reason could not have been harmed by the defendant's allegedly unlawful conduct.' " (quotation omitted) *Torres v. Mercer* Canyons Inc., 835 F.3d 1125, 1137–38 (9th Cir. 2016)(quoting Newberg on Class Actions § 2:3). "Economic injury is cognizable under the UCL and sufficient to satisfy Article III standing, so long as the plaintiff 'lost money or property as a result of the unfair competition' and demonstrates a 'causal connection' between the UCL violation and the economic injury. *Guido v. L'Oreal, USA, Inc*., 284 F.R.D. 468, 475 (C.D. Cal. 2012)(citing *Rubio v. Capital One Bank*, 613 F.3d 1195, 1204 (9th Cir.2010).

Defendants' alleged unlawful conduct consists of a combination of misrepresentations and omissions regarding the health risks and benefits of Wyeth's HRT products, including increased risks of breast cancer, strokes, heart attacks, cardiovascular disease, Alzheimer's disease, and dementia. Plaintiff offers evidence consisting of deposition testimony, prior trial testimony, Defendants' internal documents, medical

---

[7] Defendants offer evidence that: (1) since the study was published in 2002, the FDA has continued to approve HRT products for the relief of vasomotor symptoms and prevention of osteoporosis, doctors continue to prescribe it, and women continue to take it, see *doc. nos*. 353 at 8; 342-7 (current label for Premphase® / Prempro™), (2) California prescribers testified to having been aware of a risk of breast cancer throughout the class period and prescribing it for reasons other than to prevent or treat cardiovascular or Alzheimer's disease, *doc. nos.* 353 at 9; 342-11 (Winer Report.¶ 39); 342-12 (Winer Dep. 77:19-23; 140:21-141:10; 241:6-10, May 6, 2016) and (3) Plaintiff's physician testified that she prescribed HRT to Plaintiff and other California women primarily for the relief of vasomotor symptoms and prevention of bone loss. *Doc. Nos.* 341 at 9; 353 at 8; 342-10 (Vyenielo Dep. 83:3-9).

studies, and scientific journals which indicate that between 1995 and 2002, Wyeth hired authors to craft topic papers, and articles touting only the benefits of HRT products in medical journals which targeted doctors treating women suffering with certain post-menopausal symptoms. *See Doc Nos*. 351-24; 351-62. Plaintiff offers evidence to prove Wyeth aggressively suppressed the impact of key findings in studies linking HRT to an increased risk of breast cancer by hiring doctors to write articles in medical literature rebutting those scientific studies. *See Doc. Nos*. 351-28, 351-29. In addition, the record in this case contains a number of exhibits which indicate that Defendants knew the representations they made were inaccurate or incomplete and reflect Defendants' strategies to shift media focus and off-set the data that was contrary to their representations. *See Doc. Nos*. 318-12,13; 351-31,35, 36, 37, 38, 43, 57, 58, 60.

Without directly challenging Plaintiff's evidence of the alleged misrepresentations or omissions, Defendants argue that the economic injury suffered by the class, must be "a result of" the alleged conduct. The Court agrees. However, as district courts have explained, the causation, causal connection, or reliance element- whether as to statutory or constitutional standing- " 'may be presumed in the case of a material fraudulent omission.'" *Tietsworth v. Sears*, 720 F. Supp. 2d 1123, 1147 (N.D. Cal. 2010)(quoting *Plascencia v. Lending 1st Mortgage*, 259 F.R.D. 437, 447 (N.D.Cal.2009). As discussed in *Tietsworth*:

> The Supreme Court has held, in cases "involving primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery." Plascencia, 259 F.R.D. at 447, quoting Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128, 153, (1972). "Rather, '[a]ll that is necessary is that the facts withheld be material,' in the sense that a reasonable person 'might have considered them important' in making his or her decision." Plascencia, 259 F.R.D. at 447, quoting Affiliated Ute Citizens of Utah, 406 U.S. at 153-54.

*Id*. at 1147. The alleged omissions here, supported by competent evidence, fit this description. Accordingly, the Court presumes and infers from the evidence a causal connection exists between Defendants' unlawful conduct and the purchase of Defendants' products by class members – specifically those purchases during the period when Defendants allegedly failed to disclose material facts pertaining to the extent of health risks

15

involved. Although district courts have broad discretion to revisit class certification throughout the legal proceedings before the court, *Armstrong v. Davis*, 275 F.3d 849, 872 n. 28 (9th Cir.2001), the Court finds it unnecessary to do so here. The class definition is sufficiently defined to ensure members within it have standing, and narrow enough to avoid encompassing a large number of members who could not have been harmed. Further, the Court finds the class definition conforms with Plaintiff's prevailing theory of liability. *Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1139 (9th Cir. 2016)(citing *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 823 (7th Cir. 2012)).

Accordingly, Defendants' motion for summary judgment against absent class members on the grounds that Plaintiff has not produced evidence of injury or reliance by the class is **DENIED**.

### B. Evidence of Damages and Restitution

First, Defendants argue the calculations offered by Plaintiff's expert, Dr. Rosenthal, are non-compliant with controlling law and therefore inadmissible for failure to apply the appropriate legal formula[8]. Defendants conclude that Plaintiff fails to present a means by which a fact-finder could determine "actual damages" under the CLRA or restitution under the UCL and therefore Defendants are entitled to summary judgment as a matter of law. Alternatively, Wyeth moves for partial summary judgment to foreclose recovery by the class of the full retail price of HRT products, and to limit damages and restitution, if any, to out-of-pocket costs paid by Plaintiff and class members.

//

//

//

---

[8] Wyeth's motion to exclude expert testimony is based on relevance, as opposed to reliability. Wyeth does not challenge Professor Rosenthal's underlying methodology in calculating either the full refund or the out-of-pocket refund damages of the Class. Nor does Wyeth challenge Professor Rosenthal's methodology in calculating the profits it earned on HRT sales to the Plaintiff-Class. *See Doc. No.* 351-70, at 180-181.

16

### 1. CLRA Remedies

The CLRA provides, in pertinent part,

> Any consumer who suffers any damage as a result of the use or employment by any person of a method, act, or practice declared to be unlawful by Section 1770 may bring an action…to recover…:
> (1) Actual damages, but in no case shall the total award of damages in a class action be less than one thousand dollars ($1,000).
> (2) An order enjoining the methods, acts, or practices.
> (3) Restitution of property.
> (4) Punitive damages.
> (5)Any other relief that the court deems proper.

*Cal. Civ. Code* § 1780(a); *see also Paz v. Playtex Prods., Inc.*, 2008 WL 111046, at *3 (S.D. Cal. Jan. 10, 2008).

Plaintiff's prayer for relief includes "class refund damages" under the CLRA. *Doc. No.* 350 at 14. Krueger intends to introduce Dr. Rosenthal's "full prescription price" or, in the alternative, "out-of-pocket" calculations to illustrate the amount paid by the class for Wyeth's HRT products. Wyeth first asserts that Dr. Rosenthal's damages calculations supporting Krueger's CLRA claims should be excluded for failure to account for the value received from the HRT products. *Doc. No.* 317-1 at 15. Defendants rely on various cases to support their position.

In *Colgan v. Leatherman Tool Grp., Inc.*, plaintiffs brought a class action lawsuit against Leatherman under the CLRA, seeking actual damages for deceptive business practices. 135 Cal.App.4th 663 (2006). Between 1997 and 2002, Leatherman marketed and advertised various tools as being "Made in the USA," despite the "significant, functioning parts of the tools" being made elsewhere. *Id.* at 676. The trial court found Leatherman violated the CLRA and applied Civil Code Section 3343(a),which sets the amount of recovery as "the difference between the actual value of that with which the defrauded person parted and the actual value of that which he received." *Id.* The court found that plaintiffs presented "no evidence of retail prices for either the Leatherman tools or foreign-made tools during the [class period]," and that the sample retail prices provided for Chinese-made tools were statistically unreliable and inappropriate. *Id.* The court

concluded that plaintiffs failed to meet their burden of proof as to actual damages and awarded only statutory damages for violating the CLRA under Civil Code section 1780 (a). *Id*. at 676.

In *In re POM Wonderful LLC* ("*In re POM*"), No. ML 10-02199 DDP RZX, 2014 WL 1225184, at *1 (C.D. Cal. Mar. 25, 2014), plaintiffs brought an action against POM Wonderful LLC, on behalf of consumers for false and misleading advertising of their juice products. In calculating damages, plaintiff's expert presented the "Full Refund model[9], assum[ing]that consumers would not have purchased the juices if not for the alleged misrepresentations." In discussing a restitutionary award, the court clarified that, "the question is not whether a plaintiff received the particular benefit he sought or what the value of that benefit was or would have been." *Id* at 3. The court concluded that because the plaintiffs received some benefit, whether it be "hydration, flavor, energy or anything else of value," the Full Refund model could not accurately measure classwide damages because it failed to account for benefits conferred. *Id*. n 2. The *In re POM* court relied heavily on the *In re Vioxx Class Cases*, which lists *one possible* measure of restitution as "[t]he difference between what the plaintiff paid and the value of what the plaintiff received." *In re POM Wonderful LLC*, WL 1225184, at *3 (citing *In re Vioxx Class Cases*, 180 Cal.App.4th 116, 131 (2009)).

Based on the decision in *In re POM Wonderful LLC*, Defendants argue that Plaintiff cannot plausibly contend that they did not receive any value from Defendants' products and because neither refund model makes an attempt to account for the value class members received, they are legally inadequate. Defendants further argue that Plaintiff's failure to account for value or offer evidence of a "price less value received" model of damages is fatal to her claim. In response, Krueger contends that she has never placed "value" at issue and has always held a position that a reasonable class member would not have purchased

---

[9] *In re POM Wonderful LLC* plaintiffs also presented an alternate model, referred to as "the Price Premium model." The price premium model was not offered by Plaintiff in the instant case.

the HRT products had she been informed of the life-threatening risks. However, even considering the benefits of using HRT, Plaintiff argues that the individualized, subjective value, if any, received by each class member is irrelevant when determining an appropriate method by which to calculate damages.

Neither party disputes that actual damages under the CLRA are a separate and distinct remedy from that of restitution under either the CLRA or the UCL. *Colgan v. Leatherman Tool Grp., Inc*., 135 Cal. App. 4th 663, 695 (2006), *as modified on denial of reh'g* (Jan. 31, 2006) (citing *Wilens v. TD Waterhouse Group, Inc.*, 120 Cal.App.4th 746, 754 (2003))(Damages under the CLRA are a legal remedy, intended to compensate those who suffer actual damage.) "Actual damage" pursuant to the CLRA is the difference between the actual value of that with which the defrauded person parted and the actual value of that which he received." *Colgan*, 135 Cal. App. 4th at 675. So as not to confuse the subjective value attributed by members of the class, with the objective market value, the Ninth Circuit recently reiterated that:

> Under California consumer protection laws, plaintiffs can measure class-wide damages using methods that evaluate what a consumer would have been willing to pay for the product had it been labeled accurately. See *Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 989 (9th Cir. 2015). Such methods must, however, reflect supply-side considerations and marketplace realities that would affect product pricing….[Expert] analysis showed only how much consumers subjectively valued the [product], not what had occurred to the actual market price [of the product with the omitted information or without the misrepresentation]. Thus, regardless whether consumers were willing to pay a higher price for the [misrepresented] product, the expert's opinion did not contain any evidence that such higher price was actually paid…

*Zakaria v. Gerber Prod. Co*., 755 F. App'x 623, 624–25 (9th Cir. 2018).

Although Plaintiff argues that she would not have purchased HRT "but for" Wyeth's deceptive conduct, when calculating actual damages, the Court must look to what actually occurred, taking into consideration that which Plaintiff did, in fact, receive and the market value of the product (both with and without the misrepresentation). See *All. Mortg. Co. v.*

*Rothwell*, 10 Cal. 4th 1226, 1240 (1995) (discussing the two measures of damages for fraud).

> The 'out-of-pocket' measure of damages … awards the difference in actual value at the time of the transaction between what the plaintiff gave and what [s]he received. The 'benefit-of-the-bargain' measure, on the other hand, is concerned with satisfying the expectancy interest of the defrauded plaintiff by putting him in the position he would have enjoyed if the false representation relied upon had been true; it awards the difference in value between what the plaintiff actually received and what [s]he was fraudulently led to believe [s]he would receive.

*Id.* (quoting *Stout v. Turney*, 22 Cal.3d 718, 725 (1978)).

Plaintiff provides no evidence to support the market value of the alleged riskier and less beneficial HRT product she received in comparison to what she paid[10]; nor does she provide evidence of the market value of the HRT product if the false representations had been true. Plaintiff offers no evidence of the monetary effect of the alleged misrepresentations or omissions on the market price of Defendants' products. Although it is likely that a consumer would be induced to pay more for a product asserted to have numerous health benefits and minimal risk than a similar product advertised as having less health benefits and serious risks, *see Kwikset Corp. v. Super. Ct.*, 51 Cal.4th 310, 329 (2011), such evidence has not been presented to the Court. Because the Court has no facts from which it can determine actual retail prices or the retail price differential between Wyeth's HRT products and similar HRT products sold in California during the same time period, the statutory minimum is the appropriate award of damages. *See Colgan*, 135 Cal. App. 4th at 676. The Court finds that there is an absence of evidence to support Plaintiff's claim for actual damages under the CLRA and therefore **GRANTS** Defendants' motion for summary judgment as to actual damages.

---

[10] The Court need not determine whether the amount paid by class members should encompass the "full prescription price" or only the "out-of-pocket" cost because in either case, the market value of the product class members received would be deducted from that which they paid.

### 2. UCL Remedies

The UCL prohibits unlawful and unfair business practices. *Cal. Bus. & Prof.Code* § 17200 et seq.  Pursuant to the statute, remedies for violations of the UCL are limited. *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal.4th 1134 (2003). Under the UCL, "[p]revailing plaintiffs are generally limited to injunctive relief and restitution." *Cel–Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.*, 20 Cal.4th 163, 179 (1999). Restitution is broadly designed 'to restore the *status quo* by returning to the plaintiff funds in which he or she has an ownership interest.'" *Ewert v. eBay, Inc.*, 602 F. App'x 357, 359 (9th Cir. 2015) (citing *Korea Supply Co.*, 29 Cal.4th at 1149).

Krueger requests restitution under the UCL and asserts that Dr. Rosenthal's figures are properly calculated under Plaintiff's theory of liability.[11] While both parties agree that restitution is an appropriate remedy for a UCL violation, they disagree on the method of calculation.  Similar to the defendants in *In re POM* and several other UCL cases, Defendants here assert that the [only] proper measure of restitution is "[t]he difference between what the plaintiff paid and the value of what the plaintiff received." *See e.g.*, *In re Vioxx Class Cases*, 180 Cal. App. 4th 116, 1310 (2009); *see also Pulaski & Middleman, LLC v. Google, Inc. (Pulaski)*, 802 F.3d 979, 988 (9th Cir. 2015)( Restitution is "the return of the excess of what the plaintiff gave the defendant over the value of what the plaintiff received."); *Brazil v. Dole Packaged Foods*, LLC, 660 F. App'x 531, 534 (9th Cir. 2016)(same); *Schneider v. Ford Motor Co.*, 756 F. App'x 699, 701 (9th Cir. 2018) (employing a "use offset" method).   This measure of restitution is identical to a measure of actual damages. However, the underlying purpose behind actual damages differs from that of restitution. The actual damages provision of the CLRA is to compensate for actual loss. On the other hand, "restitution under the … Unfair Competition Laws [is] for…deterrence and restoration of property acquired unlawfully."  Therefore, the Court

---

[11] To the extent Plaintiff requests restitution under either the UCL or the CLRA, the analysis is the same.

may apply different standards when assessing each in accordance with their purpose. *Colgan v. Leatherman Tool Grp., Inc.,* 135 Cal. App. 4th 663, 696 (2006), *as modified on denial of reh'g* (Jan. 31, 2006).  As stated in *Pulaski*:

> Restitution has two purposes: "to restore the defrauded party to the position he would have had absent the fraud," and "to deny the fraudulent party any benefits, whether or not for[e]seeable, which derive from his wrongful act." *Nelson v. Serwold*, 687 F.2d 278, 281 (9th Cir.1982) (citing the Restatement of Restitution).

*Pulaski*, 802 F.3d at 988.

Although the "price less value received" method is commonly employed, it is not the *only* measure of restitution.  *See Tobacco II*, 240 Cal. App. 4th 779, 792 (2015) (discussing "that neither *Vioxx* nor *Cortez* suggest that the difference in price paid and value received is *the only* proper measure of restitution"). Relying on *Tobacco II*, a district court has noted that "'plaintiffs ha[ve] the burden of proving entitlement to an alternative measure of restitution proper under the circumstances.'" *Russell v. Kohl's Dep't Stores, Inc.*, (*Russell*) No. EDCV151143RGKSPX, 2015 WL 12781206, at *3 (C.D. Cal. Oct. 6, 2015).  In discussing *Tobacco II,* the *Russell* court explained:

> [W]hile plaintiffs are allowed to advance alternative measures of restitution, not all such measures will ultimately prevail because "[t]he amount of restitution ordered under the UCL 'must be supported by substantial evidence.'" Id. (quoting Colgan, 38 Cal. Rptr. 3d at 63). In fact, the court in *In re Tobacco Cases II* actually rejected the plaintiffs' alternative basis for restitution in that case—not because of a categorical ban on alternative measures of restitution but because the plaintiffs failed to adduce sufficient evidence to support their theory.

2015 WL 12781206, at *3.

Krueger offers two alternative measures of restitution: (i) the full-refund models and (ii) the disgorgement of profit model.

### i. Full-Refund Models of Restitution

Plaintiff offers two potential refund models in support of a restitutionary measure of damages derived from Rosenthal's calculations of the full prescription price, on one hand, and the out-of-pocket cost on the other. Rosenthal calculated the full prescription cost paid by all class members by multiplying the number of prescriptions filled in California (minus

22

those Californians claiming personal injury) by the average retail price of Defendants' HRT products. She calculated the total out-of-pocket cost of all class members by adding the full prescription price for uninsured California consumers, with the average amount of copay or coinsurance paid by insured California consumers.

Defendants argue that for Plaintiff to proceed on a full refund theory of restitution, Plaintiff must present sufficient evidence the HRT products were worthless. *Brazil v. Dole Packaged Foods*, LLC, 660 F. App'x 531, 534 (9th Cir. 2016) (citing *Tobacco II*, 240 Cal.App.4th 779); *see also Makaeff v. Trump Univ., LLC*, 309 F.R.D. 631, 640 (S.D. Cal. 2015) (holding Plaintiff's full refund method of restitution was consistent with Plaintiff's claim that the TU program was worthless.) Unlike plaintiffs in *Brazil* or *Makaeff*, Plaintiff does not contend that Defendant's drugs were valueless or worthless or that she did not receive any benefit. In fact, Plaintiff testified that Wyeth's HRT alleviated hot flashes, reduced symptoms of insomnia, and improved memory and everyday functioning. *See Doc. No.* 317-1 at 19 (citing Krueger Dep. 67:19-24, 84:4-86:5, Apr. 13, 2005). Citing the 2006 article, *Overall Benefits and Harms of Combination Hormone Replacement Therapy* at 3 (Feb. 6, 2006), Defendants highlight that Plaintiff's own expert, Dr. Graham Colditz, has opined that hormone therapy confers significant benefits, including: (i) temporary decreases in hot flashes and night sweats, (ii) decreased bone fractures; and (iii) increased libido.

However, Krueger's theory of liability does not rest on the assertion that she did not receive any benefit for her bargain, but instead, on the contention that she would not have purchased the hormone replacement therapy, despite its benefits, had it been marketed accurately. Although this same theory was put forth by plaintiffs in *In re POM*, the district court in that case did not have the benefit of the analysis in *Russell* or *Spann*. In *Russell,* Plaintiff filed a UCL class action lawsuit against Kohl's Department Store alleging that Kohls had induced plaintiff to purchase merchandise at a purportedly marked down "sale" price by making false claims that each of its products had previously sold at a significantly higher retail price. In doing so, plaintiff alleged that the misrepresentation as to the nature

and amount of price discounts induced consumers to purchase merchandise which they otherwise would not have purchased.  In denying defendant's motion to dismiss, the court held that:

> … alternative measures of restitution are available….Plaintiffs …can rely on a measure of restitution similar to the one pursued by the plaintiff in *Pulaski*. 2015 WL 5515617 at *7 (measuring restitution as "what a purchaser would have paid at the time of purchase had the purchaser received all the information"). Alternatively, Plaintiffs may pursue a measure of restitution similar to any of the methods discussed in *Spann*. 2015 WL 1526559 (recognizing three measures of restitution: "rescission and refund," "transaction value," or "restitutionary disgorgement").

*Russell*, 2015 WL 12781206, at *5.

Similarly, in *Spann v. J.C. Penney Corp.,* No. SA CV 12-0215 FMO, 2015 WL 1526559, at *3 (C.D. Cal. Mar. 23, 2015), Plaintiff brought a class action lawsuit against J.C. Penny Corporation alleging that the department store employed a deceptive pricing scheme.  Spann alleged that the price comparisons for the items she purchased were false. Plaintiff's decision to purchase the items were based, at least in part, on J.C. Penny's representation that they were on sale.  Defendant moved for summary judgment arguing that plaintiff could not establish entitlement to restitution under the UCL or CLRA. Relying on *In re Google AdWords Litig.,* 2012 WL 28068 (N.D.Cal. Jan. 5, 2012) and *Day v. AT & T Corp.*, 63 Cal.App.4th 325, 339 (1998), J.C. Penny argued that any measure of restitution must also account for the benefit received and that plaintiff had not established that she paid more than the product was worth. The district court ultimately disagreed, holding that plaintiff would still be entitled to present alternative methods—if measurable and supported by evidence—by which the court could order restitution. Finding that plaintiff had presented evidence that "every dollar she spent was as a result of defendant's alleged false advertising," and defendant had produced no evidence to the contrary or any evidence to demonstrate that a full refund would not be proper, the Court held that rescission with complete restitution was an appropriate remedy. *Spann,* 2015 WL 1526559, at *6.

Here, however, both parties have produced evidence to support their positions. Plaintiff's theory is that "but for" Defendant's alleged misrepresentations and omissions,

24

Plaintiff would not have purchased the HRT product and therefore Plaintiff would have paid nothing. Plaintiff must point to evidence in the record that every dollar spent was based, at least in part, on either: (1) Defendants' alleged misrepresentations that the HRT reduced the risk of various diseases, or (2) Defendants' alleged failure to warn women of the increased risk of diseases that accompanied the use of their hormone replacement therapy. *Russell*, 2015 WL 12781206, at *2 (explaining that while the court has discretion to fashion remedies to prevent, deter, and compensate for unfair business practices, restitution under the UCL must be a measurable amount to restore to plaintiff what has been acquired by violation of the statute, and that measurable amount must be supported by evidence). As such, at the summary judgment phase, it is not enough for Plaintiff to simply allege facts. She must also produce sufficient evidence to support entitlement to one of the alternative measures. Plaintiff must "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts." *Celotex*, 477 U.S. at 324 (quoting *Fed.R.Civ.P.* 56(e)).

Defendants argue that Plaintiff has not presented evidence that class members would not have purchased Defendants' HRT products "but for" the alleged misrepresentations and omissions; and contend that the undisputed facts establish the opposite.[12] In response, Plaintiff asserts that she has put forth sufficient evidence to demonstrate a genuine issue of material fact. Plaintiff's response in opposition and contemporaneously filed declaration contain evidence that the National Institute of Health abruptly terminated the estrogen-progestin hormone therapy (EPHT) sections of the nationwide HRT clinical trial after study participants displayed an increased risk of disease, including breast cancer, dementia, Alzheimer's, stoke, and venous thrombosis. *Doc. Nos.* 351-11,12,15. Following the publication of the 2002 Women's Health Initiative (WHI) study and subsequent widespread media coverage, reports indicated a 66% decline in EPHT use overall and a

---

[12] *See supra* n.7 for a summary of Defendants' opposing evidence.

67% decline in EPHT prescriptions by female Kaiser Permanente members aged 50-74 in parts of California. *Doc. Nos.* 351- 13 at 2; 351-15 at 2. In addition, Plaintiff testified that after her doctor informed her of the increased risk of disease, her physician recommended that she "stop all hormone therapy" and "get off it completely." *Doc. No.* 317-8 at 26 (Krueger Dep. 95:13-23, April 13, 2005).

In determining whether a triable issue of material fact exists, the Court's role is not to weigh the credibility of purportedly conflicting evidence. *Masson*, 501 U.S. at 520. Rather, all inferences to be drawn from the evidence must be considered in the light most favorable to the nonmoving party. *Id.*; *Barlow v. Ground*, 943 F.2d 1132, 1134 (9th Cir.1991), *cert. denied*, 505 U.S. 1206 (1992). "There must be evidence on which the fact-finder could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Accordingly, the Court finds that the evidence presented is sufficient to create a genuine issue of material fact as to whether a reasonable consumer would have purchased Defendants' products had she known all the information and whether Defendants' alleged misrepresentations and omissions were a determining factor in Plaintiff's decision to purchase. If the fact-finder finds in favor of Plaintiff, restitution, amounting to a full refund would be an appropriate remedy under the law. Therefore, Defendants' motion to exclude Dr. Rosenthal's opinion as to restitution based upon a full-refund is **DENIED.**

       *ii.*     *Restitutionary v. Non-Restitutionary Disgorgement*

Defendants contend that when a product bestows some value to the consumer, any award based on a sum of profit would equate to non-restitutionary disgorgement, which is unavailable to Plaintiff under the UCL. *See, e.g., Kraus v. Trinity Mgmt. Servs. Inc.*, 23 Cal.4th 116, 126-27 (2000), *superseded on other grounds*, as recognized in *Arias v. Superior Court*, 46 Cal.4th 969 (2009). In effect, Defendants argue that a "monetary award must account for the benefits received, and if it does not, then it is not restorative or restitutionary." *See Spann* , 2015 WL 1526559, at *8. However, it is not always necessary

for a restitutionary award to account for the benefit received. As the California Supreme

Court has explained:

> [T]he distinction between restitutionary and non-restitutionary disgorgement turns on whether the money plaintiff seeks was obtained by the defendant from the plaintiff in the first place. If so, disgorgement is restitutionary.

*Kraus*, 23 Cal.4th at 126-27.

A disgorgement of profits earned by defendants as result of allegedly unfair practices is available under the UCL - to extent that it is restitutionary. *Korea Supply Co*., 29 Cal.4th at 1148 ("Under the UCL, an individual may recover profits unfairly obtained to the extent that these profits represent monies given to the defendant or benefits in which the plaintiff has an ownership interest."); *see also Matoff v. Brinker Rest. Corp*., 439 F. Supp. 2d 1035, 1038–39 (C.D. Cal. 2006) (disgorgement of profits is available under the UCL only to the extent that it is restitutionary.) Defendant argues that that restitutionary disgorgement must follow "ordinary restitutionary principles," limiting any award to the amount necessary to *restore the status quo*." *Korea Supply Co*., 29 Cal.4th at 1149. Defendants' point has merit, as courts have recognized that the defendant's benefit and the plaintiff's loss are *typically* the same. Emphasis added. *Ivie v. Kraft Foods Glob., Inc*., No. C-12-02554-RMW, 2015 WL 183910, at *2 (N.D. Cal. Jan. 14, 2015). In such cases restitution requires the defendant to restore the plaintiff to his or her original position. *Id.* (citing *Am. Master Lease LLC v. Idanta Partners, Ltd.,* 225 Cal. App. 4th 1451, 1482*,* (2014)*, as modified (May 27, 2014)*; *Meister v. Mensinger*, 230 Cal. App. 4th 381, 398, (2014). However, where the plaintiff's loss and defendant's gain are not equal, disgorgement of profits is appropriate. *Ivie*, WL 183910, at *2.

As stated above, the purpose of restitution is two-fold, encompassing both restoration and deterrence principles, neither outweighing the other. *See Pulaski*, 802 F.3d at 988; *see also* Restatement (Third) of Restitution and Unjust Enrichment § 51 (2011) (The object of restitution in cases where a conscious wrongdoer is enriched by misconduct is to eliminate profit from wrongdoing while avoiding, so far as possible, the imposition of

a penalty.) In relying on the Restatement (Third) of Restitution, California courts have recognized that:

> The object of the disgorgement remedy—to eliminate the possibility of profit from conscious wrongdoing—is one of the cornerstones of the law of restitution and unjust enrichment, and the profit for which the wrongdoer is liable by the rule of § 51(4) is the net increase in the assets of the wrongdoer, to the extent that this increase is attributable to the underlying wrong. Rest.3d Restitution and Unjust Enrichment, § 51(4)… The public policy of [California] does not permit one to take advantage of his own wrong regardless of whether the other party suffers actual damage. Where a benefit has been received by the defendant but the plaintiff has not suffered a corresponding loss or, in some cases, any loss, but nevertheless the enrichment of the defendant would be unjust ... the defendant may be under a duty to give to the plaintiff the amount by which [the defendant] has been enriched. (quotations and citations omitted).

*Meister v. Mensinger*, 230 Cal. App. 4th 381, 398, (2014).

Defendants argue Plaintiff's actual loss, if any, would be capped at the class members' "out-of-pocket" costs which Dr. Rosenthal has calculated at $590.2 million. According to Plaintiff's expert, this $590.2 million loss (by the class) was transformed into a $771.6 million gain (by defendants). Dr. Rosenthal's calculations began with the data provided by Defendants' profit and loss statement. She then allocated annual figures on a quarterly basis. *Doc. No*. 326-2 at 9. The ratio of California prescriptions to national prescriptions was then multiplied to Wyeth's national profits to determine the percentage of Wyeth's profits derived from the sale of HRT products to Californians. Finally, in order to exclude personal injury claimants, she used the ratio of personal injury claimant prescriptions to total California prescriptions and multiplied that percentage with Wyeth's California profits to obtain a total unjust enrichment of $771.6 million. However, this amount includes *all* California profits earned as a result of the unfair business practice regardless of whether those profits were paid to Wyeth by class members or a third-party source.[13]

---

[13] The parties argue for and against the application of the collateral source doctrine in relation to allowing class members to recover monies paid by their insurers for Defendants' HRT products. The

In keeping with *Kraus* and restitutionary disgorgement principles, the portion of Defendants' profits which were obtained directly from members of the class as a result of Wyeth's alleged omissions or false statements is the *out-of-pocket* cost - or up to $590.2 million[14] of the 771.6-million-dollar profit. This figure represents monies taken directly from persons who were victims of the alleged unfair practice. Based on the clear language of the statute, the Court may order a defendant "to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition." *Cal. Bus. & Prof.Code* § 17203. The portion of profits realized by Defendants, *and obtained from plaintiffs,* as a result of the alleged deception, fit that description.

A restitution award under the UCL "must be supported by substantial evidence" *Colgan v. Leatherman Tool Grp., Inc*., 135 Cal.App.4th 663, 700 (2006), however "[t]he law requires only that some reasonable basis of computation be used." *Acree v. Gen. Motors Acceptance Corp*., 92 Cal.App.4th 385, 398 (2001). Dr. Rosenthal's calculations, specifically the *out-of-pocket* refund model and *Wyeth Profit* model, provide a reasonable basis and constitute a suitable method under Plaintiff's theory of liability by which to calculate restitutionary disgorgement. The Court finds Dr. Rosenthal's opinions would assist the trier of fact with deciding a pertinent factual issue, namely determining restitutionary damages. Accordingly, Defendants' motion to exclude Plaintiff's expert opinion is **DENIED**. Defendants' motion for summary judgment with respect to Plaintiff's claims for restitution under the UCL is **DENIED**. Defendants' motion for partial summary judgment limiting recovery to the amount actually paid by Plaintiff and class members, up to $590.2 million, is **GRANTED**.

---

Court instead relies on the plain language of *Cal. Bus. & Prof. Code* § 17203 and the statutory interpretation by California's highest Court requiring an "ownership interest in the property."

[14] See fn.6 *supra* for the underlying methodology used in calculating the out-of-pocket cost of the class.

Based on the foregoing, IT IS HEREBY ORDERED:

1.  Defendants' Motion to Exclude the Testimony of Meredith Rosenthal (doc. no. 317) is **DENIED**.

2.  Defendants' motion for Summary Judgement (doc. no. 341) is **GRANTED IN PART** and **DENIED IN PART**.

    a.  Defendants' motion for summary judgment as to actual damages pursuant to the CLRA is **GRANTED.**

    b.  Defendants' motion for summary judgment with respect to Plaintiff's claims for restitution is **DENIED**

    c.  Defendants' motion for partial summary judgment limiting restitution to the out-of-pocket costs paid by Plaintiff and class members is **GRANTED**.

**IT IS SO ORDERED**.

DATED: July 1, 2019

_____
HON. JOHN A. HOUSTON
UNITED STATES DISTRICT JUDGE